1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                  FOR THE EASTERN DISTRICT OF CALIFORNIA

10   LANCE IAN OSBAND,

11              Petitioner,                    No. CIV S-97-0152 WBS KJM

12        vs.                                  DEATH PENALTY CASE

13   JILL BROWN,
     Acting Warden of San Quentin
14   State Prison,
                    Respondent.               ORDER
15   _____/

16              Petitioner's motion for an evidentiary hearing was heard before the undersigned

17   on February 11, 2005.  Connie Alvarez appeared for petitioner.  Ward Campbell appeared for

18   respondent.  Upon review of the motion and the documents in support and opposition, upon

19   hearing the arguments of counsel and good cause appearing therefor, the court finds and orders as

20   follows.

21   /////

22   /////

23   /////

24   /////

25

26

                                                1

BACKGROUND FACTS[1]

I. Guilt Phase

   A. Prosecution Case

      1. Killing of Lois Skuse

        Just before noon on October 6, 1985, the son and daughter-in-law of 66-year-old Lois Minnie Skuse found her body on the floor of the bedroom of her Sacramento apartment. Her son first saw the body; he cried out "almost instantaneous[ly]" on entering the bedroom from a short hallway. As her daughter-in-law explained: "All of the drawers in her dresser had been dumped" on top of the body so that she and her husband could only "see her legs kind of halfway out from underneath the pile" formed by the drawers and clothing. She called to her husband not to touch anything because there might be fingerprints, and she summoned the police, who arrived while she was still on the phone. A coroner's deputy saw "one leg and part of another" protruding from underneath the pile.

        The bedroom had been ransacked.  In addition to the drawers and clothing atop Skuse's body, papers and boxes lay on the bed.  Her purse's contents had been emptied onto the bed, and her car keys and wallet were missing.  Skuse's television set also was missing.  And the padlock to her garage was unlocked, which was unusual.  A knife drawer in the kitchen was open, a position in which Skuse, a careful housekeeper, would not have left it.  After Skuse died, her son and daughter-in-law moved a knife set of Skuse's to their house along with other personal effects.  A police officer showed her daughter-in-law a photograph of a knife, or the item itself, and it was similar to the type found in that set.  However, she could not say that a knife was missing from the set.

/////

---

[1] This overview of the facts is derived from the California Supreme Court's findings of facts, which are presumed to be correct, 28 U.S.C. § 2254(d), and from the court's independent review of the state court record.

1    When the police permitted Skuse's son and daughter-in-law to reenter the home,

2    they recovered $14,000 in envelopes in various hidden locations.  Empty envelopes were

3    scattered "all over the place."  The United States Postal Service mailed Skuse's wallet to her son

4    and daughter-in-law; they received it about two weeks after the killing.

5    The coroner's deputy examined the scene.  Skuse had "some fragments" of

6    clothing on.  "There was what appeared to be a pair of panties that had been either cut or ripped,

7    where the crotch was not in its normal position with respect to where it should be. [¶] The

8    waistband was still around the waist...."  The deputy collected samples of fluid from Skuse's

9    pubic area.  An impression of defendant's palm print was found on one of the dresser drawers

10   lying on the body--a police officer testified that he believed it was the topmost drawer in the pile,

11   located near Skuse's head--and impressions of his fingerprints or thumbprints were found on a

12   small turquoise tissue box located atop the dresser, on the tissue paper itself, and on an envelope

13   and a box lid that were found on the bed.  Shoe print impressions apparently formed by blood

14   and consistent with those made by the type of shoe defendant owned were found in the

15   apartment.

16   The pathologist who performed an autopsy on Skuse testified that he found a

17   one-and-three-quarter-inch-deep V-shaped stab wound on the right side of her neck.  It could

18   have been caused by a serrated knife found near Skuse's head.  The wound was not "a simple

19   slit-like stab wound[, as] if one stabbed a knife in an apple...."  Rather, it had "two arms to it, as

20   if there were two separate stab wounds in the same area" or as if "movement had occurred while

21   the knife went in one direction ... [and] was twisted slightly, and removed, making two cuts

22   rather than one."  If the product of a single insertion, its shape could also have been caused by

23   movement by Skuse rather than twisting of the knife.  It had almost completely severed her

24   carotid artery, and was the cause of death, which would likely have occurred very quickly but not

25   instantaneously.  In addition, the pathologist testified that a rib and various facial bones,

26   including the upper jawbone, were broken, consistent with Skuse's having been beaten.

3

1  Epidermal and other injuries also revealed that she had been severely beaten about the face. The

2  pathologist found sperm in her urethra, vagina, and vaginal introitus. He also testified that Skuse

3  suffered from osteoporosis or "soft bones" that in turn caused kyphosis, i.e., a stooped or

4  hunchbacked condition.

5           2.  Attack on Norma C.

6           Early in the evening of October 21, 1985, Gloria Luevano was waiting outside the

7  gymnasium at St. Patrick's Elementary School in Sacramento County when 51-year-old Norma

8  C., covered with blood and with "one shoe on and one shoe off with one nylon," came up to her.

9  Ms. Luevano went for help and when it arrived she showed a police officer where the second

10 grade classroom was located.  The blinds to that classroom were closed, whereas those to the

11 first, third, and fourth grade classrooms were open.

12          Norma C., a second grade teacher, testified that she was grading workbooks at

13 5:20 to 5:25 that afternoon.  The classroom curtains were open.  She was wearing boots that

14 zipped up almost to the knee.  Defendant entered the room, strode quickly toward her, threw her

15 on the floor and, without a word, started beating and choking her, hitting her at least 15 times.

16 Bleeding profusely, Norma C. told him that she had a daughter and that she hoped he would not

17 kill her.  He dragged her--by her arms, she was fairly certain, although a sheriff's deputy

18 experienced in analyzing bloodstain patterns thought that she was dragged by her feet or legs--to

19 the back of the room and asked her if she had any money.  (She was uncertain whether she was

20 dragged on her back or on her stomach.)  Although her glasses had been knocked off and her

21 eyesight was dimmed by blood, she could see him going through her purse, which had both paper

22 money and coins in it.  She was fully clothed at that time.  Then she blacked out.  She next

23 recalled being lifted into an ambulance.  By the time she arrived at the hospital, she had

24 discovered that her undergarments and one boot were missing.  She could not remember telling a

25 police officer at the hospital, in effect, that she had been raped.  She identified defendant in the

26 /////

courtroom as the man who had battered her, and also testified that she had identified him in a photographic lineup.

Norma C. testified that she was left with a broken jaw and teeth and fractured facial bones. She lost her sense of smell and parts of her face remained numb at the time of trial. She had been lacerated, and had also received "three large incisions, ... [including] one ... which was near my neck vein." She had been required "to go and have some tests to see whether or not my jugular vein had been severed." She did not keep a knife in the classroom. There were, however, scissors that were evidently not in plain sight. She did not see a weapon in defendant's hand. Norma C. also testified that she did not try to defend herself because the force of defendant's attack on her convinced her that he intended to kill her in any event and she did not want to increase her suffering.

A police officer testified that five to ten minutes after he arrived at 6:20 p.m. he went to the second grade classroom to try to apprehend the culprit. The curtains were drawn. He looked inside the classroom to see whether a suspect might still be there and, observing no one, guarded it for an hour until investigators could arrive and collect evidence. Another police officer testified that the drapes were drawn when she arrived and that she found a stain that appeared to be caused by blood on the inside edge of one of them. Still another officer testified that there was blood at several locations on the classroom floor. And another officer testified that he gathered up the spilled contents of a purse and the purse itself from the floor, retrieving $1.68 entirely in coins. He saw no money inside the purse, although he did not conduct a thorough search of it. He also found and collected a "wad of clothing" consisting of "[l]ady's underpants, a pair of pantyhose that were turned inside out, and inside the leg of one pantyhose at the foot was a woman's shoe or boot." The underpants and pantyhose were torn. An identification technician for the Sacramento Police Department who inventoried the purse's contents testified that she found $4.99 in coins but no paper money.

/////

Defendant's fingerprints were found in the classroom.  Shoe print impressions apparently formed by blood also were found. There was testimony that they were likely made by defendant's shoes.

A doctor who treated Norma C. on the evening of the attack testified that she had a laceration within about an inch from the carotid artery accompanied by swelling of that side of her neck.  The swelling raised the possibility that "the carotid artery that supplies blood to the brain had been partially transected, such that the blood would leave the vascular channel ... into the soft tissue." He also described various facial fractures. She had her jaw immobilized for six weeks and could only drink liquids.

A police officer acknowledged on cross-examination that Norma C. told him from her hospital bed that she was unable to see defendant during the attack because of the blood in her eyes

3.  Post-arrest Forensic Analysis

When defendant was arrested, he was wearing Nike tennis shoes. They were introduced into evidence.  There was testimony that 20 percent of the Black population, including defendant, has type B blood.  Skuse had type O blood.  Norma C. has type A blood. Defendant's shoes had been exposed to type O blood and also to blood that could have come from individuals with types A and B or an individual with type AB.  There also was testimony that fluid on swabs containing semen found in Skuse's vaginal area tested positive for type B and type O antigens. The former could have been contributed by defendant, and either he or Skuse could have contributed the latter.  A purple robe that Skuse was wearing was semen stained; the semen reacted to a test for type B antigen, consistent with what defendant could produce.

4.  Post-arrest Interrogation

On October 22, 1985, defendant told a homicide detective that he had never visited the Skuse apartment. When told that his fingerprints had been found there, he could offer no explanation for their possible presence.  He also denied ever having been inside St. Patrick's

6

Elementary School and could not understand why his fingerprints might be found in a second grade classroom there.

B. <u>Defense Case</u>

Defendant testified on his own behalf and, contrary to his pretrial statement to the police, acknowledged having been at both crime scenes. He also admitted wearing at both scenes the shoes that were seized on his arrest. With regard to Skuse's killing, defendant testified, "I didn't do any murder." He described two Black males who were carrying a television set down the stairs leading from Skuse's apartment. He asked them if they were moving and they said they were. He asked whether the apartment was for rent and they told him to talk to the manager. They loaded the television into a red truck. He tried to find the manager but could not. He saw the solid door to Skuse's apartment open and the screen door ajar, and, getting no response from inside, entered. He found the bedroom in disarray but saw nobody, dead or alive. He did touch surfaces inside the house. He took nothing from the apartment; he was there for two to three minutes and then continued on his way. When he was arrested the day after he attacked Norma C., the police asked him about a homicide that had occurred at Skuse's apartment. That scared him and he denied being at the apartment or the elementary school.

On cross-examination, defendant admitted he inspected a jewelry box in the apartment but found nothing valuable. He also admitted, as he had on direct examination, that he entered the apartment with the idea of stealing something. When he entered the bedroom, the light was dim, and although he saw no blood, he did not know whether he might have stepped in any.

Defendant admitted he attacked Norma C. He testified that he did so out of upset: evidently his car had run out of gasoline and stalled nearby, he was having other car trouble, and he had been unable to resolve a traffic ticket earlier that day. He beat Norma C. and then dragged her to the back of the room, tearing her pantyhose. When she volunteered to give him money he emptied the contents of her purse onto the floor but, finding only coins, took nothing. He had no

weapon, did not rape or attempt to rape her, and did not intend to kill her.  He left, went back to his car, and finally obtained gasoline by siphoning it from another car.

On cross-examination, defendant admitted that he entered the classroom with the intent to steal and that he attacked Norma C. "more or less" because, in the prosecutor's words, he was "having a bad day."  He did not know why he did not drag her by the ankles rather than her pantyhose, why her torn underpants should have been found on the floor, or whether he turned out the light or pulled the drapes on leaving.  He did not know how she could have been stabbed in the neck.  He did nothing to try to get medical help for her.  After he left and siphoned gasoline out of the car, he went with some friends to buy some beer, had a few drinks, and returned home.  Defendant testified that he was of average strength at the time of the crimes.

There was evidence for the defense beyond that presented by defendant's testimony.  Defense counsel adduced evidence that a pair of yellow sunglasses found on Skuse's bed did not belong to her or to defendant.  Fingerprint impressions belonging to unknown individuals were found on other property taken from the scene of the killing, and it was impossible to determine how long defendant's fingerprint impressions might have been present on the property recovered from the premises.  Skuse's son conceded in testimony that when he found her, he could see only her ankles.  The criminalist acknowledged that Nike is a common brand of shoe and that he had not learned how many shoes with defendant's sole pattern had been sold in Northern California. It was conceivable that shoes of different size could have the same size and design of sole pattern.  The criminalist also stated that the type B activity found on Skuse's purple robe could have been caused by bacterial contamination, although such an event would be unusual.  Bacteria present in fecal matter found on the robe could have altered the analysis of the stains also found on it, and could themselves generate type B activity, in which case the seminal stains could have been caused by anybody.  Indeed, all the swabs that tested positive for semen could have been so contaminated, although there was no visual indication that they were.  The criminologist did not see any unusual bacteria.

C.   Prosecution Rebuttal Case

A police officer testified that there was blood only in the bedroom of the Skuse apartment and that he found it on the floor "[a]bout and under the victim and at her feet."  The blood at her feet consisted of that left by shoe-print impressions, and some shoe print impressions lay underneath her lower legs.  The only pooled blood in the apartment lay directly under Skuse's torso.

II.  Penalty Phase

A.  Prosecution Case

In aggravation, the prosecution introduced evidence of defendant's prior violent criminal activity.  Dorothy Cossman, who was approaching her seventieth birthday at the time, was walking on a sidewalk on September 1, 1984, when she sensed that someone was fast approaching by bicycle and preparing to snatch her purse.  She clutched it and wheeled around to ward off the perceived impending robbery.  A person on a bicycle struck her in the buttocks but did not seize the purse. She was not injured or knocked to the ground.  She could remember few details of the incident.  A police officer testified, however, that defendant was detained and arrested and that Cossman identified him in a show-up as the culprit.  On cross-examination defendant elicited the officer's belief that he pleaded guilty to misdemeanor battery.  It was later stipulated that he did so.

Fourteen-year-old Angela M. was walking to school on March 26, 1984, when defendant offered her a ride.  Instead he took her to a house where he forced her into a bedroom, kissed her repeatedly, fondled her over her brassiere, and told her she could not leave "'until I get what I want, and I want to make love to you[ ]'...."  He was interrupted by the sound of the front door being unlocked and opened, and she was able to flee and run to her aunt's house.  At some point during the incident defendant apologized for his misconduct.  Angela's mother called the police.  Angela testified that defendant later warned her that "if anyone pressed charges against him, someone was going to get hurt."  On cross-examination, asked whether she recalled that

9

1  defendant was convicted of battery, Angela M. testified that she thought he was convicted of

2  statutory rape.  After her testimony the parties stipulated that he pled no contest to a

3  misdemeanor battery charge.

4      B.  Defense Case

5          The defense presented sixteen witnesses in mitigation.  The defense case showed

6  that defendant was a relatively normal, somewhat quiet child who turned to alcohol and drugs

7  during his teen years.  The principal at the elementary school defendant attended until the end of

8  fourth grade testified that he presented no major discipline problems, was friendly with other

9  students, and was a "nice kid."  There was testimony from a pastor that he attended church until

10  his early teens and still believed in Christianity.  An older sister testified that he led an uneventful

11  childhood until age thirteen.  There was testimony that at about age seventeen he took it on

12  himself for three months to care for a sick woman who had nobody else to help her--he was at

13  her house every night and did chores for her, ignoring an opportunity to steal hundreds of dollars

14  from her purse.  And a teacher testified that defendant received a high school diploma in jail--he

15  was the first person to graduate from the independent study program in which he was

16  enrolled--that he wanted to continue formal study, and that he was a very motivated student.

17          Defendant was nineteen years old when he killed Skuse and attempted to kill

18  Norma C.  A number of defendant's friends and neighbors testified that he started drinking beer

19  with friends in sixth grade and soon was dabbling in marijuana use.  He began using other drugs

20  such as methamphetamine, phencyclidine-laced cigarettes, and cocaine, and his circle of friends

21  changed.  In the six months before he was arrested, he was regularly intoxicated by drugs and

22  alcohol, and when "loaded" he was susceptible to personality changes.  His drug and alcohol

23  abuse caused him to become more frenetic, and he began to neglect his once meticulously

24  maintained automobile.

25          A watch commander at the Sacramento County Jail testified that in the two years

26  defendant had been incarcerated since his arrest, he had not been a particular problem, and agreed

1   that defendant had "adjusted fairly well to the jail setting."  Dr. Grover, a neuropsychologist,

2   opined that defendant would adjust well to life in a prison setting.  He based that opinion largely

3   on: (1) defendant's good behavior in jail and the fact he had completed his high school education

4   while there; (2) the limited availability of drugs in prison (because Dr. Grover felt defendant's

5   "aberrant behavior prior to his arrest was the direct result of drug use"); (3) test results showing

6   no indication defendant had any cognitive impairment or brain damage; and (4) defendant's

7   school records, which showed a decline as defendant began taking drugs.  On cross-examination,

8   Dr. Grover admitted that defendant told him he was convicted because the jury was corrupt, that

9   if he were released he would be on methamphetamine or crack cocaine, and that, in the

10  prosecutor's words, "he's been a problem ever since he was born and just didn't fit into society."

11          Other testimony described defendant's background and character.  His girlfriend

12  of several years' standing expressed loyalty toward him and testified that she would like to marry

13  him.  The two had a son who was twenty months old when she testified.

14          At closing argument, counsel for defendant stressed the unpleasantness of prison

15  life and emphasized that life imprisonment without possibility of parole was a very severe

16  punishment.  He insisted that defendant was not so entirely devoid of humanity or the ability ever

17  to contribute to society that he deserved execution, and he urged the jury to show mercy to him

18  and compassion for his girlfriend, mother, and infant son.

19                          <u>PROCEDURAL HISTORY</u>

20          Petitioner was charged with the October 5, 1985 murder of Lois Skuse, the

21  burglary of the Skuse residence, and the robbery and forcible rape of Skuse.  The three special

22  circumstances alleged were that the murder was in the first degree and committed during: (1) a

23  burglary; (2) a robbery; and (3) after raping Skuse.  Petitioner also was charged with attempting

24  to murder Norma C., burglary of her classroom, robbing her, and assaulting her with intent to

25  rape her.

26          Opening statements in petitioner's trial commenced on November 18, 1987.  On

1   December 11, 1987, the jury rendered a guilty verdict on all counts except an allegation that a

2   knife was used in the attack on Norma C.  The jury found the murder of Skuse and the burglary

3   were offenses committed in the first degree.  The burglary of Norma C.'s classroom was found to

4   be in the second degree.

5            The penalty phase commenced on January 11, 1988.  On January 22, 1988, the

6   jury entered a verdict of death.  After lengthy record correction proceedings, petitioner's

7   automatic appeal was heard by the California Supreme Court in April 1996.  On July 29, 1996,

8   the California Supreme Court affirmed petitioner's judgment and sentence.  People v. Osband, 13

9   Cal. 4th 622 (1996).  The United States Supreme Court denied certiorari on January 6, 1997.

10  Osband v. California, 519 U.S. 1061 (1997).  On July 22, 1997, petitioner filed a petition for writ

11  of habeas corpus in the California Supreme Court.  On October 28, 1998, the state court denied

12  that petition.  In re Osband, No. S063051.

13           Petitioner initiated the present action on January 30, 1997.  Proceedings here were

14  stayed pending filing and resolution of state habeas proceedings.  Petitioner then filed a federal

15  habeas corpus petition on March 12, 1999 and an amended petition on June 24, 1999.

16                               LEGAL STANDARDS

17           The standard for determining whether an evidentiary hearing is appropriate is set

18  forth in the federal statute governing habeas corpus writs:

19              If the applicant has failed to develop the factual basis of a
                claim in State court proceedings, the court shall not hold an
20              evidentiary hearing on the claim unless the applicant shows that –

21              (A) the claim relies on –
                 (I) a new rule of constitutional law, made
22              retroactive to cases on collateral review by the
                Supreme Court, that was previously unavailable; or
23               (ii) a factual predicate that could not have been
                previously discovered through the exercise of due
24              diligence; and

25  /////

26  /////

> (B)   the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2).  The first step is to "determine whether a factual basis exists in the record to support the petitioner's claims."  Baja v. Ducharme, 187 F.3d 1075, 1078 (9th Cir. 1999).  If the facts do not exist or are inadequate and a hearing might be appropriate, then

> "[the] court's first task in determining whether to grant an evidentiary hearing is to ascertain whether the petitioner has 'failed to develop the factual basis of a claim in State court.'  If so, the court must deny a hearing unless the applicant establishes one of the two narrow exceptions set forth in §2254(e)(2)(A) & (B).  If, on the other hand, the applicant has not 'failed to develop' the facts in state court, the district court may proceed to consider whether a hearing is appropriate, or required under Townsend."

Id. (quoting Cardwell v. Greene, 152 F.3d 331, 337 (4th Cir. 1998), overruled on other grounds, Bell v. Jarvis, 236 F.3d 149 (4th Cir. 2000)).

A petitioner will only be charged with a "failure to develop" the facts if "there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." Williams v. Taylor, 529 U.S. 420, 432 (2000).  The petitioner must have "made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court."  Id. at 435.  "Diligence will require in the usual case that the prisoner, at a minimum, seek an evidentiary hearing in the state court in the manner prescribed by state law."  Id. at 437.

In Townsend v. Sain, 372 U.S. 293, 307-09 (1963), the United States Supreme Court held that an evidentiary hearing is mandatory where (a) petitioner's allegations of fact, if true, would entitle petitioner to relief, (b) there is a dispute over a material fact, and (c) the merits of the factual dispute were not resolved at a state hearing or there are substantial allegations of newly discovered evidence.[2]  See also Jones v. Wood, 114 F.3d 1002, 1010 (9th Cir. 1997).  The

---

[2]  The Court in Townsend listed six factors:  "(1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the

1    Court in Townsend noted that a district court has the discretion to hold a hearing even if the

2    standards set out above are not met.  Townsend, 372 U.S. at 318; Hillery v. Pulley, 533 F. Supp.

3    1189, 1204 (E.D. Cal. 1982) ("[E]ven  where not otherwise mandated, the federal court has the

4    discretion to hold an evidentiary hearing particularly where material issues of fact are in

5    dispute.").  But the Court warned that this power should not be wasted on frivolous claims.

6    Townsend, 372 U.S. at 318.  The amended habeas statute does not further limit this discretion

7    once a petitioner meets the prerequisites of section 2254(e)(2).  Clark v. Johnson, 202 F.3d 760,

8    765 (5th Cir. 2000).

9               "Factors relevant to the District Court's discretionary determination include the

10   existence of a factual dispute, the strength of the proffered evidence, the thoroughness of prior

11   proceedings, and the nature of the state court determination."  Pagan v. Keane, 984 F.2d 61, 64

12   (2d Cir. 1993) (citations omitted).  While the state court determination should be considered, it is

13   not dispositive at this stage.  "The attachment of the presumption of correctness to a particular

14   finding of fact does not deprive the federal district court of the discretion to hold an evidentiary

15   hearing."  Knaubert v. Goldsmith, 791 F.2d 722, 727 n.3 (9th Cir. 1986) (emphasis in original);

16   Richmond v. Ricketts, 774 F.2d 957, 962 (9th Cir. 1985); Pagan, 984 F.2d at 64.

17                                        ANALYSIS

18   I.  Ineffective Assistance of Counsel for Failure to Investigate and Present Evidence of Innocence
     - Claim I
19

20               Petitioner argues that his counsel failed to investigate and present evidence that

21

22   record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to
     afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence;
23   (5) the material facts were not adequately developed at the state-court hearing; or (6) for any
     reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact
24   hearing."  372 U.S. at 313.  The fifth factor was overruled in Keeney v. Tamayo-Reyes, 504 U.S.
     1 (1992).  In Keeney, the Court held that a petitioner who failed to develop facts in state court
25   must show cause and prejudice.  The Supreme Court has held that the 1996 amendments to the
     habeas statute codified the Keeney "failure to develop" standard in the first clause of
26   §2254(e)(2).  Williams, 529 U.S. at 434.

                                            14

two other individuals were responsible for the murder.  The claim in this court rests primarily on a letter received by counsel well before trial.  The letter was sent to petitioner's mother.  It was signed "Secret witness."  The letter identified two "boys" "that knows a plenty about the crime" as W.J. Thomas and Richard Williams.  It appears that the letter was meant to help petitioner, though the sentence that might indicate such an intent is missing the word "help" - "I hope this will Lance whom I don't know much but I knew some of the family."  Pet'r's Oct. 1, 2003 Mot. for Evid. Hrg. ("Motion"), Ex. A.

Petitioner presented a good deal of factual support for this claim to the California Supreme Court.  He submitted three declarations stating that others admitted to committing the Skuse murder.  State Habeas Pet., Exs. 9 (Gibson Decl.) and 26 (Flynn and Breaux Decls.).[3]  The declarants state they were not contacted by defense counsel before trial.  What the state record lacks is any indication of just what trial counsel did as a result of receiving this letter and to investigate other suspects.  Because a hearing, therefore, may be appropriate to resolve this claim, the next question is whether the failure to develop additional evidence was petitioner's fault.

Respondent argues that because petitioner himself knew the identity of the supposed true perpetrators but did not tell his attorney until after the guilt phase, he has "failed to develop the factual basis" of this claim within the meaning of section 2254(e)(2).  Respondent has some support for this argument.  In 1999, a Colorado district court examined whether or not a petitioner was entitled to an evidentiary hearing on a claim that his trial counsel was ineffective for failing to investigate and present evidence of childhood abuse.  Rodriguez v. Zavaras, 42 F. Supp. 2d 1052, 1055-56 (D. Colo. 1999).  The court found the petitioner "failed to develop the

---

[3] At oral argument, the undersigned noted that the three volumes of the state habeas exhibits lodged here did not contain tabs indicating which documents constitute which exhibits. Petitioner's counsel offered to tab the court's copy of the exhibits.  On February 23, 2005, an employee of the Federal Defender's Office tabbed the exhibits, and separately tabbed the many documents in exhibits 9, 19, and 26, in the court's lodged copies of the state habeas exhibits.

1    basis of his claim in state court" because he did not tell his attorney about the abuse when asked.

2              Respondent's argument does not directly address the "failure to develop" analysis.

3    The federal court's job is to review the decision of the state high court on the issue raised: was

4    counsel ineffective for failing to investigate and present evidence of innocence.  Petitioner raised

5    this ineffective assistance claim in his habeas petition before the California Supreme Court.

6    State Habeas Pet. at 127-134.  The California Supreme Court denied petitioner's ineffective

7    assistance claim on the merits.  <u>See</u> <u>In re Osband</u>, No. S063051 (Oct. 28, 1998).[4]  The question at

8    this point is whether petitioner was at fault for failing to provide the state court with the facts

9    alleged here for the first time.  That evidence is not the identity of the "true perpetrators."  The

10   allegation that W.J. Thomas and Richard Williams were the killers was raised before the

11   California Supreme Court.  The evidence raised here for the first time consists of interviews with

12   and declarations of petitioner's friends indicating that they knew Thomas and Williams were

13   involved in the crime.  The issue respondent raises really goes to the merits of petitioner's claim

14   – whether an attorney has a duty to conduct an investigation on a theory that contravenes what

15   her client tells her.

16             Respondent next argues that petitioner could have, but did not, present to the state

17   court some of the factual bases for this claim that he presents now.  Petitioner relies on the

18   interviews or declarations of:  Shawn Flynn, Aubrey Richey, Jamie Breaux, Eric Gibson, W.J.

19   Thomas, and Joe Blackwell.  Motion, Exs. C-I.  Respondent alleges that the 1988 interviews of

20   Blackwell, Gibson, and Thomas were available but were not presented to the California Supreme

21   Court.  Respondent also alleges there is no showing why petitioner could not have presented the

22   declaration of Aubrey Richey earlier.

23             First, while petitioner did not present the transcripts of the interviews with

24   Blackwell, Gibson, and Thomas, he argued the substance of those interviews below.  In his state

25   _____

26       [4]  The California Supreme Court's full order is shown on the case docket available on-line
     at: http://appellatecases.courtinfo.ca.gov/search/dockets.cfm?dist=0&doc_id=62912.

1    habeas petition, petitioner argued that counsel failed to investigate the involvement of Thomas

2    and Williams based on the secret witness letter.  State Habeas Pet. at 127, 128, 130, 133-134.

3    The argument refers to interviews made by a defense investigator in preparation for the penalty

4    phase.  The state petition states that the investigator "began interviewing petitioner's friends and

5    began acquiring evidence that the V Street events [the murder] were perpetrated by persons other

6    than petitioner."  Id. at 131-132.  The state petition then describes the information contained in

7    the interview transcripts now submitted by counsel.  Id.  In addition, state habeas counsel

8    presented declarations of Gibson, Breaux, and Flynn, all of whom state that someone else

9    committed the murder.  The gist of the Richey Declaration is the same.  Motion, Ex. D.

10              California law requires petitioner to submit all "reasonably available documentary

11   evidence" in support of a habeas petition.  E.g., People v. Duvall, 9 Cal. 4th 464, 474 (1995).

12   The court in Duvall held the petition should "both (i) state fully and with particularity the facts

13   on which relief is sought, as well as (ii) include copies of reasonably available documentary

14   evidence supporting the claim, including pertinent portions of trial transcripts and affidavits or

15   declarations."  Id.  "Conclusory allegations made without any explanation of the basis for the

16   allegations do not warrant relief, let alone an evidentiary hearing."  Id. (citations omitted).   Thus,

17   the documentary evidence required was sworn testimony, i.e., "trial transcripts and affidavits or

18   declarations."  The statements of Blackwell, Gibson, and Thomas are contained only in

19   transcripts of a defense investigator's interviews.  Because these transcripts are not the sort of

20   sworn testimony the California Supreme Court described in Duvall, it does not appear that at the

21   time of trial state law required they be presented.

22              With regard to the Richey declaration, it does not change the nature of petitioner's

23   state claim.  State habeas counsel submitted an impressive amount of information in support of

24   the claim.  Because the state court denied an evidentiary hearing, petitioner did not have an

25   opportunity to present more.  Petitioner presented with his state petition almost all the evidence

26   now presented here.  He should not be charged with a failure to develop.  Cf. Williams v.

17

1    <u>Taylor</u>, 529 U.S. 420, 432 (2000).

2         Because petitioner did not "fail to develop" his claim in state court, the final

3    question is whether or not an evidentiary hearing is necessary.  In this instance, petitioner's claim

4    has merit.  Case law indicates that counsel may have a duty to investigate guilt-phase theories

5    that conflict with the story told by his or her client.  <u>Phillips v. Woodford</u>, 267 F.3d 966, 978-79

6    (9th Cir. 2001); <u>Johnson v. Baldwin</u>, 114 F.3d 835 (9th Cir. 1997).  Petitioner's claim is supported

7    by the declarations of several friends who say others confessed to the murder.  An evidentiary

8    hearing is necessary to test the reliability of those friends' statements, and to hear from trial

9    counsel.[5]

10   II.  <u>Petitioner's Competence to Stand Trial - Claim V</u>

11        Petitioner alleges here (a) he was denied due process because he was tried while

12   incompetent, (b) the trial court failed to conduct a hearing on his competence, and (c) trial

13   counsel was ineffective for failing to investigate and present evidence of his incompetence.  As

14   petitioner points out, the second part of the claim must be considered on the record before the

15   trial court at the time of trial.  Petitioner argues an evidentiary hearing is necessary on the other

16   two issues to show his attorney acted unreasonably and petitioner suffered from mental deficits

17   that prohibited him from having the ability "to consult with his lawyer with a reasonable degree

18   of rational understanding--and a rational as well as factual understanding of the proceedings

19   against him."  <u>Dusky v. United States</u>, 362 U.S. 402 (1960); <u>Hernandez v. Ylst</u>, 930 F.2d 714,

20   716 n. 2 (9th Cir. 1991).

21

22       [5]  The undersigned recognizes that petitioner's trial counsel did have the unidentified
     fingerprints from both the Skuse murder and the Carolo attempted murder compared to the prints
23   of W.J. Thomas and Richard Williams.  RT XV:3709 ("Reporter's Transcript," with citation to
     volume and page number); State Habeas Pet. at 132 n. 84.  The comparisons showed no matches.
24   Petitioner's fingerprints, however, were found at both crime scenes.  While this information will
     be important in analyzing the prejudice component of petitioner's ineffective assistance claim, it
25   is not so dispositive as to negate the necessity of an evidentiary hearing on the reasonableness of
     counsel's conduct.

26

1       Prior to trial, petitioner moved for new counsel.  His attorney, public defender

2  Burt Loehr, made this request due to a breakdown in his relationship with petitioner. One of the

3  main sources of conflict was a severance motion: petitioner wanted the murder and rape counts

4  severed; Loehr did not.[6]  Loehr felt strongly that the jury would be even more prejudiced against

5  petitioner at a penalty phase if it did not hear about the rape until then.  RTIC I:16-17.

6       It does not appear, as petitioner alleges, that Loehr directly raised the issue of

7  petitioner's competence.  The record shows that petitioner made a motion to substitute counsel.

8  RTIC I:3. The trial court appointed attorney Brian Christiansen to investigate the attorney/client

9  conflict and advise the court.  Id. at 12.  Mr. Christiansen informed the court that he and Mr.

10 Loehr felt that, if petitioner was going to make a decision on severance, his competence to do so

11 should be examined.  Id. at 13-14.  Mr. Loehr told the court that he had had petitioner examined

12 by "two psychologists and a psychiatrist, and no one has informed me that he is 1368

13 [incompetent to be tried]."[7]  The court even noted that it should perhaps appoint an expert to

14 examine petitioner even though "I know that you are not expressing a doubt at the present time."

15 RTIC I:15-16.

16      The trial court appointed Dr. Mehtani to examine petitioner.  RTIC I:22.  Dr.

17 Mehtani concluded petitioner was not competent.  Motion, Ex. K.  This finding was based, in part,

18 on petitioner's refusal to interact with his attorney.  Mehtani stated that while petitioner appeared

19 to understand the charges against him, he did not appear to understand the role of the public

20 _____

21      [6]  Another source of conflict was petitioner's desire to contest his presence in Skuse's
   apartment at the time of the murder, a position Loehr evidently thought untenable given the
22 presence of petitioner's fingerprints on various items in the apartment. Record of Transcript of
   In Camera Hearings re Petitioner's Motion to Substitute Counsel I:17, 20 ("RTIC," with citation
23 to volume and page numbers).

24      [7]  Petitioner did not submit these three mental health determinations to the California
   Supreme Court.  They were discovered by respondent in discovery ordered by this court.  These
25 mental health determinations are covered by the August 10, 2000 protective order.  Any
   information contained in the determinations, or in other documents covered by the protective
26 order, is filed under seal.  See Apr. 26, 2005 Order.  An addendum to this order will be filed
   concurrently with discussion of protected information relevant to this issue.

1  defender, the district attorney, or the judge.  Id.  At a second hearing on the motion to substitute

2  counsel, Mr. Christiansen also stated that he felt petitioner's paranoia and inability to trust or

3  cooperate with counsel was a reflection of his relationship with Mr. Loehr and that the

4  appointment of new counsel might avoid the necessity of competency proceedings.  RTIC III:2.[8]

5  The trial judge asked Christiansen and Loehr whether they doubted petitioner's competency.  Id.

6  at 4.  Both replied they did not.  Id.  A couple days later, Loehr submitted a letter to the court

7  indicating he did not believe petitioner was incompetent.  CT II:414 ("Clerk's Transcript," with

8  citation to volume and page number).

9      The trial court then appointed new counsel, Vincent O'Brien.  Upon doing so, the

10  judge asked Mehtani to examine petitioner again.[9]  In his letter to Mehtani, the judge stated "Both

11  Mr. Loehr and the other counsel representing defendant [for purposes of the substitution motion]

12  Mr. Christiansen, also stated to the Court that it was their opinion that the defendant was

13  competent to assist counsel other than Mr. Loehr in the conduct of a defense in a rational

14  manner."  State's Informal Resp. to Pet'r's State Hab. Pet., Ex. H.  Only a month after his first

15  report to the judge, Dr. Mehtani concluded that petitioner now was competent because he was

16  apparently cooperating with the new attorney.  Motion, Ex. K.  Petitioner argues Mehtani did not

17  examine petitioner to come to this conclusion.  Mehtani only spoke briefly with petitioner prior to

18  testifying on December 30, 1986 that petitioner now was competent.  RTIC II:3-6 (Mehtani

19  testified simply that petitioner "is not incompetent at this time" and was "capable of cooperating

20  with his attorney in a rational manner").  The trial judge then found no substantial evidence

21  petitioner was incapable of understanding the proceedings or assisting his counsel.  Id. at 6.

22      In preparation for the penalty phase, petitioner's trial counsel had another mental

23

24  [8]   The RTIC volumes are labeled confusingly.  The hearing reflected in Volume III
precedes the hearing reflected in Volume II, chronologically speaking.  Dr. Mehtani did not
testify at the second hearing.  He did testify briefly at the third hearing.

25

26  [9]   In requesting the reexamination, the judge effectively was following a process
suggested by prior defense counsel Loehr.  CT II:415.

1   health expert, Dr. Grover, examine petitioner.  Dr. Grover did not find petitioner incompetent and

2   testified that petitioner was not mentally impaired.

3            Petitioner sufficiently developed the facts related to this claim in state court.[10]  The

4   record submitted to the California Supreme Court on habeas includes a declaration by

5   psychologist Karen Froming concluding that petitioner was "disabled with respect to his ability to

6   understand the legal proceedings."  Motion, Ex. J at 10.  Dr. Froming does not conclude petitioner

7   was incompetent but only that petitioner's "competence should have been in question throughout

8   the proceedings."  Id.  In this court, petitioner submits two new mental health evaluations of

9   petitioner.  Both were conducted  after the conclusion of the state habeas proceeding.  Motion,

10  Exs. M and N.[11]  Neuropsychologist Anne Huff concluded petitioner has paranoid schizophrenia.

11  Motion, Ex. M at 9.  Psychiatrist Pablo Stewart concluded "to a reasonable degree of psychiatric

12  certainty that Mr. Osband suffers from a variety of mental illnesses that, together and separately,

13  . . . would have made him incompetent to stand trial."  Motion, Ex. N at 22.  Without an

14  evidentiary hearing in state court, petitioner cannot be expected to present everything he may,

15  with new counsel and new funding, present here.  Petitioner's state court submissions show

16  sufficient development of the facts given the evidentiary limitations imposed by the California

17  Supreme Court.

18           Petitioner argues a hearing is necessary to resolve disputes between experts over

19  petitioner's competency.  He also states that this court must determine whether the prior experts

20  "met the standard of care for mental health experts in capital cases."  There is no constitutionally

21  protected standard of care for mental health experts.  Harris v. Vasquez, 949 F.2d 1497, 1517-18

22  (9th Cir. 1990). The pertinent issues, thus, are whether counsel acted reasonably and whether

23

24        [10]  Respondent does not argue this issue in her briefs.  At oral argument, counsel for
    respondent stated that he was not conceding the issue by failing to argue it.

25        [11]  Dr. Huff's interviews with petitioner were conducted in 2002.  Motion, Ex. M.  She
    prepared her report in September 2003.  Dr. Stewart's report does not indicate when he
26  conducted the interviews and is not otherwise dated.  Motion, Ex. N.

1    petitioner was, in fact, incompetent.

2             The undersigned finds it unlikely petitioner can succeed on the merits of this claim.

3    It does not appear petitioner will be able to establish even a reasonable probability that he was

4    incompetent at trial.  The record contains numerous opinions that petitioner was competent.[12]  Mr.

5    Loehr, who had represented petitioner for over a year, made it clear to the court that he did not

6    doubt petitioner's competence.  Mr. Christiansen, who met with petitioner at the time to discuss

7    his relationship with counsel, also had no doubt about petitioner's competence.  The opinion of

8    trial counsel is entitled to substantial weight.  See Torres v. Prunty, 223 F.3d 1103, 1109 (9th Cir.

9    2000) (citing Medina v. California, 505 U.S. 437, 450 (1992)).  Counsel is in the best position to

10   determine whether or not a defendant meets the standard of competence by having the "ability to

11   consult with his lawyer with a reasonable degree of rational understanding."  Dusky, 362 U.S. at

12   402.  It is worth noting that the two attorneys subsequently appointed to represent petitioner,

13   Vincent O'Brien and Richard Reese, never raised the issue of his competence.  See Boyde v.

14   Brown, No. 02-99008, 2005 WL 913434, at *5 (9th Cir. Apr. 21, 2005).

15            On the other hand, petitioner presents the declaration of Dr. Stewart that petitioner

16   was incompetent.  The undersigned gives Dr. Stewart's report little weight primarily because it

17   was made at least ten, and probably closer to fifteen, years after petitioner's trial.  Federal courts

18   are reluctant to rely on retroactive determinations of competency.  E.g., Pate v. Robinson, 383

19   U.S. 375, 386 (1966); Dusky, 362 U.S. at 403; Boyde, 2005 WL 913434, at *4-5; Williams v.

20   Woodford, 384 F.3d 567, 610 (9th Cir. 2004).

21            Petitioner also relies upon Dr. Mehtani's initial opinion that petitioner was not

22   competent.  This opinion is troubling.  While Dr. Mehtani's second letter to the court states that

23   his "primary reason" for finding petitioner incompetent was petitioner's inability to cooperate

24   with his counsel, Dr. Mehtani did not examine petitioner a second time before changing his

25

26            [12]  See sealed addendum to this order, described in note 7, supra.

22

1  opinion to conclude petitioner was competent.  Motion, Ex. K.  Dr. Mehtani's testimony consisted

2  only of very brief responses to very specific and brief questioning. RTIC II:3-6.  The record taken

3  as a whole strongly suggests petitioner's problems were a direct result of his poor relationship

4  with Mr. Loehr rather than a lack of competence.  However, Dr. Mehtani's testimony would be

5  helpful to clarify the record and could provide the court with a basis for ordering an evidentiary

6  hearing on this issue.  Accordingly, at this point in the proceeding, the undersigned will hear only

7  the testimony of Dr. Mehtani regarding petitioner's claim of incompetence.  Thereafter, the

8  undersigned will reevaluate the strength of petitioner's claim and determine whether a further

9  evidentiary hearing is warranted.

10  III.  <u>Excessive Security and Shackling - Claim VI</u>

11          Petitioner argues jurors saw him shackled during jury selection and trial, violating

12  his due process rights.  Petitioner provides the declarations of a juror who saw petitioner in

13  handcuffs and noted that he was always seated with two guards behind him, and of an alternate

14  juror who stated petitioner "wore shackles during the trial."  The alternate juror does not explain

15  what she means by "shackles" or "during the trial."  Motion, Ex. O.  Petitioner claims he was

16  chained around his waist to a chair.  Petitioner also argues before this court that the excessive

17  security measures exacerbated petitioner's mental problems and affected his ability to be fully

18  present at trial.

19          Respondent argues the record is complete and nothing justifies an evidentiary

20  hearing on this claim.  However, respondent points out factual issues such as whether petitioner's

21  chair was significantly different from everyone else's chair and whether petitioner was being

22  guarded by two guards or a guard and a bailiff.   In the Answer, respondent also points out that

23  when the issue of courtroom security was raised at the beginning of trial, the judge ordered just

24  one bailiff, no security chair, and no security chain.  RT II:22-23; <u>cf.</u> RT II:111 (discussion of

25  timing of unhandcuffing of petitioner before jury brought into courtroom).

26          An evidentiary hearing is required only if petitioner can succeed on his claim.

1   Jones v. Wood, 114 F.3d 1002, 1010 (9th Cir. 1997).  Even if everything petitioner alleges is true,

2   he cannot succeed.  With respect to the allegation of excessive security, the court of appeals has

3   noted:

> Our review of security arrangements is very limited:  All a federal
> court may do in such a situation is look at the scene presented to
> jurors and determine whether what they saw was so inherently
> prejudicial as to pose an unacceptable threat to defendant's right to a
> fair trial; if the challenged practice is not found inherently
> prejudicial and if the defendant fails to show actual prejudice, the
> inquiry is over.

8   Ainsworth v. Calderon, 138 F.3d 787, 797 (9th Cir. 1998).  The court found "the ratio of guards to

9   defendants was 2:1, with no more than two deputies positioned behind [defendant].  On these

10  facts, we find nothing inherently prejudicial in the security arrangements for two defendants

11  charged with capital murder."  Id. (citing King v. Rowland, 977 F.2d 1354, 1358 (9th Cir. 1992)

12  (upholding ratio of three armed guards to single defendant)); see also Williams, 384 F.3d at 589

13  ("We conclude that Williams has failed to allege facts that, if proven, would demonstrate that an

14  excessive use of conspicuous security guards at his trial unconstitutionally deprived him of a fair

15  trial.").  Petitioner's apparent argument that two guards amounted to excessive security cannot

16  succeed.

17          With respect to petitioner's allegation that jurors saw him shackled, the

18  declarations he presents are not particularly helpful.  First, "a jury's brief or inadvertent glimpse of

19  a defendant in physical restraints outside of the courtroom does not warrant habeas relief unless

20  the petitioner makes an affirmative showing of prejudice."  Williams, 384 F.3d at 593.  Second,

21  the declaration of the alternate juror lacks specificity and conflicts with the trial transcript, which

22  shows petitioner was not restrained by a security chain.  See id. at 588 (conclusory allegations by

23  counsel that are unsworn and unsupported by any proof or offer of proof do not provide an

24  adequate basis to obtain a federal evidentiary hearing).  Without some sort of showing that

25  petitioner was, in fact, shackled during trial, an evidentiary hearing is not warranted on this claim.

26  /////

IV.  Right to Expert Assistance - Claim VII

Claim VII appears to include allegations that (1) petitioner received incompetent assistance of mental health experts both at the guilt and penalty phases; and (2) petitioner's trial counsel was ineffective for failing to prepare the experts and for relying on their inadequate opinions.[13]   Ninth Circuit case law is clear that a defendant does not have a constitutional right to "competent" mental health assistance.  Harris v. Vasquez, 949 F.2d 1497, 1517-18 (9th Cir. 1990); Williams v. Vasquez, 817 F. Supp. 1443, 1468 (E.D. Cal. 1993), aff'd, 52 F.3d 1465 (9th Cir. 1995).  Therefore, petitioner can succeed only on the allegations of ineffective assistance of counsel, discussed below.

V.  Ineffective Assistance of Counsel at the Guilt Phase - Claim VIII

Petitioner claims counsel was ineffective for failing to present a coherent defense and for failing to develop a mental defense, including a mental defense based on drug use or taking account of the effect of drug use on petitioner's sub par mental functioning.  Petitioner effectively concedes that the issue of the coherency of the defense can be decided primarily on the record.  Without even arguing the point, petitioner notes that if the court has questions about the reasonableness of counsel's strategy, then petitioner should be able to present expert testimony that counsel acted unreasonably.

With respect to the failure to develop a mental defense,  the Court of Appeals has held counsel has different duties at the guilt and penalty phases with respect to mental health experts.  At the guilt phase, counsel does not have an obligation to provide retained mental health experts with background materials absent a specific request by the expert.  Hendricks v. Calderon, 70 F.3d 1032, 1038-39 (9th Cir. 1995).  "In general, an attorney is entitled to rely on the opinions of mental health experts in deciding whether to pursue an insanity or diminished capacity

---

[13]   Respondent argues petitioner has not properly raised the ineffective assistance aspect of this claim.  Whether or not respondent is correct that this aspect of claim VII is inadequately plead,  the issue of counsel's interactions with the experts is addressed in claims VIII and XX and will be analyzed in the court's consideration of those claims.

1   defense." Id. at 1038.  Requiring counsel to "second-guess their experts . . . would effectively

2   eliminate the legitimate role experts play in guiding and narrowing an attorney's investigation."

3   Id. at 1039.  Accordingly, petitioner must show either that counsel acted unreasonably in hiring

4   the mental health expert or that counsel unreasonably failed to suspect the expert's advice was

5   unsound.  See Washington v. Murray, 952 F.2d 1472, 1481-82 (4th Cir. 1991); Jones v. Murray,

6   947 F.2d 1106, 1112 (4th Cir. 1991).[14]

7          In Silva v. Woodford, the Court of Appeals held the trial attorney had a right to

8   rely on a mental examination that was far less extensive than the examinations conducted in the

9   present case.  Silva's attorney, Mr. Buckwalter, at his client's request, conducted no inquiry into

10  Silva's past.  He "never obtained or examined available records that might have alerted him to

11  Silva's mental health history, incarceration record, history of drug usage, and family background.

12  Although Buckwalter hired a psychiatrist to evaluate Silva, he provided no information or

13  direction on the type of evaluation to be performed. The resulting evaluation was, in the words of

14  the psychiatrist himself, Dr. Albert French, 'suboptimal;' he interviewed Silva for 45 minutes,

15  during which time Silva was unwilling to speak candidly because he believed the phone used for

16  the interview was being monitored by prison authorities."  279 F.3d 825, 829-30 (9th Cir. 2002).

17  The court held:

18         Although Buckwalter certainly could have done more to prepare Dr.
           French and to look into Silva's criminal substance abuse and mental
19         health history, we believe that he met the constitutional minimum in
           that he engaged and consulted Dr. French, received an unfavorable
20         opinion from him with respect to the availability of psychiatric
           defenses, and reasonably relied on that conclusion to focus his
21         energies elsewhere. Hence, Buckwalter obtained sufficient
           information from Dr. French about the viability of mental defenses
22         during the guilt phase to make an informed decision about trial
           strategy. Put another way, given that mental defenses to charges of
23         premeditated murder are rarely successful during the guilt phase, it
           was not unreasonable for Buckwalter to forego such a trial strategy

24

25         [14] Expectations for the penalty phase are different.  In Wallace v. Stewart, 184 F.3d 1112,
      1117 (9th Cir. 1999), the court held that an attorney may render ineffective assistance at the
26    penalty phase for failing to investigate and adequately prepare expert witnesses.

1
2

in light of the evaluation he received from Dr. French. We therefore
conclude that Buckwalter was not deficient in his failure to prepare
and present a mental defense during the guilt phase.

3   Id. at 850.

4      Petitioner has not made any showing that his trial counsel unreasonably chose

5   experts or unreasonably failed to suspect that his experts' advice was unsound.  Accordingly, an

6   evidentiary hearing is not necessary on this issue.  With respect to petitioner's claim of an

7   "incoherent" defense, because the undersigned can evaluate the reasonableness of counsel's

8   conduct without the assistance of a Strickland expert, an evidentiary hearing is not required on

9   this aspect of claim VIII either.[15]

10   VI.   Ineffective Assistance for Calling Petitioner to Testify at Guilt Phase - Claim IX

11      Claim IX is that counsel was ineffective by calling petitioner to testify at the guilt

12   phase both because petitioner was not competent to do so and because petitioner's testimony, that

13   he was in Skuse's apartment, conflicted with counsel's earlier attempts to discredit prosecution

14   evidence that petitioner was there.

15      Petitioner's testimony regarding the beating of Norma C. did little, if anything, to

16   help his case.  Petitioner testified that he beat Norma C. because "more or less I had a little anger

17   from what had went on that earlier [sic] day."  RT XII:2840.  Petitioner had been unable to get a

18   traffic matter resolved in court, had car problems, then ran out of gas.  Id. at 2833-2837, 2839.  He

19   testified that he was looking for money in Norma C.'s classroom and that he did not have a

20   weapon, did not rape her, and did not intend to kill her.  Id. at 2840, 2843, 2875.

21      With respect to the murder of Lois Skuse, petitioner testified that he was on his

22   way to a counseling center when he saw two men carrying a television out of an apartment

23   complex.  RT XII:2852-2854.  He asked if they were moving and whether the apartment might be

24

25
26

[15]  Because the "incoherent defense" issue revolves around the admission of petitioner's
testimony, and the undersigned will order a hearing on the reasonableness of counsel's decision
to allow petitioner to testify, it will, to some extent, be subject to consideration in light of any
new evidence presented.

1    available.  Id. at 2854-2855.  They told him to speak with the apartment manager.  Id.  When

2    petitioner looked around for the apartment manager, he noticed a door open.  Id. at 2856.  He

3    knocked and upon receiving no response, entered the apartment.  Id. at 2857-2858.  He admitted

4    on cross-examination that he entered the apartment intending to steal something.  Id. at 2869.

5    When he entered the bedroom, he saw "a lot of stuff thrown around," but did not see anyone there.

6    Id. at 2859-2861.  He looked around, picked up a few things, and left without taking anything.  Id.

7    at 2862, 2905-2907.

8            It is not clear just what petitioner seeks to present at any evidentiary hearing on this

9    claim.  As stated above, the undersigned does not feel testimony of a Strickland expert is

10   necessary.  However, given the incriminating nature of some of petitioner's testimony and the fact

11   that this claim is intertwined with the issue of counsel's investigation of third-party culpability,

12   an evidentiary hearing is necessary so that the court may hear from petitioner's trial attorneys.

13   VII.  Impermissible Factors Influenced Decisions to Charge and Impose Death  - Claim XIV

14           This court has denied petitioner discovery on this claim twice.  June 23, 2000

15   Order at 8; June 6, 2002 Order.  The basis for each prior denial was petitioner's failure to show

16   how he could succeed on the claim.  Petitioner presents no new evidence or arguments to support

17   his claim.  For the reasons stated in the June 23, 2000 and June 6, 2002 orders, petitioner's request

18   for an evidentiary hearing on claim XIV is denied.

19   VIII.  Ineffective Assistance of Counsel at the Penalty Phase - Claim XX

20           Petitioner makes two arguments.  First, he argues counsel was ineffective in the

21   way he handled defense mental health expert Dr. Grover.  Petitioner seeks to present expert

22   testimony that reasonable counsel would have prohibited tape recording of the expert's interview

23   with petitioner and would have been present during the interview.  As a result of these failures,

24   according to petitioner, Dr. Grover testified to information regarding juvenile acts committed by

25   petitioner that otherwise would not have come before the jury.  Dr. Grover testified about his

26   knowledge of petitioner's prior crimes as follows:

1           Beginning at about age thirteen, there was burglary, auto; I believe
that was in a county car parking lot or storage lot; a stealing of a
2           bicycle from another juvenile.  I think Mr. Osband was – must have
been about thirteen or fourteen then; trespass and resisting arrest in
3           '83, an arrest that started out with a charge of attempt to rape in '84,
and then there was one where there was an apparent assault against
4           an elderly woman.  I believe it was a Japanese woman.  I'm not real
clear on that one.

5

6  RT XIV:3502-3503.

7           The prosecutor also used the transcript of Grover's interviews with petitioner to

8  bring to the jury's attention comments by petitioner that: (1) his jury had been paid off by the

9  District Attorney to find him guilty at the guilt phase; (2) if he was on the street he would be

10  taking crank or crack; (3) he referred to himself as "Robin Hood' but meant that he was "the poor

11  to be given to;" (4) he "used to terrorize folks" and when he saw someone who had "something

12  better than he had, he'd just take it;" and (5) "he's been a problem ever since he was born and just

13  didn't fit into society."  RT XIV:3508-3509.  Later, the prosecutor read part of the transcript of

14  Grover's interview with petitioner in which petitioner told Grover he knew the jury would

15  sentence him to life without parole because he was young, these were his first felonies, and the

16  jury would have some doubt he was guilty.  RT XV:3543.

17           The undersigned is able to analyze the reasonableness of counsel's decision to

18  permit the mental health expert to tape petitioner's interview without the assistance of a

19  Strickland expert.  Because the undersigned will order an evidentiary hearing on counsel's

20  conduct at the penalty phase generally, and must consider the cumulative effect of all counsel's

21  errors at the penalty phase, the court will hear testimony from petitioner's counsel on the issue of

22  counsel's handling of Dr. Grover.  See Phillips v. Woodford, 267 F.3d 966, 985 (9th Cir. 2001)

23  (court must consider cumulative prejudice in determining whether an evidentiary hearing is

24  appropriate on various claims).

25           The second aspect of claim XX is an allegation that counsel failed to investigate

26  and present mitigating evidence.  The defense case at the penalty phase consisted mostly of

1  testimony that: (1)  petitioner, then 19 years old, had been a nice child; (2) petitioner had been

2  generous to some people in need; (3) he had a girlfriend, a small child, and others who cared

3  about him; (4) petitioner increased his drug and alcohol use significantly in the six months before

4  the crimes; and (5) petitioner had behaved well in jail and would adjust well to prison life.

5  Petitioner argues trial counsel should have more thoroughly investigated and presented evidence

6  of: (1) petitioner's family mental health history, including the fact both his parents had been

7  involuntarily committed at least once each; (2) petitioner's disadvantaged background; (3)

8  physical, emotional, and sexual abuse petitioner suffered as a child; and (4) the effects of

9  petitioner's drug and alcohol abuse on his mental health.  Because it appears petitioner presented

10  this evidence to the California Supreme Court, he has not "failed to develop" this claim.

11          Respondent argues petitioner's trial attorney had much of the information

12  petitioner now claims should have been introduced.  Therefore, according to respondent, the

13  defense made a tactical choice to present a "redemption-type" case in mitigation.

14          To establish deficient performance, a petitioner must demonstrate that counsel's

15  representation "fell below an objective standard of reasonableness." Wiggins v. Smith, 539 U.S.

16  510, 521 (2003) (quoting Strickland v. Washington, 466 U.S. 668, 688 (1984)).  Reasonableness

17  is determined "'under prevailing professional norms.'" Id.  The Supreme Court has

18  "acknowledged the essential importance of developing the background and character of a

19  defendant in order to make an individualized assessment of the appropriateness of the death

20  penalty" for trials occurring before petitioner's 1982 trial.  Ainsworth v. Woodford, 268 F.3d 868,

21  877 (9th Cir. 2001) (citing Penry v. Lynaugh, 492 U.S. 302, 319 (1989), abrogated on other

22  grounds, Atkins v. Virginia, 536 U.S. 304 (2002)).  At the time of petitioner's trial, a defense

23  attorney's "obligation" to investigate and present at the penalty phase evidence of the background

24  and character of the defendant was "an integral thread in the fabric of constitutionally effective

25  representation." Id.; Bean v. Calderon, 163 F.3d 1073, 1080 (9th Cir. 1998).

26          In cases, such as this one, where it is alleged that counsel's actions reflect a tactical

1    judgment to take, or not to take, a course of action, the Court in Strickland explained:

2              [S]trategic choices made after thorough investigation of law and
               facts relevant to plausible options are virtually unchallengeable;
3              and strategic choices made after less than complete investigation
               are reasonable precisely to the extent that reasonable professional
4              judgments support the limitations on investigation. In other words,
               counsel has a duty to make reasonable investigations or to make a
5              reasonable decision that makes particular investigations
               unnecessary. In any ineffectiveness case, a particular decision not to
6              investigate must be directly assessed for reasonableness in all the
               circumstances, applying a heavy measure of deference to counsel's
7              judgments.

8    Strickland, 466 U.S. at 690-91, quoted in Wiggins, 539 U.S. at 521-22. Thus, "judicial deference

9    to counsel is predicated on counsel's performance of sufficient investigation and preparation to

10   make reasonably informed, reasonably sound judgments." Mayfield v. Woodford, 270 F.3d 915,

11   927 (9th Cir. 2001) (citing Strickland, 466 U.S. at 691).  Labeling a decision "trial strategy" does

12   not "automatically immunize an attorney's performance" from Sixth Amendment challenge.

13   United States v. Span, 75 F.3d 1383, 1389 (9th Cir. 1996) (internal quotations omitted).  "Rather

14   certain defense strategies may be so ill-chosen that they may render counsel's overall

15   representation constitutionally defective." Brodit v. Cambra, 350 F.3d 985, 1003 (9th Cir. 2003)

16   (internal quotations omitted), cert. denied, 124 S. Ct. 2888 (2004).  An unreasonable strategy may

17   amount to ineffective assistance if "'some other action would have better protected a defendant

18   and was reasonably foreseeable as such before trial.'" United States v. Tucker, 716 F.2d 576, 586

19   (9th Cir. 1983) (quoting Beasley v. United States, 491 F.2d 687, 696 (6th Cir. 1974)).

20              Petitioner has submitted a mountain of the sort of mitigating evidence that courts

21   have found relevant "because of the belief, long held by this society, that defendants who commit

22   criminal acts that are attributable to a disadvantaged background, or to emotional or mental

23   problems, may be less culpable than defendants who have no such excuse." Ainsworth, 268 F.3d

24   at 877 (citing Penry, 492 U.S. at 319); Boyde, 2005 WL 913434, at *13. The breadth of the

25   evidence submitted requires this court to give petitioner's claim of ineffective assistance serious

26   attention.  The record is, however, lacking in one significant respect.  It does not contain any

31

1  testimony by petitioner's trial attorneys about what they did and why.   Accordingly, the

2  undersigned finds an evidentiary hearing necessary to consider the reasonableness of counsel's

3  conduct.[16]   The second prong of the <u>Strickland</u> test, whether counsel's unreasonable conduct

4  prejudiced petitioner, will be examined later, if necessary.

5  IX.  <u>Cumulative Effect of Errors - Claims XVII and XXIV</u>

6  　　　　These claims do not provide the basis for an evidentiary hearing on their own.  As

7  described above, the court will take evidence on some claims that, when combined with the

8  prejudicial effect of other claims, may entitle petitioner to relief.

9  X.  <u>Petitioner is not Competent to be Executed - Claim XXVIII</u>

10  　　　　Petitioner admits this claim is not ripe.  His request for an evidentiary hearing will

11  be dismissed without prejudice to its renewal at an appropriate time.

12  　　　　For the foregoing reasons, and good cause appearing, IT IS HEREBY ORDERED

13  as follows:

14  　　　　1.  Petitioner's October 1, 2003 Motion for an Evidentiary Hearing is granted in

15  part and denied in part.  The undersigned will hold an evidentiary hearing on the following claims:

16  　　　　　　a.  Claim I,

17  　　　　　　b.  Claim V - limited at this time to the testimony of Dr. Mehtani,

18  　　　　　　c.  Claim IX - limited to the testimony of petitioner's trial counsel, and

19  　　　　　　d.  Claim XX - limited at this time to an examination of the reasonableness

20  　　　　　　　　of petitioner's trial counsel's conduct.

21  Petitioner's motion is denied in all other respects.

22  /////

23  /////

24  /////

25  _____

26  　　[16]  Again, the undersigned finds the testimony of a <u>Strickland</u> expert unnecessary to the consideration of this issue.

1         2.  On June 1, 2005 at 10:00 a.m., the undersigned will hold a status conference.

2  Counsel need not file status reports but shall be prepared to discuss procedures and a schedule for

3  preparing for and conducting an evidentiary hearing.

4  DATED:  May 10, 2005.

5

6  _____
   UNITED STATES MAGISTRATE JUDGE

7

8

9

10
   osbandevi.or
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26