1
2
3
4
5
6
7
8               UNITED STATES DISTRICT COURT

9             FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   LANCE IAN OSBAND,                          No.  2:97-cv-000152 KJM KJN

12               Petitioner,                     **DEATH PENALTY CASE**

13        v.

14   KEVIN CHAPPELL,                             FINDINGS & RECOMMENDATIONS

15               Respondents.

16

17        Petitioner is a state prisoner under sentence of death.  Pending before the Court are the

18   parties' briefs on the application of 28 U.S.C. § 2254(d) to Claims I, V, IX, and XX in the

19   operative Amended Petition for Writ of Habeas Corpus.  (ECF Nos. 629, 659, 693.)[1]  After

20   careful consideration of the parties' briefs and of the state court record, the undersigned concludes

21   that the state court's denials of Claims I, V, and IX are entitled to deference, and that its denial of

22   Claim XX, subclaim C, is not entitled to deference.  Accordingly, the undersigned recommends

23   that Claim I; Claim V; Claim IX; and subclaims A, B, D, E, F, and G of Claim XX of the

24   Amended Petition be dismissed.

25                                      **FACTS**

26        The following facts are derived from the California Supreme Court's October 16, 1996,

27   _____

28   [1] "ECF" refers to this court's electronic case filing and docketing system.

                                      1

opinion affirming the judgment.  See People v. Osband, 13 Cal.4th 622, 653-61 (1996).  The state court's factual recitation is entitled to deference absent clear and convincing evidence to the contrary.  Mejia v. Garcia, 534 F.3d 1036, 1039 n.1 (9th Cir. 2008).  Here, neither party disputes the factual accuracy of the evidentiary record, as described in the California Supreme Court's direct appeal opinion.  (See generally ECF No. 629 at 6, 164, 167, 168; ECF No.  659 at 130, 131, 137, 148.)

## I. The Guilt Phase.

## A. The Prosecution's Case.

### 1. The Killing of Lois Minnie Skuse.

Just before noon on October 6, 1985, the son and daughter-in-law of 66-year-old Lois Minnie Skuse found her body on the floor of the bedroom of her Sacramento apartment. Her son first saw the body; he cried out "almost instantaneous[ly]" on entering the bedroom from a short hallway. As her daughter-in-law explained: "All of the drawers in her dresser had been dumped" on top of the body so that she and her husband could only "see her legs kind of halfway out from underneath the pile" formed by the drawers and clothing. She called to her husband not to touch anything because there might be fingerprints, and she summoned the police, who arrived while she was still on the phone. A coroner's deputy saw "one leg and part of another" protruding from underneath the pile.

The bedroom had been ransacked. In addition to the drawers and clothing atop Skuse's body, papers and boxes lay on the bed. Her purse's contents had also been emptied onto the bed, and her car keys and wallet were missing.

Skuse's television set was also missing. And the padlock to her garage was unlocked, which was unusual. A knife drawer in the kitchen was open, a position in which Skuse, a careful housekeeper, would not have left it. After Skuse died, her son and daughter-in-law moved a knife set of Skuse's to their house along with other personal effects. A police officer showed her daughter-in-law a photograph of a knife, or the item itself, and it was similar to the type found in that set. However, she could not say that a knife was missing from the set.

When the police permitted Skuse's son and daughter-in-law to reenter the home, they recovered $14,000 in envelopes in various hidden locations. Empty envelopes were scattered "all over the place."

The United States Postal Service mailed Skuse's wallet to her son and daughter-in-law. Those individuals received it about two weeks after the killing.

2

The coroner's deputy examined the scene. Skuse had "some fragments" of clothing on. "There was what appeared to be a pair of panties that had been either cut or ripped, where the crotch was not in its normal position with respect to where it should be. [¶] The waistband was still around the waist . . . ." The deputy collected samples of fluid from Skuse's pubic area.

An impression of defendant's palm print was found on one of the dresser drawers lying on the body—a police officer testified that he believed it was the topmost drawer in the pile, located near Skuse's head—and impressions of his fingerprints or thumbprints were found on a small turquoise tissue box located atop the dresser, on the tissue paper itself, and on an envelope and a box lid that were found on the bed. Shoe print impressions apparently formed by blood and consistent with those made by the type of shoe defendant owned were found in the apartment.

The pathologist who performed an autopsy on Skuse testified that he found a one-and-three-quarter-inch-deep V-shaped stab wound on the right side of her neck. It could have been caused by a serrated knife found near Skuse's head. The wound was not "a simple slit-like stab wound[, as] if one stabbed a knife in an apple . . . ." Rather, it had "two arms to it, as if there were two separate stab wounds in the same area" or as if "movement had occurred while the knife went in one direction . . . [and] was twisted slightly, and removed, making two cuts rather than one." If the product of a single insertion, its shape could also have been caused by movement by Skuse rather than twisting of the knife. It had almost completely severed her carotid artery, and was the cause of death, which would likely have occurred very quickly but not instantaneously.

In addition, the pathologist testified that a rib and various facial bones, including the upper jawbone, were broken, consistent with Skuse's having been beaten. Epidermal and other injuries also revealed that she had been severely beaten about the face. The pathologist found sperm in her urethra, vagina, and vaginal introitus. He also testified that Skuse suffered from osteoporosis or "soft bones" that in turn caused kyphosis, i.e., a stooped or hunchbacked condition.

### 2. The Attack on Norma C.

Early in the evening of October 21, 1985, Gloria Luevano was waiting outside the gymnasium at St. Patrick's Elementary School in Sacramento County when 51-year-old Norma C., covered with blood and with "one shoe on and one shoe off with one nylon," came up to her. She went for help and when it arrived she showed a police officer where the second grade classroom was located. The blinds to that classroom were closed, whereas those to the first, third, and fourth grade classrooms were open.

Norma C., the second grade teacher, testified that she was grading workbooks at 5:20 to 5:25 that afternoon. The classroom curtains were open. She was wearing boots that zipped up almost to the

knee. Defendant entered the room, strode quickly toward her, threw her on the floor and, without a word, started beating and choking her, hitting her at least 15 times. Bleeding profusely, Norma C. told him that she had a daughter and that she hoped he would not kill her. He dragged her—by her arms, she was fairly certain, although a sheriff's deputy experienced in analyzing bloodstain patterns thought that she was dragged by her feet or legs—to the back of the room and asked her if she had any money. (She was uncertain whether she was dragged on her back or on her stomach.) Although her glasses had been knocked off and her eyesight was dimmed by blood, she could see him going through her purse, which had both paper money and coins in it. She was fully clothed at that time. Then she blacked out. She next recalled being lifted into an ambulance. By the time she arrived at the hospital, she had discovered that her undergarments and one boot were missing. She could not remember telling a police officer at the hospital, in effect, that she had been raped. She identified defendant in the courtroom as the man who had battered her, and also testified that she had identified him in a photographic lineup.

Norma C. testified that she was left with a broken jaw and teeth and fractured facial bones. She lost her sense of smell and parts of her face remained numb at the time of trial. She had been lacerated, and had also received "three large incisions, . . . [including] one . . . which was near my neck vein." She had been required "to go and have some tests to see whether or not my jugular vein had been severed." She did not keep a knife in the classroom. There were, however, scissors that were evidently not in plain sight. She did not see a weapon in defendant's hand.

Norma C. also testified that she did not try to defend herself because the force of defendant's attack on her convinced her that he intended to kill her in any event and she did not want to increase her suffering.

A police officer testified that five to ten minutes after he arrived at 6:20 p.m. he went to the second-grade classroom to try to apprehend the culprit. The curtains were drawn. He looked inside the classroom to see whether a suspect might still be there and, observing no one, guarded it for an hour until investigators could arrive and collect evidence.

Another police officer testified that the drapes were drawn when she arrived and that she found a stain that appeared to be caused by blood on the inside edge of one of them. Still another officer testified that there was blood at several locations on the classroom floor. And another officer testified that he gathered up the spilled contents of a purse and the purse itself from the floor, retrieving $1.68 entirely in coins. He saw no money inside the purse, although he did not conduct a thorough search of it. He also found and collected a "wad of clothing" consisting of "[l]ady's underpants, a pair of pantyhose that were turned inside out, and inside the leg of one pantyhose at the foot was a woman's shoe or boot." The underpants and pantyhose were torn.

4

An identification technician for the Sacramento Police Department who inventoried the purse's contents testified that she found $4.99 in coins but no paper money.

Defendant's fingerprints were found in the classroom. Shoe print impressions apparently formed by blood were also found. There was testimony that they were likely made by defendant's shoes.

A doctor who treated Norma C. on the evening of the attack testified that she had a laceration within about an inch from the carotid artery accompanied by swelling of that side of her neck. The swelling raised the possibility that "the carotid artery that supplies blood to the brain had been partially transected, such that the blood would leave the vascular channel ... into the soft tissue." He also described various facial fractures. She had her jaw immobilized for six weeks and could only drink liquids.

A police officer acknowledged on cross-examination that Norma C. told him from her hospital bed that she was unable to see defendant during the attack because of the blood in her eyes.

### 3. Postarrest Forensic Analysis.

When defendant was arrested, he was wearing Nike tennis shoes. They were introduced into evidence.

There was testimony that 20 percent of the Black population, including defendant, have type B blood. Skuse had type O blood. Norma C. had type A blood. Defendant's shoes had been exposed to type O blood and also to blood that could have come from individuals with types A and B or an individual with type AB.

There was also testimony that fluid on swabs containing semen found in Skuse's vaginal area tested positive for type B and type O antigens. The former could have been contributed by defendant, and either he or Skuse could have contributed the latter. A purple robe that Skuse was wearing was semen stained; the semen reacted to a test for type B antigen, consistent with what defendant could produce.

### 4. Postarrest Interrogation.

On October 22, 1985, defendant, evidently having waived his rights under Miranda v. Arizona (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R3d 974] to silence and to counsel, told a homicide detective that he had never visited the Skuse apartment. When told that his fingerprints had been found there, he could offer no explanation for their possible presence. He also denied ever having been inside St. Patrick's Elementary School and could not understand why his fingerprints might be found in a second-grade classroom there.

### B. The Defense's Case.

Defendant testified on his own behalf and, contrary to his pretrial

1   statement to the police, acknowledged having been at both crime
2   scenes. He also admitted wearing at both scenes the shoes that were
    seized on his arrest.

3   With regard to Skuse's killing, the defense was alibi—defendant
    testified, "I didn't do any murder." He described two Black males
4   who were carrying a television set down the stairs leading from
    Skuse's apartment. He asked them if they were moving and they
5   said that they were. He asked whether the apartment was for rent
    and they told him to talk to the manager. They loaded the television
6   into a red truck. He tried to find the manager but could not. He saw
    the solid door to Skuse's apartment open and the screen door ajar,
7   and, getting no response from inside, entered. He found the
    bedroom in disarray but saw nobody, dead or alive. He did touch
8   surfaces inside the house. He took nothing from the apartment; he
    was there for two to three minutes and then continued on his way.
9   When he was arrested the day after he attacked Norma C., the
    police asked him about a homicide that had occurred at Skuse's
10  apartment. That scared him and he denied being at the apartment or
    the elementary school.
11
12  On cross-examination, defendant admitted that he inspected a
    jewelry box in the apartment but found nothing valuable. He also
13  admitted, as he had on direct examination, that he entered the
    apartment with the idea of stealing something. When he entered the
14  bedroom, the light was dim, and although he saw no blood, he did
    not know whether he might have stepped in any.

15  Defendant admitted that he attacked Norma C. He testified that he
    did so out of upset: evidently his car had run out of gasoline and
16  stalled nearby, he was having other car trouble, and he had needed
    to appear in traffic court earlier that day. He dragged her to the back
17  of the room, tearing her pantyhose. When she volunteered to give
    him money he emptied the contents of her purse onto the floor but,
18  finding only coins, took nothing. He had no weapon, did not rape or
    attempt to rape her, and did not intend to kill her. He left, went back
19  to his car, and finally obtained gasoline by siphoning it from
    another car.
20
21  On cross-examination, defendant admitted that he entered the
    classroom with the intent to steal and that he attacked Norma C.
22  "more or less" because, in the prosecutor's words, he was "having a
    bad day." He did not know why he did not drag her by the ankles
23  rather than her pantyhose, why her torn underpants should have
    been found on the floor, or whether he turned out the light or pulled
24  the drapes on leaving. He did not know how she could have been
    stabbed in the neck. He did nothing to try to get medical help for
25  her. After he left and siphoned gasoline out of the car, he went with
    some friends to buy some beer, had a few drinks, and returned
26  home.

27  Defendant testified that he was of average strength at the time of
    the crimes.

28  There was evidence for the defense beyond that presented by

6

defendant's testimony. Defense counsel adduced evidence that a pair of yellow sunglasses found on Skuse's bed did not belong to her or to defendant. Fingerprint impressions belonging to unknown individuals were found on other property taken from the scene of the killing, and it was impossible to determine how long his fingerprint impressions might have been present on the property recovered from the premises.

Skuse's son conceded in testimony that when he found her, he could see only her ankles.

The criminalist acknowledged that Nike is a common brand of shoe and that he had not learned how many shoes with defendant's sole pattern had been sold in Northern California. It was conceivable that shoes of different size could have the same size and design of sole pattern.

The criminalist also stated that the type B activity found on Skuse's purple robe could have been caused by bacterial contamination, although such an event would be unusual. Bacteria present in fecal matter found on the robe could have altered the analysis of the stains also found on it, and could themselves generate type B activity, in which case the seminal stains could have been caused by anybody. Indeed, all the swabs that tested positive for semen could have been so contaminated, although there was no visual indication that they were. However, the criminologist did not see any unusual bacteria.

### C. The Prosecution's Rebuttal Case.

A police officer testified that there was blood only in the bedroom of the Skuse apartment and that he found it on the floor "[a]bout and under the victim and at her feet." The blood at her feet consisted of that left by shoe print impressions, and some shoe print impressions lay underneath her lower legs. The only pooled blood in the apartment lay directly under Skuse's torso.

### II. The Penalty Phase.

### A. The Prosecution's Case.

In aggravation, the prosecution introduced evidence of prior violent criminal activity.

Dorothy Cossman, who was approaching her 70th birthday at the time, was walking on a sidewalk on September 1, 1984, when she sensed that someone was fast approaching by bicycle and preparing to snatch her purse. She clutched it and wheeled around to ward off the perceived impending robbery. A person on a bicycle struck her in the buttocks but did not seize the purse. She was not injured or knocked to the ground. She could remember few details of the incident. A police officer testified, however, that defendant was detained and arrested and that Cossman identified him in a showup as the culprit.

7

1    On cross-examination defendant elicited the officer's belief that he
2    pleaded guilty to misdemeanor battery. It was later stipulated that
     he did so.

3    Fourteen-year-old Angela M. was walking to school on March 26,
     1984, when defendant offered her a ride. Instead he took her to a
4    house where he forced her into a bedroom, kissed her repeatedly,
     fondled her over her brassiere, and told her she could not leave
5    "'until I get what I want, and I want to make love to you[]' . . ." He
     was interrupted by the sound of the front door being unlocked and
6    opened, and she was able to flee and ran to her aunt's house. At
     some point during the incident defendant apologized for his
7    misconduct. Angela's mother called the police. Angela testified that
     defendant later warned her that "if anyone pressed charges against
8    him, someone was going to get hurt."

9    On cross-examination, asked whether she recalled that defendant
     was convicted of battery, Angela M. testified that she thought he
10   was convicted of statutory rape. After her testimony the parties
     stipulated that he pleaded no contest to a misdemeanor battery
11   charge.

12                        **B. The Defense's Case.**

13   The principal at the elementary school defendant attended until the
     end of fourth grade testified that he presented no major discipline
14   problems, was friendly with other students, and was a "nice kid."
     There was testimony from a pastor that he attended church until his
15   early teens and still believed in Christianity. An older sister testified
     that he led an uneventful childhood until age 13. There was
16   testimony that at about age 17 he took it on himself for 3 months to
     care for a sick woman who had nobody else for the task—he was at
17   her house every night and would do chores for her, ignoring an
     opportunity to steal hundreds of dollars from her purse. And a
18   teacher testified that defendant received a high school diploma in
     jail—he was the first person to graduate from the independent study
19   program in which he was enrolled—that he wanted to continue
     formal study, and that he was a very motivated student.
20
     Defendant was 19 years old when he killed Skuse and attempted to
21   kill Norma C. There was testimony that he started drinking beer
     with friends in sixth grade and soon was dabbling in marijuana use.
22   He began using other drugs such as methamphetamine,
     phencyclidine-laced "sherm" cigarettes, and cocaine, and his circle
23   of friends changed. In the six months before he was arrested he was
     regularly intoxicated by drugs and alcohol, and when "loaded" he
24   was susceptible to personality changes. His drug and alcohol abuse
     caused him to become more frenetic, and he began to neglect his
25   once meticulously maintained automobile.

26   A psychologist opined that defendant would adjust well to life in a
     prison setting. On cross-examination, he admitted that defendant
27   told him he was convicted because the jury was corrupt, that if he
     were released he would be on methamphetamine or crack cocaine,
28   and that, in the prosecutor's words, "he's been a problem ever since

                                    8

he was born and just didn't fit into society."

There was other testimony describing defendant's background and character. His girlfriend of several years' standing expressed loyalty toward him and testified that she would like to marry him. The two had a son who was twenty months old when she testified.

At closing argument counsel for defendant stressed the unpleasantness of prison life and emphasized that life imprisonment without possibility of parole was a very severe punishment. He insisted that defendant was not so entirely devoid of humanity or the ability ever to contribute to society that he deserved execution, and he urged the jury to show mercy to him and compassion for his girlfriend, mother, and infant son.

## PROCEDURAL HISTORY

On March 21, 1986, an Information was filed in Sacramento County, California, charging Petitioner with eight criminal counts.  (2 CT 324.)[2]  Counts one through four charged Petitioner with first-degree murder (count one; Penal Code § 187(a));[3] burglary with intent to commit theft and rape (count two; Penal Code § 459); theft (count three; Penal Code § 211); and sexual assault (count four; Penal Code § 261(2)) of victim Lois Skuse on October 5, 1985.  (2 CT 324-26.)  Counts five through eight charged Petitioner with the October 21, 1985 attempted murder (count five; Penal Code §§ 187(a), 664); trespass with intent to commit theft and rape (count six Penal Code § 459); assault with intent to commit rape (count seven; Penal Code § 220); and robbery (count eight; Penal Code § 211) of victim Norma Carolo.  (2 CT 327-29.)  Enhancements for personal use of a knife were alleged for counts one, three, four, five, six, seven, and eight (Penal Code §§ 12022(b), 12022.3(a)) and for causing great bodily injury for counts five, six, seven,

---

[2] "CT" refers to the Clerk's Transcript on Appeal; "ACT" refers to the Augmented Clerk's Transcript on Appeal; "AACT" refers to the Augmented Amended Clerk's Transcript on Appeal, and "RT" refers to the Reporter's Transcript on Appeal, which were lodged on April 13, 1999. (ECF No. 17.)  Herein, for those portions of the trial record, the trial record is cited with the title preceded by a volume number and followed by a page number.  In preparing the record on appeal, the state court also created additional, discrete Reporter's Transcripts memorializing various hearings and pretrial and posttrial proceedings, but these transcripts are not sequentially paginated with the rest of the Reporter's Transcripts.  (See ECF No. 17 at 2, ECF No. 661.)  Thus, for clarity, those discrete Reporter's Transcripts are cited with reference to their Lodged Document number (see footnote 6, post), the date of the proceeding they reflect, and the page number being referenced.

[3] All statutory references are to the California codes, unless otherwise specified.

1   eight (Penal Code § 12022.7).  (2 CT 324-29.)  Relative to count one, the Information also alleged

2   three special circumstances: that the homicide was committed while Petitioner was engaged in

3   and was an accomplice in the commission of or in the attempted commission of burglary,

4   robbery, and rape.  (2 CT 324-25.)

5          Upon arraignment, the Public Defender was appointed to represent Petitioner, with

6   attorney Burton Loehr named as his counsel.  (2 CT 330.)  On July 8, 1986, Petitioner raised a

7   Marsden[4] motion, which the court denied without prejudice.  (2 CT 395.)  The following month,

8   the court appointed Brian Christiansen as Keenan[5] counsel.  (2 CT 399.)  On October 29, 1986,

9   the court appointed Dr. Janak Mehtani to evaluate Petitioner to determine if he was able to

10  understand the nature of the proceedings against him and assist counsel in a rational manner.  (2

11  CT 410, 411.)  On December 3, 1986, Petitioner again raised a Marsden motion.  (2 CT 413.)  At

12  hearing on December 9, 1986, the court granted Petitioner's Marsden motion and appointed

13  Vincent O'Brien as substitute counsel, although continued Mr. Christiansen as Keenan counsel.

14  (2 CT 416.)

15         On December 30, 1986, the court heard testimony from Dr. Mehtani concerning

16  Petitioner's competence and concluded there was insufficient indicia of Petitioner's incompetence

17  to warrant the court declaring a doubt about his competence, per Penal Code section 11368.  (2

18  CT 418; LD 2d Vol. II (Dec. 30, 1986 hearing) at 6.)[6]  At the request of defense counsel, Keenan

19  counsel Christiansen was substituted for Richard Reese on January 8, 1987.  (2 CT 419.)

20         Jury selection began on October 22, 1987, and concluded on November 16, 1987.  (3 CT

---

[4] People v. Marsden, 2 Cal.3d 118 (1970).

[5] Keenan v. Super Ct., 27 Cal.4th 413 (1982).

[6] "LD" refers to the documents lodged, in paper, with this court. The state court record was
lodged on April 13, 1999 (ECF No. 17), with some additional portions of the record lodged on
November 24, 1999 (ECF No. 48); October 8, 2013 (ECF No. 661); and August 28, 2023 (ECF
No. 706).  Herein, the undersigned references the lodged documents by the numbering provided
in the index contained in the Notice of Lodging of Record, filed on April 13, 1999 (see ECF No.
17), and in the index contained in the Notice of Supplemental Lodging of Documents In Paper,
filed on October 8, 2013 (see ECF No. 661), with the exception of the Reporter's and Clerk's
Transcripts, which are referenced in the manner described in footnote 2, ante.

1    694, 710, 732.)  The guilt and special circumstances phase began on November 18, 1987, and the

2    prosecution rested its case-in-chief on December 2, 1987, at which time the prosecutor agreed to

3    dismiss the enhancement alleging personal use of a knife on counts five, six, seven, and eight.  (3

4    CT 737, 746.)  The defense presented their case and rested on December 4, 1987.  (3 CT 748.)

5    The jury was charged on December 10, 1987.  (3 CT 751, 760-853.)  After deliberating for

6    approximately two hours, the jury returned verdicts of guilt on all counts, found all enhancements

7    true, and found all three special circumstances true.  (3 CT 854-66.)

8         The penalty phase began on January 11, 1988.  (3 CT 880.)  The prosecution presented the

9    entirety of its case that day and rested.  (Ibid.)  The defense presented its case over four days and

10   rested on January 19, 1988.  (3 CT 883-86.)  Closing arguments were heard on January 21, 1988,

11   and the jury was instructed the same day.  (3 CT 896.)  After approximately six hours of

12   deliberation, the jury returned a death verdict.  (3 CT 896; 4 CT 969.)  The court subsequently

13   denied Petitioner's motions for a new trial and to modify the verdict and entered judgment on

14   April 8, 1988.  (4 CT 996, 1027-30.)  For the non-homicide counts, Petitioner was sentenced to a

15   total determinate term of twenty-six years and four months.  (4 CT 1030.)

16        Pursuant to state statute, Petitioner's convictions and sentences were automatically

17   appealed to the California Supreme Court.  (LD 3a.)  On July 29, 1996, the California Supreme

18   Court affirmed the judgment in its entirety.  Osband, 13 Cal.4th 622.  Petitioner moved for

19   rehearing.  (LD 3d.)  The California Supreme Court denied rehearing and modified the opinion

20   without altering the judgment on October 16, 1996.  Osband, 13 Cal.4th 622.  Petitioner then

21   sought a writ of certiorari to the United States Supreme Court (LD 3e), which was denied.

22   Osband v. California, 519 U.S. 1061 (1997).

23        Proceedings in this Court commenced on January 30, 1997.  That day, Petitioner filed an

24   application to proceed in forma pauperis, a request for the appointment of counsel, and for a stay

25   of execution.  (ECF Nos. 1-2.)  On February 11, 1997, this Court granted the in forma pauperis

26   application, appointed counsel, and denied the request for a stay of execution, given that

27   Petitioner had no pending execution date.  (ECF No. 3.)  The following month, the then-assigned

28   magistrate judge directed Petitioner to notify the Court when his habeas corpus proceedings in

state court were concluded.  (ECF Nos. 6.)

On July 23, 1997, Petitioner filed a petition for writ of habeas corpus with the California Supreme Court.  (LD 4a, LD 4b; see ECF No. 7.)  Respondent filed an informal response (LD 4c, 4d; see ECF No. 9), and Petitioner filed a reply to the informal response.  (LD 4e, 4f.)  On October 28, 1998, the California Supreme Court denied this petition in full, in a summary order:

> The petition for writ of habeas corpus is denied on the merits.

> In addition, except insofar as they allege ineffective assistance of Counsel, the following claims are barred to the extent that they were raised & rejected on appeal (see *In re Waltreus* (1965) 62 Cal.2d 218, 225): II(C), III, IX(A), and IX(B). And except insofar as they allege ineffective assistance of counsel, the following claims are barred to the extent that they are based solely on the appellate record, and could have been raised on appeal (see *In re Dixon* (1953) 41 Cal.2d 756, 759): II(C), II(D), XI(B), XII, and XVI.

> Mosk, J., is of the view that the Director of the Department of Corrections should be ordered to show cause in this court why the relief prayed for should not be granted on the ground that the superior court erred, as contended in the petitioner's claim VI, when it failed to declare a doubt whether petitioner was mentally competent to stand trial and hold a hearing on his mental competence. (Pen. Code, Sec. 1368, subd.(a); *People v. Zatko* (1978) 80 Cal.App.3d 534, 547-548; *People v. Burney* (1981) 115 Cal.App.3d 497, 503; see *People v. Danielson* (1992) 3 Cal.4th 691, 726; *see also Bradshaw v. Chater* (9th Cir. 1996) 85 F.3d 634 (Westlaw, 1996 Wl 241548) (nonpub. opn.).) He would deny the remaining claims solely on the merits.

> Brown, J., would deny the petition for writ of habeas corpus in its entirety solely on the merits.

(In re Osband, No. S063051 (Cal. Sup. Ct. Oct. 28, 1998); see ECF No. 10.)

On March 12, 1999, Petitioner filed a Petition for Writ of Habeas Corpus in this Court. (ECF No. 14.)  On June 24, 1999, Petitioner filed an Amended Petition for Writ of Habeas Corpus in this Court.  (ECF No. 26.)  On July 27, 1999, Respondent filed an Answer to the Amended Petition.  (ECF No. 32.)

Shortly after the initial petition was filed, Respondent raised the issue of the applicability of 28 U.S.C. sections 2261-66 (Chapter 154) to the instant proceeding, for which the then-assigned magistrate judge ordered briefing by the parties.  (ECF No. 21; see ECF Nos. 31, 40, 41.)  After considering the briefs and argument, on December 16, 1999, the then-assigned

1    magistrate judge denied Respondent's request to schedule the case pursuant to 28 U.S.C. sections

2    2261-66.  (ECF No. 49.)

3         While that briefing was pending, the then-assigned magistrate judge issued a scheduling

4    order for various matters, including ordering the date by which any Traverse should be filed.

5    (ECF No. 39.)  A few months later, on Petitioner's request, the then-assigned magistrate judge

6    vacated those dates, including the deadline for the filing of the Traverse.  (ECF No. 47.)  The

7    Court explained that, "Since the parties will have the opportunity to brief the merits of all claims,

8    the court finds a traverse unnecessary at this stage of the proceedings."  (Ibid.)  To date, no

9    Traverse has been filed.

10        Petitioner and Respondent each filed motions for discovery on April 20, 2000.  (ECF Nos.

11   54, 55.)  After receiving full briefing and hearing argument, the then-assigned magistrate judge

12   granted in part and denied in part both motions on June 23, 2000, and ordered the parties to

13   proceed with discovery immediately.  (ECF No. 64; see ECF Nos. 57, 58, 59, 60.)  Petitioner

14   requested a protective order for certain items of discovery on July 24, 2000, to which Respondent

15   filed an opposition.  (ECF No. 65.)  The then-assigned magistrate judge granted the request on

16   August 10, 2000.  (ECF No. 68.)  Respondent moved for reconsideration, which the district court

17   denied on September 8, 2000.  (ECF Nos. 71, 73.)  Respondent then sought to file an

18   interlocutory appeal of that denial, but the district court denied the request to certify the

19   September 8, 2000 order for interlocutory appeal.  (ECF Nos. 76, 84.)

20        On March 6, 2001, Petitioner filed a supplemental motion for discovery (ECF No. 92),

21   which the then-assigned magistrate judge granted.  (ECF No. 99.)  Petitioner then sought to hold

22   the instant proceedings in abeyance while exhausting additional claims for relief in state court,

23   which the then-assigned magistrate judge denied.  (ECF Nos. 107, 112.)

24        Petitioner filed a motion for evidentiary hearing on November 20, 2001, and, the

25   following day, filed a supplemental motion for leave to conduct discovery.  (ECF Nos. 114, 115.)

26   After Respondent filed opposition briefs to both motions (ECF Nos. 124, 125), and Petitioner

27   filed replies to those briefs (ECF Nos. 128-29), the then-assigned magistrate judge denied

28   Petitioner's request for leave to conduct supplemental discovery and denied without prejudice his

1   motion for evidentiary hearing.  (ECF No. 131.)  Petitioner filed a renewed request for

2   evidentiary hearing on October 1, 2003.  (ECF No. 141, 142.)  After briefing and argument, the

3   then-assigned magistrate judge granted Petitioner's motion in part, ordering evidentiary hearings

4   on Claims I, V, IX, and XX of the Amended Petition.  (ECF No. 169; see ECF Nos. 160, 164,

5   166, 167, 168, 174, 175, 176, 178, 179.)  The court denied as to Petitioner's request for

6   evidentiary hearings on Claims VI, VII, VIII, XIV, XVII, XXIV, and XXVIII.  (ECF No. 169.)

7   Petitioner and Respondent cross-moved for reconsideration of this order, which the district court

8   denied.  (ECF Nos. 207, 212, 214, 219, 222, 227, 231, 232, 237.)

9       Petitioner and Respondent again sought discovery.  (ECF Nos. 277, 278, 281, 282, 283,

10   285, 286, 288, 289, 290.)  After hearing argument, the then-assigned magistrate judge denied both

11   parties' requests.  (ECF No. 295.)  Petitioner sought reconsideration of the magistrate judge's

12   denial, which the district court denied.  (ECF Nos. 299, 300, 301, 328.)  Petitioner filed another

13   motion for discovery on December 20, 2006, which the then-assigned magistrate judge granted

14   after briefing and argument.  (ECF Nos. 327, 340, 346, 347, 348, 349, 350.)  Respondent then

15   moved for additional discovery on January 24, 2007, which was also granted.  (ECF Nos. 369,

16   373, 376, 380, 382, 385.)

17       Evidentiary hearings were held before the then-assigned magistrate judge on April 23, 24,

18   25, 26, 27, and 30 and May 1 and 2, 2007.  (ECF Nos. 416-424.)  After considering extended

19   briefing on the issue, on December 20, 2010, the then-assigned magistrate judge granted in part

20   Petitioner's request that the transcripts of portions of the evidentiary hearings be sealed.  (ECF

21   No. 576; see ECF Nos. 452, 462, 486, 487, 488, 501, 503, 505, 517, 518, 521, 527, 529, 541, 559,

22   560, 569.)  When the then-assigned magistrate judge was elevated to district judge, the matter

23   was temporarily reassigned to a new magistrate judge, over the parties' joint opposition.  (ECF

24   Nos. 577, 578, 583.)

25       On April 13, 2011, the district judge ordered the parties to brief the applicability of Cullen

26   v. Pinholster, 563 U.S. 170 (2011), to the court's consideration of the claims that had been the

27   subject of the 2007 evidentiary hearings (Claims I, V, IX, and XX of the Amended Petition).

28   (ECF No. 595.)  Petitioner and Respondent each filed responsive briefs on May 19, 2011 (ECF

1  Nos. 600, 601), and the district judge ordered further briefing on October 11, 2011, on the

2  specific question of whether 28 U.S.C. section 2254(d) barred relief on the specified claims.

3  (ECF Nos. 611, 614.)  Petitioner filed his responsive brief on July 3, 2012 (ECF Nos. 629-638);

4  Respondent filed his opposition brief on October 2, 2013 (ECF No. 659; see also ECF No. 674);

5  and Petitioner filed his reply brief on May 8, 2015.  (ECF No. 693.)  On August 4, 2016, the

6  district court assigned the undersigned to the case.  (ECF No. 698.)

7  **APPLICATION OF 28 U.S.C. § 2254(d)**

8  I.   <u>Legal Standards</u>

9      Title 28 U.S.C. § 2254 confers upon a federal district court the jurisdiction to consider a

10  petition for writ of habeas corpus challenging a state court conviction.  A writ of habeas corpus is

11  available under section 2254 only on the basis of some transgression of federal law binding on the

12  state courts.  See Peltier v. Wright, 15 F.3d 860, 861 (9th Cir. 1994); Middleton v. Cupp, 768

13  F.2d 1083, 1085 (9th Cir. 1985).  A federal writ is not available for alleged error in the

14  interpretation or application of state law.  See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991);

15  Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000); Middleton, 768 F.2d at 1085.

16      Where a state court resolves a federal constitutional claim on the merits, the petitioner in

17  federal court may not succeed on that claim absent a showing that the state court resolution of the

18  claim was contrary to law or unreasonable.  28 U.S.C. § 2254(d).  Congress adopted this standard

19  when it revised the habeas statutes in 1996 as part of the Anti-terrorism and Effective Death

20  Penalty Act ("AEDPA").  To meet the standards, a petitioner must establish that the state court's

21  adjudication of the claim

22      (1) resulted in a decision that was contrary to, or involved an
23      unreasonable application of, clearly established Federal law, as
        determined by the Supreme Court of the United States; or

24      (2) resulted in a decision that was based on an unreasonable
25      determination of the facts in light of the evidence presented in the
        State court proceeding.

26  28 U.S.C. § 2254(d).  Section 2254(d) is a gateway.  If a petitioner satisfies either subsection (1)

27  or (2) for a claim, then the federal court considers that claim de novo.  See Panetti v. Quarterman,

28  551 U.S. 930, 953 (2007); Frantz v. Hazey, 533 F.3d 724, 737 (9th Cir. 2008).

15

1    Under AEDPA, the state court's determination is given a high degree of deference and, in

2    considering whether either subsection of 2254(d) is met, the focus of the federal court's inquiry is

3    only the record that had been before the state court at the time of its adjudication.  <u>Cullen v.</u>

4    <u>Pinholster</u>, 563 U.S. 170, 180-82 (2011).  In order to satisfy section 2254(d), the petitioner "must

5    show that the state court's ruling on the claim being presented in federal court was so lacking in

6    justification that there was an error well understood and comprehended in existing law beyond

7    any possibility for fairminded disagreement."  <u>Harrington v. Richter</u>, 562 U.S. 86, 103 (2011); <u>see</u>

8    <u>also</u> <u>Amado v. Gonzalez</u>, 758 F.3d 1119, 1131-32 (9th Cir. 2014).  Thus, federal habeas relief is

9    precluded if "'fairminded jurists could disagree' on the correctness of the state court's decision."

10   <u>Richter</u>, 562 U.S. at 101 (quoting <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664 (2004)).  This

11   objective standard of reasonableness applies to review under both subsections of 28 U.S.C.

12   § 2254(d).  <u>See</u> <u>Hibbler v. Benedetti</u>, 693 F.3d 1140, 1146-47 (9th Cir. 2012).  The federal court

13   must engage in the deferential review even where the state court has not provided a reasoned

14   decision.  <u>Richter</u>, 562 U.S. at 99-100.

15       In the present case, Petitioner raised the claims at issue in state court in a petition for writ

16   of habeas corpus, which the California Supreme Court summarily denied.  A summary denial is

17   presumed to be a denial on the merits of the petitioner's claims and, in assessing those claims

18   summarily denied by the state court, the federal court must defer to the state court's denial if

19   review of the state court record shows any "reasonable basis for the state court to deny relief."

20   <u>Richter</u>, 562 U.S. at 98.  The federal court "must determine what arguments or theories . . . could

21   have supported . . . the state court's decision; and then it must ask whether it is possible

22   fairminded jurists could disagree that those arguments or theories are inconsistent with the

23   holding in a prior decision of [the Supreme] Court."  <u>Id.</u> at 102.  The petitioner bears "the burden

24   to demonstrate that 'there was no reasonable basis for the state court to deny relief.'"  <u>Walker v.</u>

25   <u>Martel</u>, 709 F.3d 925, 939 (9th Cir. 2013) (quoting <u>Richter</u>, 562 U.S. at 98).

26       When reviewing the California Supreme Court's summary denial of a petition for writ of

27   habeas corpus that had been brought in state court, this court must consider that

28   ////

1
2
3
4

> the California Supreme Court's summary denial of a habeas petition on the merits reflects that court's determination that "the claims made in th[e] petition do not state a prima facie case entitling the petitioner to relief." It appears that the court generally assumes the allegations in the petition to be true, but does not accept wholly conclusory allegations, and will also "review the record of the trial ... to assess the merits of the petitioner's claims."

5   Pinholster, 563 U.S. at 188 n.12 (quoting In re Clark, 5 Cal. 4th 750, 770 (1993), and citing

6   People v. Duvall, 9 Cal. 4th 464, 474 (1995).  Accordingly, in these instances, the absence of a

7   prima facie case is the state-court determination that this court reviews under section 2254(d) and

8   that determination is considered a denial "on the merits" for the purposes of AEDPA.  See

9   Pinholster, 563 U.S. at 190; Ochoa v. Davis, 50 F.4th 865, 888 (9th Cir. 2022); Nunes v. Mueller,

10   350 F.3d 1045, 1054-55 (9th Cir. 2003).  A petitioner establishes a prima facie case of a

11   constitutional violation if he made allegations sufficient to support the claim and demonstrated

12   that "he ha[s] sufficient evidence for a reasonable fact finder to conclude" that he has proved his

13   claim.  Nunes, 350 F.3d at 1054-55; see also Cannedy v. Adams, 706 F.3d 1148, 1159-60 (9th

14   Cir.), amended on denial of reh'g, 733 F.3d 794 (9th Cir. 2013); Duvall, 9 Cal.4th at 474-75.

15   If this court finds petitioner had unarguably presented a prima facie case for relief on a claim to

16   the state court, the state court's summary rejection of that claim was unreasonable.  Nunes, 350

17   F.3d at 1054-55.

18        Under section 2254(d), the state court decision is not entitled to deference if either

19   subsection (d)(1) or (d)(2) is met.  See 28 U.S.C. § 2254(d) (listing subsections in the

20   disjunctive).  Subsection (d)(1) states that no deference is owed if the state court decision reflects

21   "a decision that was contrary to, or involved an unreasonable application of, clearly established

22   Federal law." 28 U.S.C. § 2254(d)(1).  "Clearly established Federal law" is that which was set

23   forth in the United States Supreme Court's "applicable holdings," Carey v. Musladin, 549 U.S.

24   70, 74 (2006), rather than dicta, at the time the state court decided the issue.  Cannedy v. Adams,

25   706 F.3d 1148, 1157 (9th Cir. 2013); see also Stanley v. Schriro, 598 F.3d 612, 617 (9th Cir.

26   2010)), amended on other grounds, 733 F.3d 794 (9th Cir. 2013).  While "circuit court precedent

27   may be persuasive in determining what law is clearly established and whether a state court

28   applied that law unreasonably," Maxwell v. Roe, 606 F.3d 561, 567 (9th Cir. 2010), circuit

1 precedent may not be "used to refine or sharpen a general principle of Supreme Court

2 jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced." Marshall

3 v. Rodgers, 569 U.S. 58, 64 (2013) (citing Parker v. Matthews, 567 U.S. 37, 48-49 (2012) (per

4 curiam)).  Additionally, where courts of appeals have diverged in their treatment of an issue, it

5 cannot be said that there is "clearly established Federal law" governing that issue. Carey, 549

6 U.S. at 77.

7       A state court decision is "contrary to . . . clearly established Federal law" under subsection

8 (d)(1) if it applies a rule contradicting a holding of the Supreme Court or reaches a result different

9 from Supreme Court precedent on "materially indistinguishable" facts. Price v. Vincent, 538

10 U.S. 634, 640 (2003).  A state court decision is an "unreasonable application" of clearly

11 established federal law if "the state court correctly identifies the governing legal principle . . . but

12 unreasonably applies it to the facts of the particular case." Bell v. Cone, 535 U.S. 685, 694

13 (2002) (citing Williams v. Taylor, 529 U.S. 362, 407-08 (2000)).  When the federal court reviews

14 the summary denial of a habeas corpus petition by the state court—where, by virtue of it having

15 been a summary denial, the state court made no factual findings—the federal court analyzes the

16 state-court decision under 2254(d)(1), because the state court's determination that petitioner's

17 allegations if true did not state a prima facie case for relief is a legal determination, rather than a

18 factual one. Prescott v. Santoro, 53 F.4th 470, 479 (9th Cir. 2022).

19       Subsection 2254(d)(2) provides that an unreasonable factual determination by the state

20 court is not entitled to deference. See 28 U.S.C. § 2254(d)(2).  There are two ways a petitioner

21 may satisfy subsection (d)(2): he may show the state court's findings of fact "were not supported

22 by substantial evidence in the state court record" or he may "challenge the fact-finding process

23 itself on the ground it was deficient in some material way." Hibbler, 693 F.3d at 1146 (citing

24 Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), abrogated on other grounds by

25 Murray v. Schriro, 745 F.3d 984, 1000 (9th Cir. 2014)); see also Hurles v. Ryan, 752 F.3d 768,

26 790-91 (9th Cir. 2014) (if a state court makes factual findings without an opportunity for the

27 petitioner to present evidence, the fact-finding process is deficient and the state court opinion is

28 not entitled to deference), cert. denied, 574 U.S. 1071 (2014).  The standard for determining

1    whether the state court's fact-finding process is insufficient requires the federal court to "be

2    satisfied that any appellate court to whom the defect [in the state court's fact-finding process] is

3    pointed out would be unreasonable in holding that the state court's fact-finding process was

4    adequate." Hibbler, 693 F.3d at 1146-47 (quoting Lambert v. Blodgett, 393 F.3d 943, 972 (9th

5    Cir. 2004)).  This standard is satisfied, for example, where the state court denied the petitioner an

6    evidentiary hearing when the petitioner's proffered evidence satisfied the state-law standard for

7    granting one.  Brumfield v. Cain, 576 U.S. 305, 320-22 (2015).  In contrast, the state court's

8    failure to have held an evidentiary hearing is not unreasonable if the state court may have

9    reasonably concluded that the evidence already on the record sufficed to resolve the relevant

10   factual question.  Hibbler, 693 F.3d at 1147; Earp, 431 F.3d at 1167-70.  Thus, a state court may

11   make factual findings without an evidentiary hearing if "the record conclusively establishes a fact

12   or where petitioner's factual allegations are entirely without credibility." Perez v. Rosario, 459

13   F.3d 943, 951 (9th Cir. 2006) (citing Nunes, 350 F.3d at 1055); cf. Schriro v. Landrigan, 550 U.S.

14   465, 474 (2007) (in federal habeas corpus proceedings, a district court may decline to hold an

15   evidentiary hearing "if the record refutes the applicant's factual allegations or otherwise precludes

16   habeas relief").

17        If a petitioner shows that section 2254(d)(1) or (d)(2) is satisfied, this court may review

18   the merits of the claim de novo.  28 U.S.C. § 2254(d); see Panetti, 551 U.S. at 953; Frantz, 533

19   F.3d at 737.  For the claims upon which petitioner seeks to present evidence, petitioner must meet

20   the standards of 28 U.S.C. § 2254(e)(2) by showing that he has not "failed to develop the factual

21   basis of [the] claim in State court proceedings" and by meeting the federal case law standards for

22   the presentation of evidence in a federal habeas corpus proceeding.  See Pinholster, 563 U.S. at

23   185-86.[7]

24

25   [7] Because the Court already ruled on Petitioner's request for evidentiary hearings under section
     2254(e)(2) (ECF Nos. 169, 237) and, pursuant to that determination, held evidentiary hearings on

26   Claims I, V, IX, and XX (ECF Nos. 416-424), it has before it the evidence necessary to
     adjudicate Claims I, V, IX, and XX on the merits. Accordingly, upon resolution of the instant

27   briefing—i.e., the application of section 2254(d) to Claims I, V, IX, and XX—the district court
     may rule on the merits of any of those claims that it determines have satisfied section 2254(d)'s

28   gateway. See Shinn, 142 S. Ct. at 1728, 1731-32, 1734; Brumsfield v. Cain, 576 U.S. 305, 308-

                                            19

1    II.    Petitioner's Challenges to the Applicability of 28 U.S.C. § 2254(d)

2            Petitioner makes broad challenges to the application of § 2254(d), none of which have

3    merit.  First, Petitioner argues that the California Supreme Court's treatment of federal

4    constitutional claims in other published decisions indicates that it holds petitioners to higher

5    pleading standards than constitutional law requires, thus indicating that the California Supreme

6    Court applies federal constitutional law unreasonably or contrary to Supreme Court precedent.

7    (ECF No. 629 at 42, 126-28, 230 (arguing that the California Supreme Court applies holds

8    petitioner to an erroneously high burden to demonstrate prejudice for claims of ineffective

9    assistance of counsel.))  This is meritless.  Under Pinholster, 563 U.S. at 188, and Richter, 562

10   U.S. at 98, 102, this Court must defer to the state court's denial if there is any reasonable basis for

11   it, consistent with governing law; this is not rebutted by evidence of what the state court did in

12   other cases, but instead the federal court's only inquiry is "'what arguments or theories . . . *could*

13   *have* supporte[d] the state court's decision [in petitioner's case]; and . . . whether it is possible

14   fairminded jurists could disagree that those arguments or theories are inconsistent with the

15   holding in a prior decision of'" the Supreme Court.  Pinholster, 563 U.S. at 188 (quoting Richter,

16   562 U.S. at 102) (italics added)); see also Visciotti, 537 U.S. at 24 ("§ 2254(d)'s 'highly

17   deferential standard for evaluating state-court rulings' . . . demands that state-court decisions be

18   given the benefit of the doubt" (quoting Lindh v. Murphy, 521 U.S. 320, 333, n.7 (1997))).

19           Second, for a similar reason, Petitioner is incorrect to the extent he suggests that the

20   California Supreme Court may have summarily rejected his claims only on those bases argued by

21   Respondent in the latter's Informal Response to Petitioner's Petition for Writ of Habeas Corpus in

22   state court, or that, when considering the possible reasonable bases for the state court's denial in

23   the instant proceeding, this Court must limit its analyses to only those arguments Respondent

24   advanced below.  (See, e.g., ECF No. 629 at 82-90, 119-23, 127-28, 150-53, 156-57, 172-78, 199-

25   209.)  Under Richter, 562 U.S. at 99-100, where Petitioner's constitutional claims "ha[ve] been

26   presented to a state court and the state court has denied relief," this Court must "presume[] that

27

28   12, 319-22 (2015); Pinholster, 563 U.S. at 179-87.

1  the state court adjudicated the claim on the merits in the absence of any indication or state-law

2  procedural principles to the contrary."  Petitioner points to no state-law procedural principles that

3  would have limited the scope of the California Supreme Court's consideration to only those

4  arguments raised by Respondent.  In fact, the California post-conviction review process appears

5  not to be so circumscribed; as the Supreme Court described in Pinholster, when adjudicating a

6  petition for writ of habeas corpus, the California Supreme Court assumes the allegations in the

7  petition to be true, reviews the entire record before it, and, based on that, determines whether the

8  petitioner has stated a prima facie case of entitlement to relief.  Pinholster, 563 U.S. at 188 n.12

9  (citing Clark, 5 Cal.4th at 770, and Duvall, 9 Cal.4th at 474).  Therefore, in evaluating whether

10 section 2254(d)'s gateway has been met, this Court may consider both the arguments and factual

11 materials submitted by Respondent in his Informal Response, but also any other basis in the

12 record or in law why the state court may have reasonably denied relief.  See Pinholster, 563 U.S.

13 at 188; Richter, 562 U.S. at 99-100.

14        Third, Petitioner argues that the California Supreme Court's denial of the opportunity for

15 adequate factual development in state habeas proceedings, absent the issuance of an order to show

16 cause, reflects a denial of his due process rights.  (ECF No. 629 at 44-48, 229-32.)  The defects

17 that Petitioner identifies do not appear to rise to level of offending fundamental principles of

18 justice or fairness, but rather permissible limitations on access to discovery mechanisms in post-

19 conviction proceedings, given the lesser liberty interests recognized in that stage of proceedings.

20 See Dist. Attorney's Office for the Third Judicial District v. Osborne, 557 U.S. 52, 69-72 (2009);

21 Chapman v. Sacramento Cnty. Dist. Attorney's Off., 812 F. App'x 641 (9th Cir. 2020).  To the

22 extent that he argues that the California Supreme Court's procedures for adjudicating habeas

23 corpus petitions violate the Supremacy Clause or reflect suspensions of the writ of habeas corpus

24 (see ECF No. 629 at 224-29), these arguments are also foreclosed by binding precedent.  Felker v.

25 Turpin, 518 U.S. 651, 664 (1996); Crater v. Galaza, 491 F.3d 1119, 1124 (9th Cir. 2007).

26        Finally, Petitioner has not shown that the California Supreme Court labored under a

27 bias—either actual, implied, or under another theory—that served to deprive him of his

28 constitutional rights or would justify this Court's refusal to defer, as a wholesale matter, to that

court's adjudication of his claims for relief.  (<u>See</u> ECF No. 629 at 229-32.)  A criminal defendant has a due process interest in unbiased appellate adjudicators.  <u>Kugler v. Helfant</u>, 421 U.S. 117, 126 n.6 (1975).  In order to show a due process violation, however, Petitioner must meet the stringent standard of showing that the particular decisionmaker in his case possessed an actual bias against him, or that certain facts existed that constituted circumstantial evidence of bias or potential for bias for that specific judicial officer.  <u>Caperton v. A.T. Massey Coal Co</u>., 556 U.S. 868, 881 (2009); <u>Aetna Life Ins. Co. v. Lavoie</u>, 475 U.S. 813, 825 (1986); <u>Withrow v. Larkin</u>, 421 U.S. 35, 47 (1975); <u>Mayberry v. Pennsylvania</u>, 400 U.S. 455, 465–66 (1971).  To show the latter, the Supreme Court has only recognized very narrow bands of conduct as meeting this high bar: where the judge has pecuniary interests implicated by the defendant's case, had engaged in a personal controversy with the defendant, or had been involved in the accusatory process in that particular case.  <u>See</u> <u>Bracy v. Gramley</u>, 520 U.S. 899, 904-05 (1997); <u>Martinez v. Ryan</u>, 926 F.3d 1215, 1226-27 (9th Cir. 2019); <u>Crater v. Galaza</u>, 491 F.3d 1119, 1131 (9th Cir. 2007).  The facts adduced by Petitioner do not meet this standard of showing the members of the California Supreme Court at the time of adjudicating his appeal or habeas corpus proceedings were either actually biased against him or acted in a manner from which bias could be implied.  (<u>See</u> ECF No. 629 at 229-32.)  Moreover, Petitioner offers no argument as to why, even if this Court were to find the state court's appellate or post-conviction adjudications had been marred by bias, the remedy would be for the instant proceeding to continue with the Court treating 28 U.S.C. section 2254(d) as satisfied, rather than another remedy, such as directing Petitioner to re-present his claims to the state court for adjudication by unbiased judicial officers.  <u>See</u> <u>Kugler</u>, 421 U.S. at 127-29; <u>see generally</u> <u>Richter</u>, 562 U.S. at 102-03 (explaining that the purpose of AEDPA is to "confirm that state courts are the principal forum for asserting constitutional challenges to state convictions").

## CLAIMS FOR RELIEF

**CLAIM I**

In Claim I of his Amended Petition for Writ of Habeas Corpus, Petitioner alleges that his trial counsel performed ineffectively by failing to investigate Petitioner's innocence of the capital

1  homicide and other crimes against Ms. Skuse, "despite the existence of credible evidence existing

2  at the time of his trial that supported his innocence." (ECF No. 26 at 9; see ECF No. 629 at 133-

3  34.) Specifically, per Petitioner, trial counsel was deficient for failing to investigate the

4  possibility that Petitioner's friends Richard Williams and/or W.J. Thomas committed the

5  homicide of Ms. Skuse. (ECF No. 26 at 10-14.) Had available evidence of their culpability been

6  presented, Petitioner alleged, the jury would have heard that Petitioner did not commit the

7  homicide of Ms. Skuse, which would have "established a reasonable doubt in the jury's mind

8  with regard to the Skuse offenses and would have led to a more favorable result for petitioner."

9  (ECF No. 26 at 14.) These allegations correspond to those raised in Claim V, subparts A, C, and

10 F; and Claim VII, subpart A, of Petitioner's Petition for Writ of Habeas Corpus filed in state

11 court. (LD 4a at 117-18, 127-34, 138-39, 179-82; LD 4e at 68-72, 90-99, 105, 145-52.) The state

12 court denied relief on these allegations summarily, on the merits, which the undersigned

13 concludes is entitled to deference under 28 U.S.C. section 2254(d)(1).

14     1.  Governing Legal Standard

15         Under clearly established federal law, to prevail on a claim of ineffective assistance of

16 counsel, a petitioner must show that his trial counsel's performance "fell below an objective

17 standard of reasonableness" and that "there is a reasonable probability that, but for counsel's

18 unprofessional errors, the result of the proceeding would have been different." Strickland v.

19 Washington, 466 U.S. 668, 687-88, 694 (1984).

20         Under the first prong of the Strickland test, a petitioner must show that counsel's conduct

21 failed to meet an objective standard of reasonableness. Strickland, 466 U.S. at 687. There is "a

22 'strong presumption' that counsel's representation was within the 'wide range' of reasonable

23 professional assistance." Richter, 562 U.S. at 104 (quoting Strickland, 466 U.S. at 689).

24 Petitioner must rebut this presumption by demonstrating that his counsel's performance was

25 unreasonable under prevailing professional norms and was not the product of "sound trial

26 strategy." Strickland, 466 U.S. at 688-89.

27         The second prong of the Strickland test requires a petitioner to show that counsel's

28 conduct prejudiced him. Strickland, 466 U.S. at 691-92. Prejudice is found where "there is a

1  reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

2  would have been different." Id. at 694.  A reasonable probability is one "sufficient to undermine

3  confidence in the outcome." Id. at 693.  "This does not require a showing that counsel's actions

4  'more likely than not altered the outcome,' but the difference between Strickland's prejudice

5  standard and a more-probable-than-not standard is slight and matters 'only in the rarest case.'"

6  Richter, 562 U.S. at 112 (quoting Strickland, 466 U.S. at 693).  "The likelihood of a different

7  result must be substantial, not just conceivable." Id.

8       Under clearly established federal law, in considering whether counsel's deficient

9  performance was reasonably probable to have affected the jury's verdict, the prejudice from

10  individual instances of deficient performance should be considered cumulatively.  Strickland, 466

11  U.S. at 695-96 ("Taking the unaffected findings as a given, and taking due account of the effect

12  of the errors on the remaining findings, a court making the prejudice inquiry must ask if the

13  defendant has met the burden of showing that the decision reached would reasonably likely have

14  been different absent the errors.").  (See ECF No. 209 at 101-02.)  Thus, the court "must analyze

15  each of [petitioner's] claims separately to determine whether his counsel was deficient, but

16  'prejudice may result from the cumulative impact of multiple deficiencies.'" Boyde v.

17  Brown, 404 F.3d 1159, 1175 (9th Cir. 2005) (quoting Cooper v. Fitzharris, 586 F.2d 1325, 1333

18  (9th Cir. 1978) (en banc)); see also Michaels v. Davis, 51 F.4th 904, 930 (9th Cir. 2022); Lang v.

19  Cullen, 725 F. Supp. 2d 925, 970-71 (C.D. Cal. 2010).

20       When a court is considering a claim of ineffective assistance of counsel through the

21  AEDPA lens, the court's analysis is "doubly . . . deferential," Richter, 562 U.S. at 105, because,

22  in order to grant relief, the court must consider not only whether Strickland's substantive standard

23  has been met, but whether each prong has been met so unequivocally that no reasonable jurist

24  could conclude otherwise. Id.  Where, as here, the state court has denied relief without a reasoned

25  opinion, the habeas court must determine whether there was any reasonable basis for the denial,

26  consistent with clearly established federal law. Richter, 562 U.S. at 98; Kipp, 971 F.3d at 948.

27  Thus, if the state court could have reasonably found there was a lack of a prima facie showing of

28  relief on either the deficiency or prejudice prong of the Strickland inquiry, the denial is entitled to

deference.  Shinn v. Kayer, 141 S. Ct. 517, 524, 208 L.Ed.2d 517 (2020); cf. Strickland, 466 U.S. at 697 (because petitioner bears the burden on both prongs, "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.")

    2.  Petitioner Made a Prima Facie Showing in State Court of Trial Counsel's Deficient
        Performance

       Under clearly established federal law, the state court could not reasonably have found that Petitioner had failed to state a prima facie case that his trial counsel performed deficiently at the guilt phase of his trial, by having failed to investigate other persons' commission of the crimes charged in counts one, two, three, and four.  At the time of Petitioner's trial, defense counsel had a duty to make reasonable investigations in the course of representation.  Strickland, 466 U.S. at 690-91.  This included, at a minimum, reviewing readily-available materials that could impeach the prosecution's case.  See Rompilla v. Beard, 545 U.S. 374 (2005); Commonwealth v. Rompilla, 653 A.2d 626, 504 (Pa. 1995) (1988 capital trial).  It also includes independent defense investigation into the strength of the prosecution's evidence against the defendant.  Hinton v. Alabama, 571 U.S. 263, 273 (2014); Hinton v. State, 172 So.3d 249, 257 (Ala. 2006) (1986 capital trial).

       In the proceedings in state court, Petitioner sufficiently alleged that trial counsel performed deficiently under prevailing professional norms by failing to investigate other suspects' culpabilities for the crimes with which Petitioner was charged.  The nature of the prosecution's evidence against Petitioner, as disclosed in discovery, demanded at least some investigation into whether Petitioner was the perpetrator of the crimes charged in counts one, two, three, or four.  While some forensic evidence indicated his presence at the scene of the crimes against Ms. Skuse, it was not overwhelming: Petitioner could not be identified as the source of the semen found during autopsy, his fingerprints were not on the apparent murder weapon, there were no witnesses placing him at the scene, there was no evidence indicating he had been found

1    with the proceeds of the burglary of Ms. Skuse's home, and he did not confess when interrogated.

2    See Osband, 13 Cal.4th at 657-64.  (See ECF No. 629 at 143-44; LD 4c at 40.)  There was also

3    some evidence suggesting that an additional perpetrator or perpetrators had been involved,

4    including sunglasses found in Ms. Skuse's bedroom that apparently belonged neither to her nor to

5    Petitioner, and multiple fingerprints discovered throughout her home whose origins could not be

6    identified.  See Osband, 13 Cal.4th at 658.  (See ECF No. 629 at 143, 145, 154; ECF No. 659 at

7    116.)  Moreover, the forensic evidence connecting Petitioner to the crimes was somewhat

8    ambiguous in what it demonstrated. Shoe impressions from the crime scene were consistent with

9    the brand and size of Nike sneakers worn by Petitioner and blood found on his shoes matched the

10   type of Ms. Skuse's, but the prosecution's "criminalist acknowledged that Nike is a common

11   brand of shoe and that he had not learned how many shoes with defendant's sole pattern had been

12   sold in Northern California." Osband, 13 Cal. 4th at 654, 659.  (See ECF No. 629 at 143.)

13   Petitioner's palm print was found on one of the dresser drawers piled atop Ms. Skuse's body,

14   though apparently not on any of the lower drawers that had also been placed on her, and

15   prosecution witnesses acknowledged that her body had been barely visible under the stack when

16   it was discovered.  See Osband, 13 Cal.4th at 653-54, 659. (ECF No. 629 at 142-43.)  Thus, this

17   evidence may have been consistent with an additional perpetrator having been involved in the

18   crimes against Ms. Skuse, and with Petitioner being innocent of her homicide, robbery, and

19   sexual assault.

20         Any reasonable defense counsel, when presented with this evidence against their client,

21   would have conducted some investigation into whether the prosecution could prove beyond a

22   reasonable doubt that Petitioner had actually perpetrated each of the crimes against Ms. Skuse

23   with which he was charged.  In this way, the allegations in this case are indistinguishable from the

24   material facts of Hinton, where the Supreme Court held defense counsel deficient for making only

25   a rudimentary investigation into the reliability of the evidence on which the prosecution would

26   rely to prove the defendant's guilt.  There, the defendant was charged with two counts of capital

27   murder and the central dispute at the guilt phase was whether he had been the person who shot

28   two victims during the course of two separate robberies.  Hinton, 571 U.S. at 264-66.  There was

26

1    little evidence linking the defendant to the crimes:  a victim to a third robbery identified Mr.

2    Hinton as his assailant and bullets taken from the homicide victims were purported to match a

3    firearm seized from Mr. Hinton's home.  Id. at 264-66.  In light of these facts, the Supreme Court

4    observed, reasonable defense counsel should have investigated the strength of the prosecution's

5    evidence in order to "effectively rebut[]" it at trial.  Id. at 273.  Because trial counsel had

6    unreasonably failed to consult with a qualified expert to assess the prosecution's firearms

7    evidence, counsel had acted deficiently under prevailing professional norms per the first prong of

8    Strickland.  Id. at 266-68, 273-75; see Strickland, 466 U.S. at 688 (defense counsel has a "basic

9    dut[y]" "to bring to bear such skill and knowledge as will render the trial a reliable adversarial

10   testing process").

11          Here, given the nature of the evidence purporting to inculpate Petitioner, defense counsel

12   should have engaged in reasonable investigations to challenge it at trial, which would have

13   included investigation into alternative suspects for counts one, two, three, and four.  In state court,

14   Petitioner pled, and provided some available documentary support, see Duvall, 9 Cal.4th at 474,

15   for the allegation that before trial, defense counsel had received an anonymous letter implicating

16   two people – "Richard" and "William Johnson call[ed] W.J." – in the capital crime.  (LD 4a at

17   127-28; LD 4b Ex. 15; ECF No. 629 at 134, 136, 152.)  The writer indicated that they had heard

18   the two men talking about "the crime" and seemed to have known "plenty" about it.  (LD 4a at

19   127-28.)  The letter also included some identifying information about the men, including the

20   author's knowledge of the locations of their respective residences.  (LD 4a at 127-28.)  Petitioner

21   also pled that both men could have been located and interviewed before trial, as they were known

22   to Petitioner's friends; in fact, defense counsel did interview William Johnson Thomas before the

23   penalty phase and called him as a penalty-phase witness, who testified to his knowledge of

24   Petitioner's drug use.  (LD 4a at 131-32; LD 4e at 91-93, 147-48.)  Despite this fact, per

25   Petitioner's allegations, defense counsel failed to conduct a reasonable investigation into whether

26   either man was culpable for the crimes against Ms. Skuse and, consequently, failed to adduce

27   available evidence at trial on this issue.  (LD 4a at 139; LD 4e at 147-49.)

28          Respondent posits several arguments as to why these allegations could have reasonably

1   been rejected by the state court, but none of these arguments provide a reasonable basis for the

2   state court's denial under governing law.  See Pinholster, 563 U.S. at 188 n.12; Duvall, 9 Cal. 4th

3   at 474.  First, Respondent conjectures about facts that could be true, which, Respondent argues,

4   would defeat Petitioner's allegations of deficient performance should such conjectures prove true.

5   For instance, Respondent argues that defense counsel ended their investigation into alternate

6   suspects because "Petitioner never told his counsel that [alternative suspects] Williams and

7   Thomas were 'involved' in Lois Skuse's murder" (ECF No. 659 at 107; see also id. at 115); or

8   because Petitioner repeatedly "expressed" to his counsel "that he was not involved in the crimes"

9   against Ms. Skuse with which he was charged.  (ECF No. 659 at 115.)  In state court, however,

10   neither the record nor the informal response demonstrated that these averments were, in fact, true.

11   (See LD 4c at 39-45, 70-71.)  Instead, in the informal response in state court, Respondent simply

12   cited one instance in the record that showed that defense counsel pursued some form of

13   investigation into alternate suspects in preparing for their motion for new trial, after the guilt

14   verdicts had been rendered, and Respondent argued that this showed that defense counsel had not

15   performed deficiently in their pre-guilt-phase preparations.  (See LD 4c at 70-71, citing 15 RT

16   3709; see also 14 RT 3254-55.)  Likewise, the record itself did not demonstrate whether

17   Petitioner had told or not told his counsel certain things about the involvement of other suspects,

18   as Respondent now posits, but rather that he had expressed to one of his counsel—who was later

19   substituted via Marsden motion—his preference at that time as to what defenses would be

20   eventually presented on his behalf.  (See ECF No. 659 at 115 (citing LD S1 (July 8, 1986 hearing)

21   at 9; LD S2 (Aug. 12, 1986 hearing) at 2-4, 9; LD 2d Vol. I (Oct. 29, 1986 hearing) at 4-5, 7, 16-

22   20; LD 4b Ex. 4 at 1-2).)  None of these portions of the record, however, indicate what Petitioner

23   had or had not told his counsel about his role, if any, in the crimes against Ms. Skuse.

24        Although the record before the state court was not inconsistent with the factual

25   possibilities Respondent now offers, Petitioner was not required to disprove these speculations in

26   order to make a prima facie showing of his entitlement to relief.  Rather, under California law, a

27   habeas corpus petition is only dismissed summarily under a few narrow circumstances: if the

28   allegations, even if credited, do not state a claim for relief, Duvall, 9 Cal.4th at 474; if the

1    allegations are conclusory, i.e., are "without any explanation of" their factual basis, ibid.; or if

2    Respondent through "citation to legal authority and by submission of factual materials" in the

3    informal response demonstrates that the claim is fundamentally meritless.  People v. Romero, 8

4    Cal.4th 728, 742 (1994).  The state court, then, would not have rejected Petitioner's allegations

5    simply on the basis of Respondent's current factual conjectures nor, more generally, on factual

6    conjectures adverse to the petitioner and unsupported by the record before it.  See Pinholster, 563

7    U.S. at 188 (when considering the bases on which the state court may have summarily denied

8    relief, federal court presumes California Supreme Court follows those procedures set forth in

9    California decisional law); In re Serrano, 10 Cal. 4th 447, 465 (1995); ECF No. 237 at 8

10   (explaining, under Serrano, California law permits a habeas corpus petitioner to present more

11   evidence at an evidentiary hearing that he had included with his petition).

12           Moreover, even if Respondent's hypotheses about what Petitioner told his counsel prove

13   true, it would have been contrary to clearly established federal law for the state court to have

14   concluded that that alone sufficed to demonstrate the reasonableness of counsel's investigation.

15   (See ECF No. 659 at 116.)  Whether defense counsel conducted a reasonable investigation is a

16   profoundly fact-intensive inquiry, and the determination of reasonableness wholly depends on

17   what counsel knew, or should have known, at the time they prepared for trial.  See, e.g., Hinton,

18   571 U.S. at 273-74; Rompilla, 545 U.S. at 383-84, 389; Strickland, 466 U.S. at 690-91 ("strategic

19   choices made after thorough investigation of law and facts relevant to plausible options are

20   virtually unchallengeable," but "strategic choices made after less than complete investigation are

21   reasonable precisely to the extent that reasonable professional judgment supports limitations on

22   investigation"); Wiggins v. Smith, 539 U.S. 510, 522-23 (2003) (where trial counsel is alleged to

23   have failed to introduce favorable evidence due to his failure to uncover it through reasonable

24   investigation, the operative inquiry into deficient performance under Strickland is "not whether

25   counsel should have presented" the evidence they could have found, but rather "whether the

26   investigation supporting counsel's decision not to introduce [the] evidence [at issue] *was itself*

27   *reasonable*" (italics in original).)  Counsel must pursue investigative leads apparent in the

28   information they do have, unless they have reason to believe such pursuit would be

29

1  "counterproductive" or "fruitless."  Id. at 525; see also Andrus v. Texas, 140 S. Ct. 1875, 1882-

2  83, 207 L. Ed. 2d 335 (2020).  Whether the breadth and contents of a defense investigation were

3  reasonable is determined by consideration of what, as a matter of historical fact, trial counsel

4  knew and did, measured against contemporaneous professional norms.  Wiggins, 539 U.S. at 523.

5  Thus, under some factual scenarios, it may be reasonable for defense counsel to cabin the defense

6  investigation to information provided by their client, while, in other cases, such a limitation is

7  unreasonable.  Compare Phillips v. Woodford, 267 F.3d 966, 978-79 (9th Cir. 2001) and Johnson

8  v. Baldwin, 114 F.3d 835 (9th Cir. 1997) with Bean v. Calderon, 163 F.3d 1073, 1082 (9th Cir.

9  1998).  (See ECF No. 169 at 17.)

10      Here, the record before the state habeas court was largely silent on the nature, timing, or

11  scope of defense counsel's investigation, including any reasons for the choices counsel made to,

12  allegedly, limit their investigations.  At an evidentiary hearing, it may be the case that the

13  evidence demonstrates that the defense investigation was reasonable, given the totality of the

14  factual circumstances that come to light upon evidentiary development.[8]  (See ECF No. 659 at

15  114-16.)  At the pleading stage in state court, however, Petitioner pled that, although defense

16  counsel received information suggesting other persons' involvement in the crimes against Ms.

17  Skuse, counsel nevertheless failed to follow up on those leads in a reasonable manner before the

18  commencement of the guilt phase.  Under California's pleading rules, this was sufficient to state a

19  prima facie case of counsel's deficient performance.  See Duvall, 9 Cal.4th at 474; see generally

20

21  [8] For example, Respondent argues that Petitioner's allegations of deficient performance must fail
   because Petitioner's first counsel, Mr. Greer, indicated he was preparing a mental-state defense
22  for the guilt phase.  (ECF No. 659 at 114.)  Whether or not subsequent counsel's investigations
   were reasonable, however, would rely on facts that were not contained in the record before the
23  state court, such as those describing the nature of Mr. Greer's investigation, the nature of
   subsequent counsel's investigation, what leads were known to either counsel, what Petitioner
24  communicated to either counsel, and what either counsel learned in the course of their
   investigations.  See, e.g., Rompilla, 545 U.S. at 383-84, 389.  For the same reason, the state court
25  could not have summarily dismissed this claim on the basis that the record showed defense
   counsel interviewed certain of Petitioner's friends before trial, without additional factual
26  information to allow the court to assess whether those interviews—and the fact of counsel not
   having interviewed other people—demonstrate a reasonable investigation given what counsel
27  knew at the time and in light of prevailing professional norms.  (See ECF No. 659 at 120-24.)

28

1    Hinton, 571 U.S. at 273-74; Rompilla, 545 U.S. at 383-84, 389; Strickland, 466 U.S. at 690-91;

2    Cannedy v. Adams, 706 F.3d 1148, 1159-61 (9th Cir.), amended on denial of reh'g, 733 F.3d 794

3    (9th Cir. 2013).  (See ECF No. 169 at 17; ECF No. 237 at 6-7.)

4             Similarly unpersuasive are Respondent's arguments that the state court may have

5    reasonably denied Petitioner relief without evidentiary development by making factual inferences

6    that were adverse to Petitioner.  For example, Respondent posits that, based on Petitioner's trial

7    testimony, the state court could infer that Petitioner had told his counsel that the people he

8    reportedly saw in Ms. Skuse's apartment had been strangers to him, rather than Mr. Williams and

9    Mr. Thomas (see ECF No. 659 at 112-13), or could infer that his allegations were not credible

10   because Petitioner himself seemed an unreliable witness.  (See ECF No. 659 at 114.)  As a matter

11   of state procedural law, however, the California Supreme Court does not summarily dismiss

12   pleadings on the basis of these kinds of speculative, adverse factual inferences (see Duvall, 9

13   Cal.4th at 474; Romero, 8 Cal.4th at 742), and, if it did, that denial would reflect an unreasonable

14   factual determination undeserving of this Court's deference under AEDPA.[9]  See, e.g., Hurles v.

15   Ryan, 752 F.3d 768, 790-91 (9th Cir. 2014).  This, therefore, does not provide a basis to defer to

16   the state court's summary denial of the claim. See Pinholster, 563 U.S. at 188.

17            Finally, the state court could not reasonably have rejected Petitioner's allegations of

18   deficient performance on the basis that the declarations Petitioner tendered in support of the

19   allegations left unanswered certain questions about the defense investigation, including why

20   counsel should have known certain of Petitioner's acquaintances had information relevant to an

---

21   [9] Respondent also briefly argues that the California Supreme Court may reasonably have denied
     relief because it may have drawn adverse inferences from Petitioner's failure to support his
22   allegations with declarations from himself or his trial counsel.  (ECF No. 659 at 113 n.39.)  The
     cases on which Respondent relies for this argument do not support this assertion.  Both cited
23   cases concerned whether the petitioner had met his burden to prove his allegations of ineffective
     assistance of counsel, not whether he had pled them adequately in state court, see Schurz v. Ryan,
24   730 F.3d 812 (9th Cir. 2013); Gentry v. Sinclair, 705 F.3d 884, 895-96, 900-01 (9th Cir. 2013);
     and one of the cases on which Respondent relies arose from Washington State, which provides no
25   elucidation into what inferences a California state court may apply as a matter of California
     procedural law.  See Gentry, 705 F.3d 884.  Respondent's argument does not appear consistent
26   with California law governing habeas corpus cases and therefore does not provide a reasonable
     basis to defer to the state court's denial.  See Pinholster, 563 U.S. at 188; Duvall, 9 Cal.4th at
27   471-72, 474; see generally Romero, 8 Cal.4th at 742; ECF No. 169 at 17; ECF No. 237 at 6-7.
28
                                                   31

alternate-suspect defense and what communications, or efforts at communication, had occurred between the defense team and particular witnesses.  (ECF No. 659 at 122-24.)  California pleading rules do not require that level of specificity in order to make a prima facie showing of entitlement to relief. Rather,

> [a]s long as sufficient evidence, though perhaps not every bit of evidence, is attached to the state habeas petition to support the facts alleged by petitioner, then the petitioner's burden to show that the claims are not merely conclusory has been met.
>
> Along with his state habeas petition before the California Supreme Court, petitioner submitted a letter from a self-proclaimed "secret witness" that suggested that someone charged. (May 11, 2005 Order at 16-17.) He also "submitted three declarations stating that others admitted to committing the Skuse murder." (Id. at 15 (citing State Habeas Pet., Exs. 9 (Gibson Decl.) and 26 (Flynn and Breaux Decls.)).) These documents support the factual allegations made in the state habeas petition, namely petitioner's claim that someone else committed the murder and that his lawyer was aware of this theory but failed to seriously pursue it. (Id.) The court therefore finds that petitioner's submission of documentary evidence was sufficiently in compliance with the California procedural requirements.

(ECF No. 659 at 6-7.)  The fact that some of the documentary materials filed with the petition suggested that further factual development might be necessary in order for Petitioner to prove that defense counsel acted unreasonably did not, without more, demonstrate that Petitioner's allegations were facially not credible.  See Cannedy, 706 F.3d at 1160-61.  The California Supreme Court could not have reasonably denied relief on this basis.

    3.   The State Court Was Not Unreasonable If It Dismissed This Claim Due to Petitioner's Failure to Make a Prima Facie Showing of Prejudice

        In order to make a prima facie showing of prejudice in state court, Petitioner had to allege facts upon which a factfinder could conclude that, had defense counsel conducted an appropriate investigation into alternate suspects, there was a reasonable probability that counsel would have presented evidence supportive of that defense and a reasonable probability that the jury would have returned a more favorable verdict if such evidence was presented.  See Wiggins, 539 U.S. at 535-36; Wong v. Belmontes, 558 U.S. 15, 19-20 (2009) (per curiam); Bemore v. Chappell, 788

1    F.3d 1151, 1169 (9th Cir. 2015); Duvall, 9 Cal.4th at 474. Here, based on the record before the

2    state court, the state court could reasonably have concluded that Petitioner failed to make a prima

3    facie showing that either of these two aspects of the prejudice inquiry had been met.

4        In state court, Petitioner alleged that, had defense counsel conducted a reasonable

5    investigation into Petitioner's culpability for the crimes charged in counts one through four, they

6    could have presented evidence suggesting he was not guilty of these crimes and not culpable of

7    the special circumstances. (LD 4a at 181-82.) Per Petitioner, the defense could have presented

8    evidence that "Richard Williams, W. J. Thomas, and/or others" committed the burglary,

9    homicide, and sexual assault of Ms. Skuse, according to statements they had made in the presence

10    of others inculpating themselves. (LD 4a at 118, 131-33; see also id. at 128 [alleging "trial

11    counsel failed to adequately investigate and/or present evidence to the jury that Mr. Williams, Mr.

12    Williams' cousin, Leonard ("Lenni") James, and/or William J. Thomas were the responsible

13    parties for the events at issue involving Ms. Skuse"]; LD 4e at 68, 90, 93 [alleging that the

14    evidence in support of the habeas corpus petition showed that Richard Williams or W.J. Thomas

15    had killed Ms. Skuse].)[10] These statements were buttressed by available circumstantial evidence

16

17    [10] In his pleadings, Petitioner never specifically addresses how the possible defenses described in
the instant claim would relate to each of the specific counts for which Ms. Skuse was alleged as

18    the victim. (See generally ECF No. 26 at 9-14; ECF No. 629 at 133-57; LD 4a at 117-18, 127-34,
138-39, 179-82; LD 4e at 68-72, 90-99, 105, 145-52.) Instead, Petitioner repeatedly treats counts

19    one through four jointly as "the Skuse offenses" when making his arguments. (See ECF No. 26 at
14; see, e.g., ECF No. 629 at 134, 151.) To the extent his factual arguments are specific to any

20    particular count or charge, they focus almost exclusively on the homicide count (count one) and,
briefly, on the special circumstances alleged. (See ECF No. 26 at 9, 10, 14; ECF No. 629 at 145,

21    156; ECF No. 693 at 105-07, 113-15, 122-27, 130.) Although the undersigned may construe
Petitioner's arguments as also encompassing potential defenses to counts three and four,

22    Petitioner's own arguments seem adverse to a finding of prejudice relative to count two, given
that Petitioner's testimony conceded that he entered Ms. Skuse's home with felonious intent and,

23    in the instant claim, he indicates the available alternate-suspect defense would have been
compatible with his trial testimony. (ECF No. 629 at 134; see ECF No. 629 at 133 [arguing

24    prejudice relative to the crimes of "robbery, rape and murder of Lois Skuse"], 141 [same]; ECF

25    No. 693 at 99 [same].) Thus, even liberally construed, Petitioner's pleadings on the instant claim
in no way satisfy—for count two—his "burden to demonstrate that 'there was no reasonable basis

26    for the state court to deny relief'" on that claim, on the issue of prejudice. Walker v. Martel, 709

27    F.3d 925, 939 (9th Cir. 2013) (quoting Richter, 562 U.S. at 98). The undersigned, therefore,
proceeds on the prejudice analysis only as to counts one, three, and four and the special

28    circumstances.

1   implicating Mr. Williams, specifically, that he wore the same type of sunglasses found at the

2   Skuse crime scene (LD 4e at 92), and that he had been implicated in other murders that occurred a

3   year after Petitioner's arrest in the instant case.  (LD 4e at 94-96, 148.)  They also could have

4   presented available evidence that, in the years before the crimes, Petitioner became friends with

5   Messrs. Williams and Thomas and was dominated by them.  (LD 4a at 131; LD 4e at 91-92.)  The

6   totality of this evidence, per Petitioner, would have supported a defense theory that Petitioner had

7   been present outside Ms. Skuse's home, consistent with his trial testimony, but that it had been

8   his friends—Mr. Williams and Mr. Thomas—who entered the apartment, robbed it, assaulted Ms.

9   Skuse, and murdered her, with Petitioner entering only after the fact.  (LD 4a at 131-32; LD 4e at

10   98, 147.)  Moreover, Petitioner had been involved only because Messrs. Williams and Thomas

11   pressured him, and he had kept their identities a secret out of fear. (LD 4a at 128-31; LD 4e at 98,

12   147-48.)  Finally, Petitioner alleged that available evidence would have shown he had been

13   intoxicated on PCP during the crimes.  (LD 4e at 147-48.)  Petitioner alleged that, had such

14   evidence been presented, the jury would have reached more favorable verdicts at the guilt and

15   penalty phases.  (LD 4a at 180, 182, 368; LD 4e at 147-49.)

16       As a threshold matter, Respondent argues that the record vitiates any showing of prejudice

17   because it demonstrates that Petitioner would have forbidden his counsel from presenting a

18   defense that either identified the other perpetrators of the crimes against Ms. Skuse or argued that

19   Petitioner was a more minor participant in the crimes and was innocent of the charged special

20   circumstances.  (ECF No. 659 at 116-18, nn.43-44.)  See Landrigan, 550 U.S. 4 at 475-76 (claim

21   of ineffective assistance of counsel for failure to present available evidence must fail as a matter

22   of law on the prejudice prong if record shows petitioner instructed counsel not to present the

23   evidence); see generally Clark, 5 Cal. 4th at 770 (state court may summarily reject habeas corpus

24   claim if its allegations are contradicted by the trial record). Here, the record would not have

25   supported the state court's wholesale rejection of Petitioner's prejudice allegations on this basis.

26   Respondent first relies on a statement made by defense counsel Loehr at one of the hearings

27   related to the Marsden proceedings, in which Mr. Loehr represented to the court that Petitioner

28   was "not cooperating in preparing a defense that might go to either lessening the degree or

34

1   showing that the special circumstances don't exist."  (ECF No. 659 at 116 n.43, citing LD S2

2   (Aug. 12, 1986 hearing) at 4.)  At the same hearing, Mr. Loehr also conveyed to the court that

3   Petitioner "presented me with a demand that I present a defense that he was not there."  (LD S2

4   (Aug. 12, 1986 hearing) at 3.)  These statements were made, however, at the beginning of a multi-

5   month process of Petitioner expressing dissatisfaction with and mistrust towards his counsel and

6   the court exploring whether their dispute could be resolved via substitution of counsel, ultimately

7   substituting both Mr. Loehr and Keenan counsel with other defense counsel. (2 CT 395, 399, 413,

8   416, 419.)  The record does not show that the sole dispute between Petitioner and Mr. Loehr had

9   been the possibility of the latter presenting a defense of reduced culpability, but rather that this

10  was one amongst a number of grievances Petitioner had against Mr. Loehr, the crux of which

11  seemed to be Petitioner's mistrust of Mr. Loehr generally.  (See LD S1 (July 8, 1986 hearing);

12  LD S2 (Aug. 12, 1986 hearing).)  Once Messrs. O'Brien and Reese were appointed substitute

13  counsel, the record evinces no similar discord between them and Petitioner—for example, no

14  Marsden motion appears in the record after their appointment.  (See generally 2 CT 419 – 4 CT

15  1030).  The record is silent, however, as to the nature of Petitioner's communications with

16  substitute counsel and, specifically, whether he made the same demands about his defense to

17  them as he had made to Mr. Loehr.  Given, however, that the context in which those statements

18  appear on the record, a reviewing court could not conclude definitively that Petitioner must have

19  given substitute counsel a similar ultimatum.  The record is compatible equally with the

20  possibility that Petitioner presented the same demand to new counsel, who acquiesced to it, as it

21  is with the possibility that Petitioner's more sanguine relationship with substitute counsel made

22  him more open to defense possibilities that he had previously resisted.  Simply, the record does

23  not support a conclusion that, at the time Messrs. O'Brien and Reese represented Petitioner at the

24  guilt phase, they were hamstrung by the same limitations that had plagued Petitioner's

25  relationship with his previous counsel.

26      To the extent Respondent supports this argument with evidence in the state court record of

27  statements Petitioner had made to a psychiatric expert (see ECF No. 659 at 117 n.44), those

28  statements could not have established for the state court that Petitioner would have disallowed

1  defense counsel to present a defense implicating Messrs. Thomas or Williams so as to justify

2  summary rejection of his prejudice allegations.  In support of his Informal Response to

3  Petitioner's Petition for Writ of Habeas Corpus in the state court, Respondent presented a report

4  prepared by defense expert Dr. Grover in preparation for his penalty phase testimony, which had

5  been discovered to the prosecution.  (LD 4d Ex. M.)  In it, Petitioner indicated he knew more

6  about the crimes against Ms. Skuse than the jury had heard, but refused to divulge further

7  information about it because he did not want to be known as a snitch by other prison inmates.  (Id.

8  at 49-51.)  Petitioner also described, hypothetically, that he might divulge more information if he

9  was tortured or threatened with death or the death of his parents and spoke vaguely about being

10  either hypothetically or actually blackmailed.  (Id. at 52-54.)  These reported statements,

11  however, were minimally probative of what Petitioner had told his counsel and what, if any,

12  limitations on the presentation of his defense may have been.  Nowhere in the report of Dr.

13  Grover did Petitioner indicate he categorically refused to permit certain evidence to be presented

14  in his defense, nor that he had communicated such to his counsel.  (See generally LD 4d Ex. M.)

15  In fact, in the same portion of the discussion, Dr. Grover suggested the possibility that

16  Petitioner's lawyers could uncover and present evidence "that somebody else did it," and

17  Petitioner did not respond by stating or otherwise indicating he would have forbidden the

18  presentation of any such evidence, in any form.  (See id. at 53.)  Moreover, the statements in the

19  report were made after the guilt phase verdict had been returned, rendering it even more

20  speculative that they had reflected Petitioner's feeling about his defense at the time it had been

21  presented.  Simply, the record before the state court did not support a factual finding that

22  Petitioner had categorically forbidden his trial lawyers from presenting any available evidence

23  that other persons had committed any or all of the crimes against Ms. Skuse, and therefore this is

24  not a reasonable basis on which to defer to the state court's summary denial of the claim.  See 28

25  U.S.C. § 2254(d); Richter, 562 U.S. at 98, 102; Romero, 8 Cal.4th at 742.

26         Even if, however, the record did not show the Petitioner would have forbidden the defense

27  at issue, the record in the state court also did not show that reasonable defense counsel would

28  have presented the evidence identified by Petitioner or, if they did, that the jury would have

1    returned more favorable verdicts.  See Wiggins, 539 U.S. at 535-36.

2          The evidence identified by Petitioner in support of this claim (or claims, in state court)

3    substantiated three possible guilt-phase defenses.  First, it may have supported a mental state

4    defense of voluntary intoxication, in that Petitioner argued that there was available evidence that

5    he was intoxicated on PCP at the time of the crimes against Ms. Skuse.  Second, the identified

6    evidence may have been relevant to a defense of duress, to the extent the evidence suggested that

7    Petitioner had acted that night under the domination of Messrs. Thomas and Williams.  Third, the

8    identified evidence may have resulted in acquittals on counts one, three, and four, and not-true

9    findings on the three special circumstances, if the jury believed that only Messrs. Thomas and

10   Williams had committed the sexual assault of, theft from, and homicide of Ms. Skuse, with

11   Petitioner only entering her home afterwards to seek out goods to steal.  In addition to these guilt-

12   phase defenses, Petitioner also indicated that this evidence, singly or cumulatively, may have

13   resulted in a more favorable penalty phase verdict had it been presented.  The undersigned

14   considers each of these in turn.

15         First, the evidence presented to the state court relative to Petitioner's allegation that he

16   was intoxicated on PCP at the time of the crime was so meager that the state court may

17   reasonably have concluded that Petitioner had not shown that all reasonable counsel would have

18   presented this evidence.  The available evidence of this on which he relied in state court

19   constituted one declaration from one of Petitioner's friends reporting that Petitioner had been

20   "high" on "sherm cigarettes" and marijuana the night of the crimes at issue and "at some point"

21   he left with Mr. Williams in a car.  (LD 4f Ex 26 (Flynn Decl.) at ¶¶ 6-9; LD 4e at 93, 147-48.)

22   At the time of Petitioner's trial, however, reasonable defense counsel in a capital case may have

23   very well concluded that this evidence alone was too thin a reed on which to present an

24   intoxication defense, as it left wholly unanswered what the level of Petitioner's intoxication was

25   at the time of the crimes and how such intoxication may have affected his cognition and behavior,

26   among other issues.  See, e.g., Wharton v. Chappell, 765 F.3d 953, 967 (9th Cir. 2014) (no

27   prejudice for failing to present an intoxication defense where toxicology experts could not pin the

28   level of defendant's intoxication at the time of the crime, at 1987 California capital trial); see

1    generally Mayfield v. Woodford, 270 F.3d 915, 931 n.17 (9th Cir. 2001) ("We note that juries are

2    unlikely to favor defenses based on abuse of dangerous drugs in evaluating a defendant's

3    culpability for violent behavior. [Defense counsel] testified that he knew of no death penalty

4    cases tried in San Bernardino County prior to 1983 where a drug defense had been successful in

5    gaining either an acquittal or in reducing the sentence from death to life without parole.").

6           Second, in his state court pleadings, Petitioner alleged that, at the time of the crimes, he

7    had been a follower of his friends, Mr. Williams and Mr. Thomas.  Although not alleging this as

8    the basis of a duress defense specifically, Petitioner theorizes that the jury may have relied on it to

9    conclude that he had a reduced culpability at the guilt phase.  (LD 4e at 91-92, 147-49.)  To the

10   extent Petitioner suggests the state court should have understood his allegations to argue a duress

11   defense should have been presented, the evidence presented in the state court did not demonstrate

12   duress under California law; certainly, it is not the case that every reasonable capital defense

13   counsel would have presented the evidence on which Petitioner relies to assert a duress defense.

14   As a matter of state law, duress is not an available defense to the crime of murder, People v.

15   Anderson, 28 Cal.4th 767 (2002); Penal Code § 26, and therefore could not have been offered as

16   a defense to count one.  Although it may have been available as a defense on counts three or four,

17   the record does not support a conclusion that every reasonable capital defense counsel would

18   have urged such a defense.  Under California law at the time of Petitioner's trial, duress was

19   shown where the defendant has reason to fear another person will cause his death imminently if

20   the defendant does not comply with that person's demands.  Penal Code § 26; see, e.g., People v.

21   Wilson, 36 Cal. 4th 309, 331 (2005); People v. Petznick, 114 Cal. App. 4th 663, 676 (2003), as

22   modified on denial of reh'g (Jan. 14, 2004); People v. Subielski, 169 Cal. App. 3d 563, 567

23   (1985); Availability of Defense., 1 Witkin, Cal. Crim. Law 4th Defenses § 56 (2022) (collecting

24   California cases).  There was no evidence presented in state court in any way indicating that

25   Petitioner had acted under fear of imminent death from either Mr. Williams or Mr. Thomas, or

26   anyone else, when participating in the crimes at issue.  See generally Osband, 13 Cal.4th at 653-

27   61; LD 4a; LD 4e.  If Petitioner's theory was that this evidence, while not meeting the standard to

28   show duress, would have nevertheless caused the jury to have concluded, at the guilt phase, that

Petitioner had reduced culpability for the crimes charged in counts one through four (see ECF No. 629 at 148-49), that argument also fails as a matter of law.  Under California law, absent proof of duress, the fact that a defendant may have felt reluctant to participate in a crime or that he had been led to the crime by his co-participants does not absolve him of legal culpability.  See Penal Code § 26; Anderson, 28 Cal.4th 767; Petznick, 114 Cal. App. 4th at 677.  Ergo, to the extent Petitioner's allegations encompass this theory, reasonable counsel may have foregone presentation of this defense as unlikely to induce more favorable verdicts on counts one through four, or the special circumstances, at the guilt phase.  See Wiggins, 539 U.S. at 535-36; Wong, 558 U.S. at 19-20.

Finally, Petitioner presented some evidence in support of his allegations in state court that only Mr. Thomas and Mr. Williams had committed the crimes charged in counts one, three, and four (murder, sexual assault, and theft) and the special circumstances.  (LD 4a at 128-35; LD 4e at 90-99, 101-05.)  Although Petitioner's allegations in state court are somewhat unclear in this regard, he indicated that this defense would have been compatible with Petitioner's later testimony that he had only been outside Ms. Skuse's home while two other persons committed the violent crimes against and theft from Ms. Skuse.  (LD 4a at 118, 129-32; LD 4e at 98, 145; see ECF No. 629 at 133-34 [arguing same].)  In his testimony, Petitioner did not identify these persons, let alone as having been his friends; did not testify that he had felt pressured to have been present or involved; testified that his entry into Ms. Skuse's home had been spontaneous and not pursuant to guidance from the men he reportedly saw emerging from the home, nor from any specific persons; and did not testify that he had been intoxicated at the time.  (12 RT 2847-71, 2894-2918.)  Nevertheless, Petitioner alleged in his habeas corpus proceedings that defense counsel should have presented evidence from other witnesses establishing these facts. (LD 4e at 98; see LD 4a at 129-32.)

As a preliminary matter, Petitioner's allegations in habeas corpus do little to reconcile Petitioner's testimony with this theory.  In a later claim, Petitioner alleges that his counsel were ineffective in calling Petitioner to testify at the guilt phase.  (ECF No. 26 at 78-83.)  Although Petitioner's state court pleadings broadly alleged that Petitioner was unprepared to testify or,

1   perhaps, should not have been called as a witness at all, the only specific factual allegations

2   Petitioner made is that counsel was deficient in eliciting testimony from Petitioner that he entered

3   Ms. Skuse's home with felonious intent.  (LD 4a at 185-92; LD 4e at 154 n.78, 154-61; see ECF

4   No. 629 at 168, citing Osband, 13 Cal.4th at 657-58 and 12 RT 2857; ECF No. 693 at 131-32,

5   134-35; ECF No. 26 at 80, 82-83.)  In the instant claim, then, it appears that Petitioner's theory is

6   that the evidence that could have been presented regarding Mr. Thomas's and Mr. Williams'

7   culpabilities would have been compatible with Petitioner's later testimony.  (LD 4e at 98, 145;

8   LD 4a at 118, 129-32; see ECF No. 629 at 133-34, 151.)

9          If defense counsel had taken that approach, however, they risked its rejection by the jury

10   in light of Petitioner's testimony.  Had defense counsel presented evidence that the perpetrators of

11   counts one, three, and four were friends of Petitioner's with whom he had been in a car that night,

12   the jury may have rejected as not credible the theory that he waited obliviously outside while his

13   friends committed violent crimes, then opted to enter the home shortly after his friends left.  This

14   theory may have seemed even more implausible given that, as Petitioner now alleges, Messrs.

15   Williams and Thomas were not simply Petitioner's friends, but people who domineered him.

16   Additionally, the evidence proffered on habeas—which included a declaration describing

17   Petitioner having left in a car with Mr. Williams on the night of Ms. Skuse's death (see LD 4f Ex.

18   26 (Flynn Decl.) at ¶¶ 6-9)—seems incompatible with Petitioner's repeated, detailed testimony

19   that he had taken a bus to Ms. Skuse's apartment (see 12 RT 2847-71, 2894-2918), and thereby

20   may have given the jury cause to find the defense evidence not credible.  Given these risks,

21   reasonable defense counsel may have opted to forego presentation of this theory of defense, as it

22   seems no more likely to lead to acquittal of the counts at issue than the theory that was presented

23   to the jury.  See Waidla v. Davis, 68 F.4th 575, 598-99 (9th Cir. 2023).

24          Addressing this dilemma, Petitioner further alleged that defense counsel could have

25   presented evidence that Petitioner had felt threatened not to implicate his friends in the crimes.

26   (LD 4a at 130; LD 4e at 98; see ECF No. 629 at 139, 141.)  Had such evidence been presented,

27   Petitioner argues, the defense could have provided the jury a compelling explanation of why

28   Petitioner's trial testimony had failed to identify Messrs. Williams and Thomas as the perpetrators

1    nor had described his feeling of pressure to be involved in the crimes.  (LD 4e at 98.)  While this

2    may be a plausible possibility, Petitioner did not present evidence in state court to show that he

3    could substantiate this theory.  See Nunes, 350 F.3d at 1054-55.  Instead, as evidence of these

4    threats, Petitioner relied solely on statements he had made—in which he had obliquely referenced

5    vague, hypothetical threats from unspecified persons—to a defense expert after the guilt phase.

6    (LD 4a at 130; LD 4e at 98.)[11]  This, however, does not reflect prejudice from defense counsel's

7    failure to investigate other suspects pretrial.  The fact that Petitioner chose to disclose this

8    information to an expert after the guilt phase appears, per Petitioner's allegations, in no way

9    ascribable to defense counsel's alleged failure to investigate.  (See LD 4a at 130; LD 4e at 98.)

10   Thus, as a matter of law, this allegation of prejudice must fail.  See Strickland, 466 U.S. at 694 (in

11   order to prove prejudice, habeas petitioner "must show that there is a reasonable probability that,

12   *but for* counsel's unprofessional errors, the result of the proceeding would have been different"

13   (italics added)).

14          In any event, the evidence adduced in state habeas proceedings that Petitioner alleged

15   could have been presented to demonstrate Mr. Thomas and Mr. Williams had committed the

16   homicide, assault, and theft from Ms. Skuse was so slight that the state court was reasonable if it

17   concluded that prejudice had not been shown.  Petitioner argues that, had trial counsel

18   investigated reasonably, they would have learned and could have presented evidence that one of

19   Petitioner's friends recalled that Mr. Williams "used to wear aviator[-style] glasses."  (LD 4e at

20   92, citing LD 4f Ex. 26 (Flynn Decl.) ¶ 3.)  This evidence would have been relevant at the guilt

21   ─────────────────
     [11] In this proceeding, Petitioner also argues that defense counsel could have presented evidence
22   that Mr. Williams "was known to have threatened violent retaliation if anyone informed on him."
     (ECF No. 629 at 149, citing LD 4f Ex. 25 at 6; see LD 4e at 95.)  Assuming arguendo that this
23   factual assertion was properly alleged in the state court (see LD 4a at 130-32, 180-82; LD 4e at
     92-96), the evidence on which Petitioner relies derives from testimony from a witness in an
24   unrelated case, who had accused Mr. Williams of threatening him relative to that case.  (See LD
     4f Ex. 25 at 6.)  That testimony was given in 1991.  (See LD 4e at 95.)  Petitioner offers no theory
25   as to how his defense counsel could have learned of that witness's testimony, or the contents
     thereof, at his own 1987 guilt phase.  The state court may have reasonably given no credence to
26   any allegation by Petitioner that his own defense counsel, had they investigated appropriately,
     could have presented such evidence at his trial, four years prior.  Moreover, for the additional
27   reasons set forth *post*, the evidence derived from that trial does not support a prejudice finding for
     the instant claim.
28

                                                      41

1   phase because a pair of yellow aviator-style glasses were found at the crime scene with a bloody

2   fingerprint on one lens, and the glasses could not be attributed to Ms. Skuse or to Petitioner.  See

3   Osband, 13 Cal.4th at 658; ECF No. 629 at 145.  This allegation does little to assist Petitioner in

4   meeting his burden to show prejudice.  The evidence tendered did not indicate when Mr.

5   Williams was seen wearing aviator-style glasses, let alone that it was around the time of the

6   crime; indeed, the overall totality of that portion of the cited declaration appears to suggest the

7   declarant was recalling how Mr. Williams had presented several years prior to the crimes.  (See

8   LD 4f Ex. 26 (Flynn Decl.) ¶ 3.)  Although Petitioner tendered declarations of two persons who

9   stated they had seen Petitioner with Mr. Williams shortly prior to the crimes, neither declaration

10  indicates Mr. Williams had been observed wearing aviator-style glasses at that time and both

11  declarants described that Mr. Williams and Petitioner left (presumably, to commit the crimes

12  against Ms. Skuse) after it had already become evening, further rendering speculative any

13  inference that Mr. Williams had been wearing these sunglasses during the crimes at issue.  (See

14  LD 4f Ex. 26 (Flynn Decl.) ¶ 9; id. (Breaux Decl.) ¶¶ 6-8.)  There was no evidence that Mr.

15  Williams wore yellow glasses specifically, or that they otherwise resembled those found at the

16  scene, except that they were of the same general style.  Finally, had defense counsel presented

17  evidence that Mr. Williams had been seen wearing aviator-style glasses in the past, the defense

18  ran the very risk that the prosecution may have presented rebuttal evidence that fingerprints found

19  on the glasses had been tested and did not, in fact, match Mr. Williams, as well as evidence that

20  Petitioner could not be excluded as the source of the fingerprints.  (See LD 4a at 132 n.84; LD 4d

21  Ex. A; ECF No. 169 at 18 n.5; ECF No. 659 at 117 n.44; see also 14 RT 3256-57, 3318; 15 RT

22  3709; 4 CT 980-87.)  See, e.g., People v. Cain, 10 Cal. 4th 1, 45-46 (1995) (jury may view as

23  inculpatory test results indicating defendant could not be excluded as source of biological

24  material found at crime scene).  For all of these reasons, reasonable counsel may have foregone

25  presentation of Mr. Flynn's testimony stating that Mr. Williams had worn aviator-style sunglasses

26  in the past, or, if presented, the jury may have reasonably concluded such testimony did little to

27  support a defense that Mr. Williams had been the perpetrator of the crimes charged in counts one,

28  three, or four and the special circumstances.

1    Petitioner also argues that, had defense counsel reasonably investigated, they may have

2  presented evidence that Mr. Williams had been "involved" in a double homicide that occurred

3  approximately a year after the crimes against Ms. Skuse, a few blocks away from her home, and

4  that Mr. Williams had "acted as a police informant [in that case] . . . deflecting attention from

5  himself and his girlfriend."  (LD 4e at 94-96 & n.50, citing LD 4f Ex. 25 (People v. Scott and

6  Lamar, No. 3 Crim C010153 (Cal. Ct. App. Feb. 16, 1994.).)  For many reasons, it would have

7  been reasonable for the state court to have concluded that these allegations contributed little, if

8  anything, to Petitioner meeting his burden to make a prima facie showing of prejudice.  To the

9  extent that Petitioner argues that evidence from the Scott and Lamar case could have been

10  presented at Petitioner's trial to show that Mr. Williams was the perpetrator of the crimes against

11  Ms. Skuse, that argument seems unsupported by the record.  Per Petitioner's own allegations, at

12  the eventual trial in Scott and Lamar, the defense presented to the jury the theory that the

13  defendants—who were the parents of Mr. Williams' girlfriend—were innocent and that Mr.

14  Williams was the actual perpetrator.  The jury rejected that theory and found the defendants

15  guilty.  (LD 4e at 94-95; LD 4f Ex. 25.)  Petitioner made no theory as to why the jury in his case

16  would have reached the opposite conclusion, that Mr. Williams had in fact committed those

17  homicides.  (See LD 4e at 94-96.)  Petitioner also left unaddressed why Mr. Williams'

18  involvement, if any, in subsequent homicides would have made it more likely that he had also

19  participated in the crimes against Ms. Skuse, as there appeared in the state record no factual

20  overlap or even similarities between the cases except their rough geographic proximity.  (See LD

21  4e at 94-96.)  Petitioner also made no argument addressing how defense counsel would have

22  learned of and been able to have presented any such evidence, given that the Scott and Lamar trial

23  took place several years after his own trial and his factual allegations in state court relied almost

24  exclusively on evidence that was adduced at that trial.  (See LD 4e at 94-96.)

25    Aside from evidence from the Scott and Lamar trial, Petitioner also relied in state court on

26  a declaration from Leonard James in which he described Mr. Williams as having been "involved"

27  in that case because Mr. Williams had "informed the police" about his girlfriend's parents'

28  commission of the crimes.  (LD 4e at 94, citing LD 4f Ex. 26 (James Decl.) ¶ 8.)  Given, though,

43

that the <u>Scott and Lamar</u> jury later found Mr. Williams' girlfriend's parents guilty of the homicides, there appears little purchase for Petitioner's argument that defense counsel in his case should have argued that Mr. Williams had simply informed on them to distract police from his own culpability.  Reasonable defense counsel may have concluded that, had they presented such an apparently tenuous theory, it could have backfired spectacularly by inducing the jury's perception of Mr. Williams as a helpful citizen who bravely reported his girlfriend's parents' homicidal acts to the police, rather than a scheming murderer who had successfully deceived law enforcement, the District Attorney, and the jury about his responsibility for the <u>Scott and Lamar</u> homicides.  Finally, because the jury heard uncontroverted evidence that Petitioner was identified in this case not via police informant but because there were similarities between in the physical evidence present at the crime scenes of Ms. Skuse and of Norma C.  (11 RT 2565-581; <u>see</u> 2 CT 389), defense counsel may have quite reasonably opted against presenting the apparently-unsupported theory that Mr. Williams had inculpated Petitioner in the instant case in order to divert attention from Mr. Williams' own involvement in the crimes.  For all of these reasons, the state court could have reasonably concluded that Petitioner had not shown that reasonable trial counsel would have presented this theory, and the available evidence to support it, or that, if presented, the jury was reasonably likely to have rendered more favorable verdicts on counts one, three, and four at the guilt phase nor the special circumstances.

The final form of evidence on which Petitioner relies for his theory of prejudice are declarations from persons that, per Petitioner, indicate Mr. Williams and/or Mr. Thomas took responsibility for the homicide of Ms. Skuse.  This evidence, too, was of the nature that the state court may reasonably have concluded that the record did not support the conclusion that every reasonable defense counsel would have presented such evidence or, if presented, that the jury was reasonably likely to have rendered more favorable guilt-phase verdicts as a result.  In state court, Petitioner relied on two declarations whose contents, he argued, defense counsel should have presented to show that shortly after Ms. Skuse's murder, "Richard Williams and W.J. Thomas argued publicly regarding which of the two of them had killed" her.  (LD 4e at 148.)  In the first declaration, the declarant, Jamie Breaux, stated in relevant part:

1

2

3

4

> One night, a group of us were hanging out and talking; Richard and W.J. were there. Richard and W.J. were going back and forth, each of them blaming the other for killing an older lady. Neither of them ever said anything about Lance being involved in the killing; they just kept blaming each other. I didn't want to be around them when they were talking about this, so I left.

> A week or maybe more after Ricard and W.J.'s conversation, Lance was arrested for beating up a school teacher.

5

6   (LD 4f Ex. 26 (Breaux Decl.) ¶¶ 9-10; <u>see</u> LD 4e at 148 (citing same).)  In the second declaration,

7   Shawn Flynn declared in relevant part that, on an unspecified night, he had been in a park at night

8   with friends, including Petitioner, "Richard and W.J." (LD 4f Ex. 26 (Flynn Decl.) ¶ 6; <u>see</u> LD 4e

9   at 148.)  "A few days or so later," Mr. Flynn was again with Richard and W.J. and

10

11

12

13

> they appeared nervous; each one of them was claiming that the other one had killed an older lady during a break-in they had done after they had left the park the night when we had all been together at the park. Neither Richard or W.J. ever claimed that Lance was involved in the killing. . . . From the way W.J. and Richard were talking, it was clear to me that Lance was not involved in the killing.

14   (LD 4f Ex. 26 (Flynn Decl.) ¶ 9; <u>see</u> LD 4e at 148.)[12]

15       Although this evidence seems to have more exculpatory value to Petitioner than the facts

16   surrounding the sunglasses and Mr. Williams' girlfriend's parents' homicide trial, the state court

17   could reasonably have determined that it did not, even if considered together with the other

18   evidence of prejudice asserted for this claim, demonstrate a reasonable probability that the jury

19   would have reached a more favorable verdict on counts one, three, or four or the special

20   circumstances.  Plainly, neither declaration addresses the crimes charged in counts three or four,

21   and thus do not support a prejudice finding relative to those counts.  Although both declarants

22   indicate Messrs. Williams and Thomas implicated one another in the homicide charged in count

23   one, they only weakly suggest that Petitioner was not also involved in that homicide.  The

24   physical evidence from the crime scene indicated that multiple persons may have been present

25   during and participated in the crimes, and thus the fact that Mr. Williams and Mr. Thomas may

26

27

28

---

[12] In his Informal Reply in state court, Petitioner also cited the declarations of Mr. Breaux at ¶ 7; Mr. Flynn at ¶¶ 2, 6-8, 10; Mr. James at ¶ 6; and Ms. Mitchell at ¶ 3. (LD 4e at 47-48.) None of these portions of these declarations, however, discuss Petitioner's culpability of the homicide of Ms. Skuse nor Mr. Thomas' or Mr. Williams' responsibility for it.

1   have made some sort of statements blaming the other for homicide does not preclude Petitioner's

2   involvement in nor his legal culpability for that crime.  Under California law, even if the jury had

3   fully credited the notion that Messrs. Williams and Thomas had said things indicating Petitioner

4   had not committed the homicidal acts, Petitioner nevertheless may have remained legally culpable

5   for the homicide as an aider and abettor.  See, e.g., People v. Vasquez, 246 Cal. App. 4th 1019,

6   1024 (2016).  In light of the totality of the evidence heard by the jury—which included forensic

7   evidence suggesting Petitioner's presence at the crime scene, his commission of a similar crime

8   soon thereafter, his lying when questioned by police, and his later trial testimony that Petitioner

9   now represents as not fully truthful—a reviewing court could reasonably have concluded that

10   even if defense counsel had presented evidence of Mr. Breaux's and Mr. Flynn's vague

11   impressions about the meaning of Messrs. Thomas' and Williams' conversations, this did not

12   meet the bar of showing that there was a reasonable probability that the jury would have

13   determined that Petitioner had not participated in the crimes against Ms. Skuse, within the

14   meaning of California law and the instructions for criminal liability that they would receive.  This

15   remains true even if the defense had buttressed this evidence with evidence that Mr. Williams

16   also wore aviator glasses and knew people who, years later, were convicted of homicides.  See

17   Strickland, 466 U.S. at 695-96; Boyde, 404 F.3d at 1175.

18        Simply, under clearly established federal law, the state court reasonably could have

19   decided that the evidence proffered in state habeas proceedings only weakly supported an

20   innocence defense and was not "sufficient to undermine confidence in the outcome" of the

21   verdicts on counts one, two, three, or four, nor on true findings of the special circumstance.  See

22   Strickland, 466 U.S. at 694; see, e.g., Rompilla, 545 U.S. at 393 (penalty phase prejudice shown

23   where available evidence not presented to the jury "adds up to a . . . case that bears no relation to"

24   what had been "actually put before the jury" at trial); Porter, 558 U.S. at 41 (same, where jury had

25   heard "absolutely none" of the evidence the defense could have presented) Williams, 529 U.S. at

26   398 (same).  For all of these reasons, Petitioner has not shown that the state court's summary

27   denial of this claim necessarily reflected that it had applied clearly established federal law

28   unreasonably or in a manner contrary to precedent, nor that its denial was premised on an

46

1    unreasonable factual determination, relative to the guilt phase verdicts.  See 28 U.S.C. § 2254(d).

2             Petitioner also pled in state court that these errors prejudiced him at the penalty phase.

3    These allegations, however, were wholly conclusory, as Petitioner presented no theory as to how

4    the proposed evidence would have met Strickland's prejudice standard at the penalty phase, and

5    the state court reasonably may have found, consistent with state pleading rules, that they lacked

6    the specificity required to carry Petitioner's pleading burden.  See Pinholster, 563 U.S. at 188

7    n.12; Duvall, 9 Cal.4th at 474; Clark, 5 Cal.4th at 770.  (See LD 4a at 180, 182, 368; LD 4e at

8    147-49.)  Upon its thorough review of the record, however, the state court may have reasonably

9    concluded that the proposed evidence was too minimal to meet Petitioner's burden to show

10   prejudice at the guilt phase.  In its habeas corpus review, the state court would have, consistent

11   with clearly established federal law, "reweigh[ed] the evidence in aggravation against the totality

12   of available mitigating evidence."  Wiggins, 539 U.S. at 534.  For the reasons described above,

13   the evidence Petitioner put forth in habeas corpus to demonstrate his reduced culpability for the

14   crimes against Ms. Skuse was only minimally persuasive and, in several respects, would have

15   been subject to potent rebuttal.  On the other side of the scale, the jury heard forceful aggravation

16   evidence, both in terms of the circumstances of the charged crimes and other violent acts

17   attributed to Petitioner.  It would not have been a misapplication of Supreme Court precedent for

18   the state court to conclude that the proposed evidence did not suffice to show prejudice to a

19   reasonable probability, even when cumulated with the other available mitigation evidence (see

20   Claim XX, post).  See, e.g., Porter, 558 U.S. at 41; Rompilla, 545 U.S. at 393; Wiggins, 539 U.S.

21   at 534; Williams, 529 U.S. at 398.

22             For all of these reasons, the state court could reasonably have concluded, consistent with

23   clearly established federal law, that Petitioner failed to make a prima facie showing of prejudice

24   on claim one.  See 28 U.S. § 2254(d).  The undersigned therefore recommends it be dismissed.

25   **CLAIM V**

26             In Claim V, Petitioner alleges that he was denied due process of law because he was tried

27   while incompetent and because the trial court failed to declare a doubt as to his competence to be

28   ////

47

1   tried.[13]  (ECF No. 26 at 29-41.)  He also alleges that he was denied effective assistance of counsel

2   by defense counsel's failure to adequately investigate and present evidence of his incompetence.

3   (ECF No. 26 at 29, 41-42; see ECF No. 629 at 3-4, 48-49.)  He raised these allegations in state

4   court as Claim VI of his petition for writ of habeas corpus filed in the California Supreme Court

5   on July 23, 1997, which that court denied summarily on the merits.  (LD 4a at 140-78; see ECF

6   No. 629 at 48.)  The undersigned concludes that that denial is entitled to deference under 28

7   U.S.C. section 2254(d)(1).

8       1.   Governing Legal Standards

9           a.   Substantive Due Process Right to Be Tried Only While Competent

10              Under clearly established federal law, the trial of an incompetent defendant violates his

11   substantive rights to due process under the Fifth and Fourteenth Amendments.  Indiana v.

12   Edwards, 554 U.S. 164 (2008); Cooper v. Oklahoma, 517 U.S. 348, 354 (1996); Drope v.

13   Missouri, 420 U.S. 162, 171 (1975).  A defendant is incompetent if "he lacks the capacity to

14   understand the nature and object of the proceedings against him, to consult with counsel, and to

15   assist in preparing his defense."  Drope, 420 U.S. at 171; see also Dusky v. United States, 362

16   U.S. 402, 402 (1960) (per curiam) (a criminal defendant is competent to stand trial where he has

17   "sufficient present ability to consult with his lawyer with a reasonable degree of rational

18   understanding . . . [and] a rational as well as factual understanding of the proceedings against

19   him").  California statute provides the mechanism for determining a criminal defendant's

20   incompetence to stand trial, including setting forth a presumption that the defendant is presumed

21   competent that the defendant may overcome by a showing of incompetence by a preponderance

22   of the evidence.  Medina v. California, 505 U.S. 437, 440 (1992); Penal Code § 1369(f). This

23   standard itself comports with the requirement of due process.  Medina, 505 U.S. 437.

24   _____

25   [13] In his brief addressing the application of 28 U.S.C. section 2254(d) to this claim, Petitioner for
     the first time raises allegations that the trial judge possessed an actual bias against him, which

26   affected the court's rulings on the question of Petitioner's competence.  (See ECF No. 629 at 77-
     78, 95-98; ECF No. 693 at 78.) These allegations were not included in the Amended Petition (see

27   ECF No. 26 at 29-42), and therefore cannot provide a basis for relief.  See Rules Governing
     Section 2254 Cases in the United States District Courts, Rule 2(c)(1); Mayle v. Felix, 545 U.S.

28   644, 649 (2005).

b.   Procedural Due Process Rights Intrinsic to Competency Determination

When evidence before the trial court raises a "bona fide doubt" about a defendant's competence, the court must sua sponte order a competency hearing.  Pate v. Robinson, 383 U.S. 375, 385 (1966); Drope, 420 U.S. at 172-73.  Evidence before a trial judge raises a "bona fide" doubt where there is "'substantial evidence of incompetence'" before the trial court.  Amaya-Ruiz v. Stewart, 121 F.3d 486, 489 (9th Cir. 1997) (quoting United States v. Lewis, 991 F.2d 524, 527 (9th Cir. 1993)); see also Blazak v. Ricketts, 1 F.3d 891, 893 n.1 (9th Cir. 1993) ("A 'bona fide doubt' has also been expressed as 'sufficient doubt,' 'good faith doubt,' 'genuine doubt,' 'reasonable doubt,' and 'substantial question'; these all describe the same constitutional standard.").  "Evidence" encompasses all information properly before the court.  Chavez v. United States, 656 F.2d 512, 518 (9th Cir. 1981); Moore v. United States, 464 F.2d 663, 666 (9th Cir. 1972).

Evidence relevant to the question of the defendant's competence includes the defendant's "irrational behavior, demeanor before the trial court, and available medical evaluations."  Drope, 420 U.S. at 180; see also Williams v. Woodford, 384 F.3d 567, 603-04 (9th Cir. 2004); Torres v. Prunty, 223 F.3d 1103, 1108-10 (9th Cir. 2000); Hernandez v. Ylst, 930 F.2d 714, 718 (9th Cir. 1991).  The trial court should give some weight to defense counsel's opinion of the defendant's competence to stand trial.  Medina, 505 U.S. at 450; Torres, 223 F.3d at 1109.  Counsel's opinion of the defendant's competency, however, is not dispositive and the defendant having difficulty understanding attorney/client communications, without additional substantiation, is not sufficient to raise a "bona fide doubt" of his competence.  See, e.g., Gilbert v. Mullin, 302 F.3d 1166, 1179-80 (10th Cir. 2002).  Substantial evidence of incompetence has been found where one mental health professional has testified that the defendant was unable to assist in his or her defense.  See People v. Stankewitz, 32 Cal.3d 80, 92 (1982); People v. Pennington, 66 Cal.2d 508, 516-17 (1967).  Where, however, a mental health professional opines that the defendant is presently competent, the trial court may nevertheless have erred in failing to hold a competency hearing if the totality of other evidence before the court—including evidence of the defendant's history of impairments—raises a bona fide doubt as to his competence.  Blazak, 1 F.3d at 897-98.

49

1    To succeed on a claim that petitioner's due process rights were violated by the trial court's

2    failure to hold a competency hearing, the petitioner need not show that he was in fact incompetent

3    at the time, but that there was sufficient evidence to cause the trial court to have a bona fide doubt

4    as to his competence.  See de Kaplany v. Enomoto, 540 F.2d 975, 983 (9th Cir. 1976) (en banc);

5    McGregor v. Gibson, 248 F.3d 946, 954 (10th Cir. 2001) (en banc).  In reviewing whether a state

6    trial court should have sua sponte conducted a competency hearing, a federal court may consider

7    only the evidence that was before the trial court.  Lewis, 991 F.2d at 527; Chavez, 656 F.2d at

8    515-16.  For cases, like the present case, arising under AEDPA, a state court's finding that the

9    evidence was insufficient to require such a hearing is a finding of fact which must be adhered to

10   unless it was "unreasonable" within the meaning of 28 U.S.C. § 2554(d)(2).  Torres, 223 F.3d at

11   1107-08, 1110; see Maggio v. Fulford, 462 U.S. 111, 117 (1983).

12   If the trial court erroneously failed to hold a competency hearing, the remedy is for the

13   state to hold a retrospective competency hearing if one is feasible.  Odle v. Woodford, 238 F.3d

14   1084, 1089-90 (9th Cir. 2001); de Kaplany v. Enomoto, 540 F.2d at 986 & n.11.  Under

15   California law, a retrospective competency hearing is feasible where there is "availab[le] . . .

16   sufficient evidence to reliably determine the defendant's mental competence when tried earlier."

17   People v. Ary, 51 Cal.4th 510, 520 (2011).  If the state court concludes that a retrospective

18   competency determination is not feasible, the defendant's conviction must be vacated.  Odle, 238

19   F.3d at 1090 n.7.

20   c.  Sixth Amendment Right of Effective Assistance of Counsel

21   California statute permits defense counsel to seek a hearing on defendant's competence if

22   she believes the defendant may be incompetent.  Under Penal Code section 1368,

23   At the request of the defendant or his or her counsel or upon its own
     motion, the court shall recess the proceedings ... to permit counsel
24   to confer with the defendant and to form an opinion as to the mental
     competence of the defendant at that point in time. . . . If counsel
25   informs the court that he or she believes the defendant is or may be
     mentally incompetent, the court shall order that the question of the
26   defendant's mental competence is to be determined in a hearing.

27   A trial counsel's failure to declare a doubt as to a defendant's competency constitutes ineffective

28   assistance in violation of the Sixth Amendment when "'there are sufficient indicia of

50

1    incompetence to give objectively reasonable counsel reason to doubt the defendant's competency,

2    and there is a reasonable probability that the defendant would have been found incompetent to

3    stand trial had the issue been raised and fully considered.'" Stanley v. Cullen, 633 F.3d 852, 862

4    (9th Cir. 2011) (quoting Jermyn v. Horn, 266 F.3d 257, 283 (3d Cir. 2001)); see also Clark v.

5    Arnold, 769 F.3d 711, 730 (9th Cir. 2014) (to succeed in establishing ineffectiveness for counsel's

6    failure to declare a doubt as to competency a petitioner "has to show not only that the trial court

7    would have ordered a reevaluation, but also that there was a reasonable probability that the

8    defendant would have been found incompetent to stand trial had the issue been raised and fully

9    considered." (internal quotation marks and citation omitted)); see generally Strickland, 466 U.S.

10   668.

11       2.   The State Court's Ruling Was Not Unreasonable nor Contrary to Clearly Established

12            Federal Law in Summarily Denying Relief on the Allegations That the Trial Court Erred

13            In Failing to Hold a Competency Hearing

14            In his state court proceedings, Petitioner alleged that the trial court erred in not declaring a

15   doubt as to Petitioner's competence after having received the November 26, 1986 report by court-

16   appointed expert Dr. Janak Mehtani opining that Petitioner was not competent to stand trial.  (LD

17   4a at 168; see also id. at 170; ECF No. 629 at 88-89.)  Upon review of totality of evidence before

18   the trial court at the time of its determination, the undersigned concludes that the California

19   Supreme Court could have reasonably concluded that there was not substantial evidence of

20   incompetence before the trial court so as to trigger that court's obligation to conduct a

21   competency hearing.  See Drope, 420 U.S. at 180; Pate, 383 U.S. at 385; Torres, 223 F.3d at

22   1107-08, 1110; Lewis, 991 F.2d at 527; Chavez, 656 F.2d at 515-16.

23            In state court proceedings, Petitioner alleged that several broad categories of evidence had

24   demonstrated his substantial incompetence by the time the trial court received Dr. Mehtani's

25   November 26, 1986 report.  (LD 4a at 157-73.)  First, he alleged that his own statements at an

26   October 29, 1986 Marsden hearing indicated incompetence.  (Id. at 157-65; see also ECF No. 629

27   at 94.)  At that hearing, Petitioner expressed dissatisfaction with his attorney, Burton Loehr, and

28   confusion about the purpose of the hearing.  Petitioner contends that his statements at this hearing

1   evince an "extreme inability to even understand the nature of" the <u>Marsden</u> hearing (LD 4a at

2   162), "significant misunderstandings about the [trial] process" (<u>ibid.</u>), and "extreme mistrust or

3   paranoia" towards defense counsel Loehr.  (LD 4a at 161.)  The state court, however, could have

4   reasonably disagreed with these characterizations.  The record does not demonstrate that

5   Petitioner displayed an "extreme inability to even understand the nature of" the hearing he was

6   attending; rather, it appears he repeatedly expressed exasperation that his defense counsel had

7   misled him about what the purpose of the hearing was going to be.  (LD 2d Vol. I (Oct. 29, 1986

8   hearing) at 5, 6-9, 12, 18-19.)  In the hearing, he evinced understanding of the court's questions,

9   responded appropriately, and asked questions when he did not understand things.  (<u>Id.</u> at 6-9, 10-

10  11, 12-14, 17-19, 20-21, 23.)  Although he disagreed with his counsel's characterizations of their

11  communications and disputes, that did not indicate that he did not understand what was being

12  discussed in court.  (<u>See ibid.</u>)  Several times, Petitioner indicated he did not understand legal

13  terms of art—namely, the precise definition of "severance," and the meanings of "1368" and

14  "730"—which in no way demonstrates his lack of competence as either a legal or factual matter.

15  (<u>Id.</u> at 10-11, 15, 21.)  <u>See, e.g.</u>, <u>Gacy v. Welborn</u>, 994 F.2d 305, 314 (7th Cir. 1993) (discussing

16  non-attorney jurors' difficulties in deducing the meaning of specific legal terms); <u>United States v.</u>

17  <u>Torres</u>, 965 F.2d 303, 308 (7th Cir. 1992) (same); Walter W. Steele, Jr., <u>Jury Instructions: A</u>

18  <u>Persistent Failure to Communicate</u>, 67 N.C. L. Rev. 77, 81 (1988) (same).

19        The record also does not support Petitioner's characterization that his statements at this

20  hearing demonstrated an "extreme mistrust or paranoia" towards his counsel.  (<u>See</u> LD 4a at 161.)

21  The record was silent as to what Petitioner's and his counsel's communications had actually been,

22  and thus it would have been only speculative for the trial court to deduce that Petitioner's

23  complaints arose from paranoia suggestive of incompetence.  Indeed, at one point in the hearing,

24  one of Petitioner's complaints was seemingly validated when second-chair defense counsel Mr.

25  Christiansen interjected with his recollections of his work on the case and Petitioner replied that

26  he had not seen Mr. Christiansen since their first introductory meeting, which Mr. Christainsen

27  then acknowledged was correct.  (LD 2d Vol. I (Oct. 29, 1986 hearing) at 12-13; <u>see also id.</u> at 14

28  [reiterating same].)

1    Petitioner also alleged that statements by defense counsel at the October 29, 1986 hearing

2    militate towards an incompetence finding.  (LD 4a at 163-64.)  At that hearing, defense counsel

3    endeavored to explain one of the areas of dispute that had arisen between Petitioner and him,

4    offering that "I think [Petitioner]'s having some trouble being articulate in the Court.  He's

5    certainly very verbal when I go over and try to talk to him . . . but he disagrees with me

6    vehemently about the defense that should be taken here. . . ."  (LD 2d Vol. I (Oct. 29, 1986

7    hearing) at 7.)  Although second-chair defense counsel indicated he was concerned about

8    Petitioner's "mental abilities," he acknowledged that his only contact with Petitioner had been

9    one meeting; in contrast, first-chair counsel Mr. Loehr told that court that he had had Petitioner

10   "examined by two psychiatrists or two psychologists and a psychiatrist, and no one has informed

11   me that he is 1368."  (Id. at 13-15.)  Mr. Loehr explained that the consulting experts had

12   determined Petitioner had an I.Q. "around eighty or eighty-five . . . so he has some difficulties

13   understanding concepts that we, as lawyers, talk about with some ease."  (Id. at 16.)  Mr. Loehr

14   believed he and Petitioner disagreed about the defense to present because Petitioner struggled to

15   articulate his ideas to him, "because I don't think he's a very articulate man" and because

16   Petitioner did not have counsel's legal experience that informed the latter's belief in the non-

17   viability of an innocence defense.  (Id. at 17.)

18   The totality of these comments and representations by trial counsel would have given the

19   court little cause to believe there was "substantial evidence of incompetence" requiring the court

20   to declare a doubt about Petitioner's competence to proceed.  See United States v. Lewis, 991

21   F.2d 524, 527 (9th Cir. 1993).  Counsel's representation that Petitioner had a subaverage I.Q. did

22   not itself show that Petitioner was incompetent.  In Atkins v. Virginia, 536 U.S. 304, 318 (2002),

23   the Supreme Court explained that intellectually disabled "persons frequently . . . are competent to

24   stand trial. . . . Their deficiencies do not warrant an exemption from criminal sanctions, but they

25   do diminish their personal culpability" relative to their moral deservingness of the death penalty.

26   See also Penry v. Lynaugh, 492 U.S. 302, 307-308 (1989) (observing jury found the defendant

27   had an I.Q. in the range of 50 to 63 but was nonetheless competent to stand trial); Boyde v.

28   Brown, 404 F.3d 1159, 1166-67 (9th Cir. 2005) (observing that people with mental deficiencies

53

1   are not necessarily incompetent to stand trial).  Furthermore, Mr. Loehr explained his perception

2   that Petitioner simply struggled to articulate himself in court and that they disagreed about trial

3   strategy, but in no way indicated that he personally believed that Petitioner was incompetent by

4   virtue of intellectual disability or any other reason.  See Medina, 505 U.S. at 450 (reasonable for

5   trial court to rely on defense counsel's presentation of defendant's features showing

6   incompetence, because "defense counsel will often have the best-informed view of the

7   defendant's ability to participate in his defense"); Torres, 223 F.3d at 1109 (holding it was

8   unreasonable for trial court to reject defense counsel's perception of defendant's competence).

9   Finally, the trial court would not have been unreasonable in giving weight to defense counsel's

10  representations that Petitioner had been assessed by several mental health professionals and none

11  had indicated concern that Petitioner was incompetent.  See, e.g., Pate, 383 U.S. at 386; Stanley v.

12  Cullen, 633 F.3d 852, 862–63 (9th Cir. 2011); Torres, 223 F.3d at 1109.  In sum, there was

13  nothing deriving from this hearing, either from the presentation of Petitioner himself nor from the

14  representations of his counsel, that constituted substantial evidence of incompetence that should

15  have given rise to the trial court having a bona fide doubt as to Petitioner's competence to

16  proceed.  See Drope, 420 U.S. at 172-73, 180 (substantial evidence of incompetence may include

17  the defendant's "irrational behavior, demeanor before the trial court, and available medical

18  evaluations").

19      Petitioner also argued that, in light of the foregoing, the trial court was unreasonable in not

20  declaring a doubt about Petitioner's competency upon receipt of Dr. Mehtani's November 26,

21  1986 report.  (LD 4a at 165-68.)  In that report, Dr. Mehtani stated he had examined Petitioner

22  twice and concluded that he was not presently competent to stand trial.  (LD 4b Ex. 4 at 1, 4.)  Dr.

23  Mehtani described that Petitioner was of average intelligence, but his "insight and judgment

24  seemed to be impaired."  (Id. at 4.)  He gave a tentative diagnosis of a psychotic disorder or

25  disorder relating to schizophrenia.  (Ibid.)  The basis for these conclusions were Petitioner's

26  statements indicating his mistrust of his counsel, his belief that his counsel had performed

27  substandardly in their motion practice on his behalf, and a belief that he was being "railroad[ed]"

28  by the court, prosecutor, and his counsel.  (Id. at 4-5.)  Dr. Mehtani perceived these statements to

1    indicate not only that Petitioner was paranoid, but also that he did not understand the nature of the

2    court proceedings in which he was engaged.  (Ibid.)

3            Petitioner argued in his state habeas corpus proceedings that, at that point, the trial court

4    should have declared a doubt as to Petitioner's competence to proceed.  (LD 4a at 168.)  The

5    California Supreme Court, however, could have reasonably concluded that clearly established

6    federal law accorded with the trial court's efforts to obtain more information about Petitioner's

7    functioning, particularly because the basis of Dr. Mehtani's clinical opinions was Petitioner's

8    mistrust of his counsel and belief he was not being treated fairly, which may have suggested a

9    conflict with his attorneys that was not borne from incompetence.  In addition to the Marsden

10   hearing on October 23, 1986, the court had held two previous hearings at which Petitioner had

11   expressed dissatisfaction with Mr. Loehr and his representation of him.  (See LD S1 (July 8, 1986

12   hearing); LD S2 (Aug. 12, 1986 hearing).)  In People v. Stankewitz, 32 Cal.3d 80 (1982), the

13   California Supreme Court addressed a factually similar scenario, where the defendant had both

14   expressed dissatisfaction with counsel and displayed features of mental impairment.  There, the

15   trial court became aware pretrial that the defendant's "relations with his appointed counsel . . .

16   [had] become a matter of dispute."  Stankewitz, 32 Cal.3d at 88.  At one pretrial hearing, his

17   counsel informed the court that "a fundamental dispute" had emerged between the defendant and

18   himself, which "no amount of further discussion could resolve," and that he believed this dispute

19   was the product of the defendant's mental impairments, based on counsel's discussions with

20   psychiatrists who had examined him.  Ibid.  The trial court appointed an expert to examine

21   Petitioner for incompetency and that expert concluded he was incompetent, diagnosing him with

22   a form of delusional disorder.  Ibid.  At a hearing, the expert explained that the defendant's

23   delusions manifested in a staunch disagreement with counsel about what defense should be

24   presented on his behalf.  Ibid.  At the conclusion of that hearing, the trial court found "for certain,

25   it's been shown that [the defendant] could not cooperate in a rational manner with the Public

26   Defender" but nonetheless failed to declare a doubt as to the defendant's counsel, instead ordering

27   the substitution of counsel.  Id. at 89.

28           The California Supreme Court held it was error for the trial court to have failed to declare

a doubt about the defendant's incompetence on the record before it, particularly the opinion of the

court-appointed expert and the statements of counsel about his perception of the defendant's

functioning.  Id. at 92-94.  The court endorsed, however, the notion that it was generally proper

for the trial court to have endeavored, to the extent it did, to determine whether the purported

signs of incompetence were instead simply indications of the breakdown of the attorney-client

relationship:

> Given Dr. Glenn's belief that these problems might not arise with
> different counsel, it is conceivable that a substitution of counsel
> could have alleviated the entire tangle. At least, this was an
> alternative which the trial court could have tried in hopes of
> avoiding any need for a full competency hearing. . . .
>
> In view of the state of the record before it, the trial court had to take
> some action to unravel the fundamental dispute presented to it. The
> court may not have been required to hold a full competency hearing
> if the problem could have been resolved by a substitution of
> counsel. But the court should not have chosen to do nothing at all.
> Since that is how it responded, this court has no choice but to find
> this inaction to be error.

Id. at 93-94.  This approach is not an unreasonable application of, nor contrary to, clearly

established federal law governing competency determinations.  See Torres, 223 F.3d at 1109-10

(recognizing that Pate and Drope require some amount of factfinding by the trial court to

determine whether there is substantial evidence of a defendant's incompetence and holding the

trial court was unreasonable for failing to pursue such factfinding before ruling there was no such

substantial evidence); Chavez v. United States, 656 F.2d 512, 518 (9th Cir. 1981) (trial court has

duty to probe and assess the reliability of evidence of incompetence before it, in determining

whether there exists substantial evidence sufficient to declare a doubt about defendant's

competence).

Here, the trial court was required to consider Dr. Mehtani's opinions contained in the

latter's November 26, 1986 report, but it was also required to weigh that opinion in light of the

entire record before it.  See Drope, 420 U.S. at 174-82; Pate, 383 U.S. at 385; Torres, 223 F.3d at

1109-10; Chavez, 656 F.2d at 518.  Alongside Dr. Mehtani's November 26, 1986 opinion, the

court also had its own observations of Petitioner behaving, communicating, and responding

appropriately at hearings; his counsel's representations that Petitioner's principal deficit was

1    being inarticulate in a courtroom setting; and defense counsel's representations that Petitioner had

2    been examined by several additional mental health professionals, none of whom perceived his

3    incompetence.  In light of the entirety of this record, the California Supreme Court may have

4    reasonably determined that the trial court's failure to declare a doubt had not transgressed the

5    standards set forth in clearly established federal law.  See Drope, 420 U.S. at 174-82; Pate, 383

6    U.S. at 385.

7           Petitioner also argued that the trial court should have declared a doubt about his

8    competence at a subsequent hearing, on December 3, 1986.  (LD 4a 168-70.)  The California

9    Supreme Court, again, was not unreasonable under clearly established federal law in concluding

10   that the record at that point did not demonstrate Petitioner's substantial incompetence.  After

11   receiving Dr. Mehtani's November 26, 1986 report, the court held another closed hearing with

12   Petitioner and his counsel, on December 3, 1986.  (LD 2d Vol. III (Dec. 3, 1986 hearing).)  There,

13   both defense counsel informed the court that they believed that the features Dr. Mehtani had

14   perceived as evidence of incompetence actually reflected Petitioner's specific mistrust of Mr.

15   Loehr, such that substitution of counsel was the appropriate remedy.  (Id. at 2-3.)  Mr. Loehr

16   stated that, in their private conversations, Petitioner was articulate and that, personally, he had

17   "not thought that Mr. Osband was not able to understand the proceedings or to cooperate with

18   counsel in a general sense."  (Id. at 3.)  He explained that he perceived that Petitioner simply

19   staunchly mistrusted him, but that "I'm not sure it's the right thing to do to proceed with the

20   1368" because "the main problem is that he's mad at me."  (Id. at 4.)  In response to the court's

21   further questioning, both counsel stated they had no basis on which they could express a doubt as

22   to Petitioner's competence to proceed.  (Ibid.)  The court then addressed Petitioner directly, who

23   cogently expressed his continued dissatisfaction with counsel.  (Id. at 4-7.)  The court continued

24   the hearing to rule at a later date on both the Marsden motion and the question of whether there

25   was substantial evidence of Petitioner's incompetence, such that the court should sua sponte

26   declare a doubt.  (Id. at 9-10.)

27           Despite Petitioner's arguments to the contrary, nothing at this hearing suggested

28   Petitioner's incompetence.  Petitioner's statements and interactions with the court did not suggest

1    an inability to understand the proceedings in which he was engaged or to consult with his counsel.

2    See Dusky, 362 U.S. at 402.  Both of Petitioner's counsel stated they believed, based on their own

3    interactions with Petitioner, that he was competent.  Under clearly established federal law, the

4    trial court was required to give weight to its own observations of Petitioner's functioning and to

5    counsel's perceptions of his functioning.  See Medina, 505 U.S. at 450; Drope, 420 U.S. at 174-

6    82; see also Torres, 223 F.3d at 1109.  The trial court may have reasonably determined, at the

7    conclusion of the December 3, 1986 hearing, it did not have before it substantial evidence of

8    Petitioner's incompetence under clearly established federal law.  See Medina, 505 U.S. at 450;

9    Drope, 420 U.S. at 174-82; Pate, 383 U.S. at 385.

10           Finally, it was not contrary to clearly established federal law, nor an unreasonable

11   application of it, for the trial court to have asked Dr. Mehtani for a supplemental evaluation and

12   report after the court granted Petitioner's Marsden motion and substituted Mr. Loehr as

13   Petitioner's counsel.  (1 RT P43-49; LD 4d Ex. H.)  Given the totality of evidence before the

14   court at that time, such factfinding was reasonable.  See Torres, 223 F.3d at 1109-10; Chavez, 656

15   F.2d at 518; see generally Medina, 505 U.S. at 450; Drope, 420 U.S. at 174-82.  Despite

16   Petitioner's characterizations (LD 4a at 170-71), the record does not show that the trial court was

17   biased in making this request, but appears simply to demonstrate the court's efforts to make the

18   factual and legal determinations required of it.

19           In sum, based on the totality of the record before the trial court at the instances identified

20   by Petitioner, the California Supreme Court was reasonable in concluding that the trial court had

21   not transgressed federal constitutional law in failing to declare a doubt as to Petitioner's

22   competence to be tried.  The state court's denial of this subclaim on habeas corpus, therefore, is

23   entitled to deference.  See Richter, 562 U.S. at 98-103.

24       3.  The State Court's Ruling Was Not Unreasonable or Contrary to Clearly Established
         Federal Law in Summarily Denying Relief on the Allegations That the Petitioner Was
25
         Incompetent At Trial
26

27           The state court was not unreasonable for summarily denying Petitioner relief on his

28   subclaim that he was incompetent at the time of trial, thereby violating his substantive due

1    process rights, as the court could reasonably have found that Petitioner failed to make a prima

2    facie showing of his incompetence by a preponderance of the evidence.  See Medina, 505 U.S. at

3    440; Drope, 420 U.S. at 171.  In support of this claim, Petitioner tendered the declaration of Mr.

4    Loehr, in which he stated that he recalled Petitioner had "some genuine difficulties" in

5    understanding the strength of the evidence against him and the viability of certain defenses and

6    was "suspicious" towards him.  (LD 4b Ex. 3 at ¶¶ 9, 16.)  Petitioner also tendered the declaration

7    of Dr. Karen Froeming, who opined that Petitioner "was severely disabled with regard to his

8    ability to understand the legal proceedings at the time of his arrest, the trial, his relationship with

9    counsel, and his competence should have been in question."  (LD 4b Ex. 5 at ¶ 32.)  Dr. Froming

10   further opined that Petitioner had not been properly examined by Dr. Mehtani.  (Id. at ¶¶ 33-36.)

11   She did not opine that Petitioner was actually incompetent at the time of trial.  (See LD 4b Ex. 5.)

12   Finally, Petitioner alleged that his family's history of mental illness supported a finding of his

13   incompetence.  (LD 4a at 155-56.)

14        The California Supreme Court could reasonably have concluded that none of these

15   materials, even taken together and considered with the evidence in the trial record, did not meet

16   the standard of demonstrating that Petitioner, at the time of trial, "lack[ed] the capacity to

17   understand the nature and object of the proceedings against him, to consult with counsel, and to

18   assist in preparing his defense."  See Drope, 420 U.S. at 171.  This is a narrow, specific showing,

19   which a defendant must meet by a preponderance of the evidence.  Medina, 505 U.S. at 440.

20   While the courts must be careful in determining matters of competence, they also cannot project

21   notions of incompetence onto defendants without adequate evidentiary support.  See Atkins, 536

22   U.S. at 318; Adams v. United States ex rel. McCann, 317 U.S. 269, 279-80 (1942).   The state

23   court was not unreasonable, nor acted contrary to clearly established federal law, if it concluded

24   that the materials Petitioner had proffered in support of his allegations failed to make even a

25   prima facie showing that he could meet his burden to prove his incompetence at the time of his

26   trial.  See, e.g., Stanley v. Cullen, 633 F.3d 852, 862-63 (9th Cir. 2011).  Deference to the state

27   court's summary denial of this subclaim is warranted.  See Richter, 562 U.S. at 98-103.

28   ////

59

1    4.   The State Court's Ruling Was Not Unreasonable nor Contrary to Clearly Established

2         Federal Law in Summarily Denying Relief on the Allegations That the Defense Counsel

3         Was Ineffective In Failing to Demonstrate Petitioner's Incompetence to the Trial Court

4              The California Supreme Court was not unreasonable in summarily denying Petitioner's

5    allegations that his trial counsel was ineffective in investigating and presenting to the trial court

6    evidence of Petitioner's incompetence.  To make a prima facie showing, Petitioner was required

7    to demonstrate both deficient performance and prejudice, which specifically required a showing

8    that "there are sufficient indicia of incompetence to give objectively reasonable counsel reason to

9    doubt the defendant's competency, and there is a reasonable probability that the defendant would

10   have been found incompetent to stand trial had the issue been raised and fully considered."

11   Stanley, 633 F.3d at 862; see generally Strickland, 466 U.S. at 691-92.  For the reasons set forth

12   above, the state court could have concluded, consistent with governing Supreme Court precedent,

13   that the record did not show sufficient indicia of incompetence such that all reasonable trial

14   counsel would have doubted Petitioner's competence.  The record before the state court also

15   failed to show prejudice, in that it did not make a prima facie showing that there was a reasonable

16   probability that Petitioner would have been found incompetent had available evidence been

17   presented to the trial court, for the reasons described *ante*.  See Clark v. Arnold, 769 F.3d 711,

18   730 (9th Cir. 2014).  The state court's summary denial of this subclaim, therefore, is entitled to

19   deference.  See Richter, 562 U.S. at 98-103.

20   **CLAIM IX**

21        In Claim IX, Petitioner alleges that defense counsel performed ineffectively at the guilt

22   phase by calling Petitioner to testify, by failing to advise him concerning impeachable aspects of

23   his testimony, and failing to investigate available defenses and Petitioner's competence to testify.

24   (ECF No. 26 at 78-84; LD 4a at 185-86.)  He raised this claim in his state petition for writ of

25   habeas corpus, as subpart B of Claim VII.  (ECF No. 629 at 157-58; LD 4a at 183-96.)  The state

26   court denied relief summarily on the merits, which the undersigned concludes is entitled to

27   deference.  See 28 U.S.C. § 2254(d)(1).

28   ////

60

1          1.   Governing Legal Standard

2          "The right of an accused to testify in his own defense is well established and is 'a

3    constitutional right of fundamental dimension.'" United States v. Pino–Noriega, 189 F.3d 1089,

4    1094 (9th Cir. 1999) (quoting United States v. Joelson, 7 F.3d 174, 177 (9th Cir. 1993)); accord

5    Rock v. Arkansas, 483 U.S. 44, 51 (1987) (noting that right to testify "has sources in several

6    provisions of the Constitution"); Faretta v. California, 422 U.S. 806 (1975) (recognizing that

7    Sixth Amendment includes the right of self-representation, and that a defendant's right "to

8    conduct his own defense by calling witnesses is incomplete if he may not present himself as a

9    witness," and that right to testify "is also a necessary corollary to the Fifth Amendment's

10   guarantee against compelled testimony"); see also United States v. Orozco, 764 F.3d 997, 1001

11   (9th Cir. 2014).  The decision whether to testify ultimately falls to the defendant, rather than

12   counsel.  See Jones v. Barnes, 463 U.S. 745, 751 (1983) ("the accused has the ultimate authority

13   to make certain fundamental decisions regarding the case" including whether to "testify in his or

14   her own behalf"); see also Rock, 483 U.S. at 52-53; Harris v. New York, 401 U.S. 222, 230

15   (1971) ("Every criminal defendant is privileged to testify in his own defense, or to refuse to do

16   so."); United States v. Kaczynski, 239 F.3d 1108, 1118 (9th Cir. 2001).

17         In order to be competent to testify, the defendant must have "a sufficient understanding to

18   apprehend the obligation of an oath and to be capable of giving a correct account of the matters

19   which he has seen or heard in reference to the questions at issue." District of Columbia v. Arms,

20   107 U.S. 519, 521–22 (1883); see also United States v. Benn, 476 F.2d 1127, 1130 (D.C. Cir.

21   1972) (Competency to testify "depends upon the witness' capacity to observe, remember, and

22   narrate as well as an understanding of the duty to tell the truth."); Evid. Code § 701 ("A person is

23   disqualified to be a witness if he or she is:  (1) Incapable of expressing himself or herself

24   concerning the matter so as to be understood, either directly or through interpretation by one who

25   can understand him; or (2) Incapable of understanding the duty of a witness to tell the truth. . . .").

26         As set forth above, at the time of Petitioner's trial, defense counsel had a duty "to make

27   the adversarial testing process work in [his client's] case" by electing strategies and tactics that

28   maximized the defendant's likelihood of a favorable verdict, in counsel's "reasonable

professional judgment."  Strickland, 466 U.S. at 690-91.  Such judgment, strategies, and tactics, however, are only reasonable if they are premised on an investigation that itself comports with contemporaneous professional norms.  Id. at 691 (counsel has a duty to make "reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary").  Even where a trial decision belongs entirely to the defendant – for example, the decision to plead guilty – defense counsel nevertheless maintains a responsibility to provide the defendant reasonable, competent advice in the exercise of that decision.  Lafler v. Cooper, 566 U.S. 156, 162-63 (2012); Missouri v. Frye, 566 U.S. 134, 146-48 (2012); Padilla v. Kentucky, 559 U.S. 356, 366-74 (2010); Hill v. Lockhart, 474 U.S. 52, 56-59 (1985).

> 2.  The California Supreme Court Did Not Unreasonably Apply Nor Act Contrary To Clearly Established Federal Law If It Found No Prima Facie Showing of Deficient Performance

The California Supreme Court could have reasonably denied relief on the grounds that Petitioner failed to make a prima facie showing of his counsel's deficient performance by failing to make any allegations nor offer any reasonably available evidentiary support tending to show to what extent Petitioner's decision to testify was attributable to defense counsel or to what extent certain contents of his testimony had resulted from defense counsel's actions or omissions.  The thrust of Petitioner's argument appears that, during both direct and cross-examination, Petitioner testified that he had entered Ms. Skuse's apartment with an intent to commit theft, which thereby constituted an admission of one element of burglary and thus one of the elements of the felony-murder theory on which count one and the special circumstance allegations were based.[14]  (See

---

[14] Petitioner also, briefly, alleges that, had trial counsel performed the investigation described in Claim I, they would have learned that "persons other than petitioner were guilty of the Skuse homicide" and that Petitioner decided to testify falsely out of fear of threats to his family.  (ECF No. 26 at 80-81; see LD 4a at 186-87.)  For the reasons set forth ante, the state record did not establish that Petitioner had in fact received threats relative to his testifying; that defense counsel's ignorance of any such threats was attributable to their deficient investigation; that other persons had committed the homicide of Ms. Skuse; nor that Petitioner was not guilty under California law for the crimes against Ms. Skuse, including her homicide.  The state court, therefore, was not unreasonable if it concluded that these allegations did not assist Petitioner in making his showing of deficient performance for Claim IX.

1    ECF No. 629 at 168, citing <u>Osband</u>, 13 Cal.4th at 657-58 and RT 2857; ECF No. 693 at 131-32,

2    134-35; ECF No. 26 at 80, 82-83; LD 4a at 185-92; LD 4e at 154 n.78, 154-61.)  Because this

3    concession was helpful to the prosecution's case and because it conflicted with the defense's

4    strategy up to that point, which had been to cast doubt on the prosecution's evidence that

5    Petitioner had even entered the victim's home at all, Petitioner posits that the elicitation of this

6    testimony necessarily reflects deficient performance, i.e., it was so strategically unsound that no

7    reasonable defense counsel would have called Petitioner to testify or would have knowingly

8    elicited the testimony.  (<u>See</u> ECF No. 629 at 167-71; ECF No. 693 at 131-32, 134-35; LD 4a at

9    185-92; LD 4e at 154 n.78, 154-61.)

10           These allegations, however, were silent on the critical question of what defense counsel

11   had actually done.  Neither Petitioner's allegations nor evidentiary support proffered to the state

12   court indicated that it was counsel's decision, rather than Petitioner's, to have Petitioner testify.

13   There were no allegations that Petitioner chose to testify based, even in part, on advice that

14   counsel had given him.  There were no allegations that counsel had agreed with Petitioner's

15   decision to testify.  Simply, there was nothing that would have permitted the state court to

16   conclude that, when Petitioner opted to exercise this fundamental constitutional right, that choice

17   was pursuant in any part to advice from, or decision-making by, counsel.  (<u>See</u> LD 4a at 185-92;

18   LD 4e at 154 n.78, 154-61.)

19           This omission distinguishes Petitioner's case from others where the Supreme Court had

20   found counsel ineffective for performing deficiently in advising a defendant in the latter's

21   exercise of a constitutional right.  In <u>Padilla</u>, 559 U.S. 356, for example, the defendant pled guilty

22   to a drug offense and then, because of his guilty plea, was immediately subject to deportation.  He

23   then challenged his guilty plea in post-conviction proceedings, alleging that his trial counsel was

24   ineffective.  <u>Id.</u> at 359.  He did not, however, rely simply on the fact that his guilty plea resulted

25   in adverse collateral consequences to show that his counsel had necessarily given him poor advice

26   or had otherwise performed deficiently.  Rather, in his petition he alleged specifically that, "his

27   counsel not only failed to advise him of this consequence prior to his entering the plea, but also

28   told him that he 'did not have to worry about immigration status since he had been in the country

1  so long'"; that he had "relied on his counsel's erroneous advice when he pleaded guilty to the

2  drug charges that made his deportation virtually mandatory"; and that "he would have insisted on

3  going to trial if he had not received incorrect advice from his attorney." Ibid.  The Supreme

4  Court held that these allegations had made a prima facie showing of deficient performance under

5  Strickland because, by assuring petitioner he would not be deported, counsel had given him

6  advice that was erroneous under binding immigration statutes.  559 U.S. at 368-69.

7        The Supreme Court engaged in similar analyses in Lafler and Frye.  In both cases,

8  convicted persons alleged that their trial counsel performed ineffectively by committing specific

9  acts or omissions relative to plea offers from the prosecution.  In Lafler, the Supreme Court held

10  that the defendant had shown deficient performance because it was undisputed that counsel had

11  "advised [the defendant] to reject the plea offer on the grounds he could not be convicted at trial"

12  based on counsel's erroneous understanding of the law governing his client's charges.  566 U.S.

13  at 162-63; see Cooper v. Lafler, 376 F. App'x 563, 570 (6th Cir. 2010).  In Frye, the defendant

14  pled guilty to a charge without a plea agreement in place and was sentenced to three years'

15  incarceration.  566 U.S. at 138-39.  He then filed a petition for writ of habeas corpus alleging his

16  trial counsel had performed ineffectively.  Id. at 139.  As to deficient performance, he alleged that

17  the prosecution had communicated an offer to counsel that would have permitted the defendant to

18  plead guilty to a misdemeanor and be recommended for a 90-day sentence; that defense counsel

19  had failed to communicate the offer to him; and that had he known of it, he would have accepted

20  the offer.  Id. at 138-39.  These specific acts—defense counsel's receipt of the offer and choice

21  not to communicate it to the defendant—the Supreme Court held constituted unreasonable,

22  deficient performance by trial counsel.  Id. at 145.

23        Here, in contrast, Petitioner alleged no specific acts or omissions by trial counsel that

24  tended to show that counsel was responsible, to any extent, for the contents of Petitioner's

25  testimony.  As a matter of law, Petitioner was entitled to elect to testify and, when he did, he was

26  required to answer truthfully.  See United States v. Joelson, 7 F.3d 174, 177-78 (9th Cir. 1993)

27  (although a criminal defendant's decision to testify often reflects a "strategic trial decision," it is,

28  at base, a constitutional right belonging wholly to the defendant to exercise); see generally Rock,

483 U.S. at 52-53; Nix v. Whiteside, 475 U.S. 157, 166 (1986); Jones, 463 U.S. at 751; Harris,

401 U.S. at 230; cf. United States v. Pino-Noreiga, 189 F.3d 1089, 1095 (9th Cir. 1999) ("A

defendant who wants to reject his attorney's advice and take the stand may do so by insisting on

testifying. . .").  Unlike the convicted persons in Padilla, Lafler, and Frye, Petitioner failed to

allege how his exercise of a particular constitutional right was influenced by counsel and how that

influence fell short of contemporaneous professional norms.  Because clearly established federal

law required Petitioner to "identify the acts or omissions of counsel that are alleged not to have

been the result of reasonable professional judgment," Strickland, 466 U.S. at 690, the state court

could reasonably have concluded that Petitioner's allegations, even if fully credited by a

factfinder, did not suffice to show that defense counsel committed some particular act or omission

that was unreasonable.  See, e.g., United States v. Sanchez-Cervantes, 282 F.3d 664, 672 (9th Cir.

2002), as amended (Mar. 15, 2002) (assessing deficient performance by considering evidence of

what advice counsel had given the defendant about the decision to testify, his reasons for giving

that advice, and the defendant's averments that he had only testified pursuant to counsel's

advice); People v. Cunningham, 25 Cal.4th 926, 1031-32 (2001), as modified (Aug. 15, 2001) (on

similar allegations, holding deficient performance not shown where record was silent on what

advice defense counsel had given the defendant concerning his decision to testify); cf. Holt v.

Smith, No. 01:97-cv-06210-DAD, 2023 WL 3126313, at *72 (E.D. Cal. April 27, 2023) (finding

counsel deficient for calling defendant to testify where, inter alia, trial counsel had stated it had

been his decision to call the defendant as a witness).  The state court was therefore not

unreasonable if it concluded there was no prima facie showing of deficient performance made on

this basis.

        The state court also could have found inadequate Petitioner's allegations that his trial

testimony was so harmful to his case that it necessarily reflected poor preparation or investigation

by defense counsel.  These allegations fail as speculative.  As the California Supreme Court has

commonsensically observed, "[a]nyone who has ever tried a case knows that . . . [i]t is not

uncommon for even the most carefully prepared witness to give an occasional surprise answer."

People v. Gates, 43 Cal.3d 1168, 1213-14 (1987).  Thus, "it does not follow," ibid., to "hold

1   defense counsel responsible for the potentially damaging responses furnished by a defendant or

2   other witness." People v. Cunningham, 25 Cal.4th 926, 1031-32 (2001), as modified (Aug. 15,

3   2001).  Without more specific factual allegations as to the nature of counsel's preparations and

4   investigations relative to Petitioner's testimony, the state court may reasonably have found these

5   allegations too conclusory to suffice, under Strickland, to show that particular acts or omissions

6   by defense counsel were unreasonable.  See, e.g., Moore v. Mitchell, 708 F.3d 760, 786 (6th Cir.

7   2013) (holding that state court was reasonable in denial of claim that defense counsel had been

8   ineffective in preparing defense witnesses to testify because record was silent on what those

9   preparations had been and "the fact that Dr. Chiappone testified as he did is equally compatible

10  with the conclusion that Dr. Chiappone actively concealed this information from trial counsel, did

11  not remember it when trial counsel asked and only remembered on the stand, or made it up on the

12  spot.  It would be the same as a witness's blurting something out unexpectedly, with no warning,

13  with no evidence whatsoever as to trial counsel's preparations."); Sechrest v. Ignacio, 549 F.3d

14  789, 816-17 (9th Cir. 2008) (holding trial counsel had performed deficiently in their preparations

15  of a trial witness where evidence showed that counsel had not spoken to the witness at all after

16  agreeing to him testifying); Carpenter v. Vaughn, 296 F.3d 138, 151 (3d Cir. 2002) (assessing

17  similar claim by considering specific evidence of what defense counsel's preparations of the

18  defendant's testimony had been, then concluding that such preparations were not deficient);

19  Johnson v. Baldwin, 114 F.3d 835, 840 (9th Cir. 1997) (trial counsel was deficient in calling

20  petitioner to testify where an evidentiary hearing had shown counsel's paltry preparations,

21  including not investigating available evidence to corroborate the alibi to which petitioner would

22  testify).

23         Other of Petitioner's allegations may have also been reasonably rejected as speculative.

24  In this proceeding, Petitioner posits that defense counsels' failure to investigate other suspects or

25  Petitioner's intoxication during the homicide somehow related to their failure to prepare

26  Petitioner to testify, acquiescence to his decision to testify, or failure to anticipate likely cross-

27  examination to his testimony.  (See ECF No. 629 at 158-60, 164, 179; ECF No. 693 at 132.)

28  Petitioner failed, however, to make any specific factual allegations to substantiate the claim of

66

1    deficient performance on this basis.  To be sure, counsels' failure to conduct a reasonable

2    investigation in one aspect of the case may have a ripple effect of counsel not knowing vital

3    information necessary to make a strategically-sound decision in another aspect of the case.  See,

4    e.g., Andrews v. Davis, 944 F.3d 1092, 1121 (9th Cir. 2019) ("Strickland recognizes that some

5    errors by counsel will have 'pervasive effect[,] . . . altering the entire evidentiary picture.'").

6    Here, however, such an inference appeared unfounded in the state court.  Even if defense counsel

7    had investigated alternate suspects to the extent Petitioner alleges was necessary, that does not

8    render it per se unreasonable for defense counsel to also call Petitioner to testify—if, indeed, that

9    decision may be fairly ascribed to counsel—given that the jury would hear evidence for which

10   Petitioner's testimony could have provided a helpful explanation, namely, the otherwise

11   unrebutted physical evidence that the jury could conclude placed Petitioner at the crime scene and

12   Petitioner's post-arrest statement asserting that he had not been present, which the jury could

13   conclude was untruthful as it conflicted with the physical evidence.  See Osband, 13 Cal.4th 622;

14   see, e.g., Waidla v. Davis, 68 F.4th 575, 598 (9th Cir. 2023) (presentation of defendant's

15   testimony not unreasonable, as it "'was the only way to potentially rebut' the State's

16   overwhelming evidence of guilt").  Similarly, even if defense counsel had investigated

17   Petitioner's intoxication at the time of the capital crime, that alone would not render it

18   unreasonable for Petitioner to testify about what he recalled occurred, including, perhaps, details

19   of his intoxication.  See, e.g., Salazar v. Ryan, 194 F. Supp. 3d 931, 944 (D. Ariz. 2016)

20   (defendant testified about his own intoxication at the time of the charged crime); People v.

21   Castillo, 16 Cal.4th 1009, 1013 (1997) (same); United States v. Higareda-Santa Cruz, 826 F.

22   Supp. 355, 356-57 (D. Or. 1993) (same).  Petitioner made no allegations to identify what would

23   have been different about his testimony had trial counsel thoroughly investigated other

24   perpetrators' involvements in the homicide or Petitioner's alleged intoxication at the time, given

25   that any testimony Petitioner gave would be bounded by his duty to testify truthfully and

26   counsel's duty not to suborn his perjury.[15]  See Nix, 475 U.S. at 166.  And, as above, the fact that

27

28   [15] In his state court pleadings, Petitioner very briefly argued that, had trial counsel performed

1    Petitioner's testimony on the question of intent contradicted other aspects of the defense theory

2    does not, without more, establish that counsel prepared or advised Petitioner deficiently.  See,

3    e.g., Cunningham, 25 Cal.4th at 1031-32; Gates, 43 Cal.3d at 1213-14.  On the record before the

4    state court at the time of its adjudication, therefore, it would have been reasonable for the court to

5    conclude that Petitioner had failed to allege with requisite specificity the particular acts and

6    omissions that were deficient in this respect.  See Richter, 562 U.S. at 98; Strickland, 466 U.S. at

7    690.

8            The state court could also have reasonably concluded that Petitioner failed to make a

9    prima facie showing that counsel should have known Petitioner was incompetent at the time of

10   his testimony and should have elected to not call him as a witness on this basis.  For the reasons

11   set forth in the undersigned's discussion of Claim V, *ante*, the allegations and evidence tendered

12   to the state court did not make a prima facie showing that Petitioner was actually incompetent at

13   the time of trial.  While the focus of Petitioner's allegations in Claim V is the evidence of

14   incompetence available at the time of the trial court's rulings in November and December 1986,

15   Petitioner does not identify, in support of Claim IX, any additional indicia of incompetence in the

16   state court record between the time of those rulings and his testimony a year later, in December

17   1987.  (See ECF No. 26 at 81-82, 84; ECF No. 629 at 162-63, 167-68, 175-77.)

18           Instead, Petitioner additionally relies on the declaration of Dr. Froeming submitted to the

19   state court, which reported that neuropsychological testing performed after trial revealed that

20   Petitioner possessed "very pronounced" deficits in auditory comprehension, especially of

21   complex information.  (ECF No. 629 at 170, citing LD 4b Ex. 5 at ¶¶ 11-17, 21, 25; ECF No. 693

22   at 137.)  Dr. Froeming's ultimate conclusions included that Petitioner "was severely disabled with

23   ─────────────────────────────────────────

24   reasonably, they "could have ameliorated petitioner's fear of the actual perpetrators' retaliation
     against petitioner's family if those perpetrators were identified," (LD 4e at 159) implying,
     perhaps, that reasonable defense counsel could and should have elicited testimony from Petitioner
25   himself about such threats.  As described *ante*, however, the record before the state court did not
     show that Petitioner had actually received any threats relative to his testifying nor that, if he did,
26   defense counsel's ignorance of them was attributable to their substandard investigation.  The state
     court, therefore, would have been reasonable to give no weight to these speculative allegations.
27   See, e.g., Zapien v. Davis, 849 F.3d 787, 800 (9th Cir. 2015); see also Pinholster, 563 U.S. at 188
     n.12 (quoting Clark, 5 Cal.4th at 770).
28

                                                    68

1   regard to his ability to understand the legal proceedings at the time of . . . the trial" and possessed

2   "language disorder and frontal-subcotrical deficits . . . severe enough to have had an impact on his

3   . . . competence [and] trial testimony," such that "his competence should have been in question

4   throughout the proceedings." Id. at ¶¶ 32, 36.  The standard for incompetence to testify, however,

5   is narrow and stringent, requiring a showing that the witness is "[i]ncapable of expressing himself

6   or herself concerning the matter so as to be understood, either directly or through interpretation

7   by one who can understand him; or (2) [i]ncapable of understanding the duty of a witness to tell

8   the truth." Evid. Code § 701; see also Arms, 107 U.S. 521-22; Benn, 476 F.2d at 1130.  A

9   reviewing court could reasonably conclude that Dr. Froeming's opinion, even if fully credited by

10  a factfinder, that Petitioner had neuropsychological deficits that "had an impact on" his

11  testimonial competency, which "should have been in question" during his trial, simply did not

12  suffice to show that these deficits were of the nature and severity to have rendered him incapable

13  of expressing himself via examination or understanding his obligation to testify truthfully.  As

14  such, the state court could have reasonably concluded that, even if defense counsel had

15  investigated Petitioner's testimonial competency to the extent he now identifies, counsel

16  nevertheless may reasonably have concluded that they possessed insufficient evidence of his

17  testimonial incompetence to preclude his testimony or, if they had so moved, that the trial court

18  would have, at that point, found Petitioner incompetent to testify, based on Dr. Froeming's

19  opinion or its equivalent.  See generally Nunes, 350 F.3d at 1054-55 (prima facie showing made

20  where petitioner's allegations sufficiently state a claim and he demonstrates "he ha[s] sufficient

21  evidence for a reasonable fact finder to conclude" that he can prove his claim); Knowles, 556

22  U.S. at 123 (counsel not deficient for failing to make a request that would likely have been

23  denied); Jones, 463 U.S. 745 (counsel has no professional duty to raise meritless arguments).[16]

24  _____

25  [16] The fact that Petitioner's testimony was unhelpful to aspects of the defense is itself little
    evidence that Petitioner was incompetent to testify.  The Supreme Court has "rejected this kind of

26  paternalistic projection of incompetence on to a criminal defendant." United States v. Martinez,
    883 F.2d 750, 761 (9th Cir. 1989), vacated on other grounds by, 928 F.2d 1470 (9th Cir. 1991),

27  citing Adams v. U.S. ex rel. McCann, 317 U.S. 269, 279 (1942).  An act that is strategically
    unwise, self-defeating, or resulted in "consequences [that were] not what [the defendant] would

28  wish" is not necessarily an act borne from legal incompetence. Ibid.

1    For all of these reasons, the state court could have reasonably concluded that Petitioner

2    failed to make a prima facie of deficient performance on this claim, thereby precluding relief.

3    Shinn, 141 S. Ct. at 524; Strickland, 466 U.S. at 697.  That decision is entitled to deference and

4    the undersigned therefore recommends dismissal of Claim IX. 28 U.S.C. § 2254(d)(1).

5    **CLAIM XX**

6    In Claim XX, subpart C, of his Amended Petition for Writ of Habeas Corpus, Petitioner

7    alleges that defense counsel performed ineffectively at the penalty phase of his trial by failing to

8    adequately investigate available mitigation evidence, failing to present compelling mitigation of

9    which counsel was aware, and failing to investigate or present available evidence of Petitioner's

10   mental disabilities.  (ECF No. 26 at 140-67; ECF No. 629 at 181.)  Petitioner presented these

11   allegations in state court as subparts C, D, and E to Claim XIII of his petition for writ of habeas

12   corpus, which the California Supreme Court denied summarily.  (LD 4a at 487-653; In re Osband,

13   No. S063051 (Cal. Sup. Ct. Oct. 28, 1998).)[17]  For the reasons set forth below, the undersigned

14   concludes that denial reflected an unreasonable application of clearly established federal law and

15   is not entitled to deference.

16   1.   Governing Legal Standard

17   At the time of Petitioner's trial, "prevailing professional norms imposed a duty on counsel

18   to adequately investigate, develop, and present mitigating evidence in capital sentencing

19   _____

20   [17] In both his petitions for writ of habeas corpus in state court and in this court, Petitioner
     advanced additional subclaims to this claim.  (ECF No. 26 at 136-79; LD 4a at 451-86, 654-794.)

21   Although the district court had ordered Petitioner to brief the "application of § 2254(d) to Claim[]
     . . . XX" and specified that, "[a]lthough the evidentiary hearing was ordered

22   on only a portion of some claims, Petitioner shall address the claims *in toto*, as they were

23   presented to the California Supreme Court," (ECF No. 614 at 1-2; see also ECF No. 613 at 1),
     Petitioner's responsive brief only made arguments addressing subpart C of Claim XX.  (See ECF

24   No. 26 at 140-67; ECF No. 629 at 181.)  Given the district court's clear directive in its briefing
     order and in light of the law that a habeas petitioner bears "the burden to demonstrate that 'there

25   was no reasonable basis for the state court to deny relief,'" Walker v. Martel, 709 F.3d 925, 939

26   (9th Cir. 2013) (quoting Richter, 562 U.S. at 98), the undersigned treats as abandoned subparts A,
     B, D, E, F, and G of Claim XX, as Petitioner has made no argument nor cited authority tending to

27   show that those subclaims were adjudicated in a manner undeserving of deference under 28
     U.S.C. section 2254(d).

28

proceedings."  Robinson v. Schriro, 595 F.3d 1086, 1108 (9th Cir. 2010); see Wiggins, 539 U.S. at 524 (counsel has a duty to "discover all reasonably available mitigating evidence" to prepare for penalty phase of capital trial); Summerlin, 427 F.3d at 630 (holding same regarding 1982 Arizona trial); Ainsworth v. Woodford, 268 F.3d 868, 877 (9th Cir.2001) ("[Investigation] was as crucial in 1980 as it is today in order to assure individualized sentencing and the defendant's right to a fair and reliable capital penalty proceeding."); ABA Standards for Criminal Justice 4–4.1 (2d ed. 1980) ("It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the penalty [phase]."); see also Strickland, 466 U.S. at 690-91.  Such mitigation investigation included, as its starting point, "a thorough investigation of the defendant's background" and personal history. Williams v. Taylor, 529 U.S. 362, 396 (2000); see, e. g., Sears v. Upton, 561 U.S. 945, 952 (2010) (defense counsel's mitigation investigation "was on its face . . . constitutionally inadequate" where it was limited to only interviewing a few witnesses "selected by [the defendant's] mother"); Porter v. McCollum, 558 U.S. 30, 39 (2009) (defense counsel deficient under professional norms prevailing at time of petitioner's 1988 trial by failing to "interview any members of [petitioner's] family" or acquire records relevant to his life history); Wiggins, 539 U.S. at 524 (under professional norms in 1982, defense counsel must investigate capital defendant's medical, educational, employment, incarceration, family and social history); see also Williams, 529 U.S. at 415 (O'Connor, J., concurring) (counsel has a duty to make a "diligent investigation into his client's troubling background and unique personal circumstances"); Boyde v. California, 494 U.S. 370, 382 (1990) ("[E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." (internal quotation and citation omitted)); Robinson, 595 F.3d at 1108-09 ("certain forms of investigation" such as inquiry into "readily available" information about the defendant's "school, employment, and medical" history "are fundamental to preparing for virtually every capital sentencing proceeding").

    Within this broad duty to investigate the defendant's life generally, counsel also has a

71

1   more specific obligation to investigate the defendant's "social background and evidence of family

2   abuse."  Summerlin, 427 F.3d at 630 (citing Boyde v. Brown, 404 F.3d 1159, 1176 (9th Cir.

3   2005)); see Porter, 558 U.S. at 33, 41; Williams, 529 U.S. at 373, 395; Ainsworth v. Woodford,

4   268 F.3d 868, 877 (9th Cir. 2001).  In addition to abuse experiences, counsel must investigate

5   other known possible sources of trauma experienced by the defendant.  See, e.g., Porter, 558 U.S.

6   at 35, 41 (counsel deficient for failing to investigate and present evidence of defendant's "military

7   service in two of the most critical—and horrific—battles of the Korean War," and "his struggles

8   to regain normality upon his return from war").  Counsel also has a "duty to investigate and

9   present mitigating evidence of mental impairment, which includes examination of mental health

10  records."  Lambright, 490 F.3d at 1117 (quoting Summerlin, 427 F.3d at 630) (cleaned up).

11          During the course of such investigation, counsel must reasonably pursue leads or

12  directions of inquiry suggested by the information known to them.  Thus, for instance, in

13  Wiggins, the Supreme Court held defense counsel performed deficiently by failing to investigate

14  the defendant's mother's alcoholism, his series of failed foster home placements, educational and

15  physical neglect, and indications of his "emotional difficulties" in foster care, all of which were

16  suggested in the social service records that defense counsel possessed.  539 U.S. at 524-25; see

17  also Rompilla v. Beard, 545 U.S. 374, 387-89 (2005) (detailing the wealth of mitigating

18  information defense counsel could have learned had they simply investigated the court record of

19  the prior conviction on which the prosecutor intended to rely as aggravation); Earp v. Ornoski,

20  431 F.3d 1158, 1175-76 (9th Cir. 2005) ("The presence of certain elements in a capital

21  defendant's background, such as a family history of alcoholism, abuse, and emotional problems,

22  triggers a duty to conduct further inquiry before choosing to cease investigating."); Douglas v.

23  Woodford, 316 F.3d 1079, 1088-89 (9th Cir. 2003) (finding defense counsel deficient where he

24  was on notice of the defendant's "particularly difficult childhood" but failed to contact pertinent

25  witnesses).

26          Informed by a reasonable investigation, defense counsel must then present to the jury a

27  compelling case for sparing the defendant's life.  See Wiggins, 539 U.S. at 532 (at the penalty

28  phase, defense counsel has "every incentive to make their mitigation case seem as strong as

72

1   possible"); see generally Strickland, 466 U.S. at 690 (at its core, the Sixth Amendment obligates

2   defense counsel "to make the adversarial testing process work in the particular case").  Defense

3   counsel is unreasonable if she fails to present at the penalty phase reasonably available evidence

4   that was known, or should have been known, to her, that would have been mitigating and would

5   not have exposed the defendant to harmful rebuttal.  See Strickland, 466 U.S. at 690-91, 698-99;

6   Williams, 529 U.S. at 396 (counsel was unreasonable for failing to introduce evidence in their

7   possession that the defendant was "borderline mentally retarded"); id. at 399 (counsel has a duty

8   not only to investigate, but to present and "explain[] the significance of all the available

9   [mitigating] evidence"); Frierson v. Woodford, 463 F.3d 982, 993 (9th Cir. 2006) ("Because a

10  sentencing jury is given 'broad latitude to consider amorphous human factors, in effect, to weigh

11  the worth of one's life against his culpability,' the presentation of relevant mitigation evidence is

12  of vital importance to the jury's penalty determination." (quoting Hendricks v. Calderon, 70 F.3d

13  1032, 1044 (9th Cir. 1995)); Caro v. Calderon, 165 F.3d 1223, 1227 (9th Cir. 1999) ("It is

14  imperative that all relevant mitigating information be unearthed for consideration at the capital

15  sentencing phase."); People v. Pensinger, 52 Cal.3d 1210, 1279-80 (1991) (holding capital

16  defense counsel is obligated to "portray the defendant as a human being with positive qualities"

17  and 'attempt to show that the defendant's capital crimes are humanly understandable in light of

18  his past history and the unique circumstances affecting his formative development, that he is not

19  solely responsible for who he is'") (quoting People v. Deere, 41 Cal.3d 353, 366 (1985).)

20      Prejudice exists where there is "a reasonable probability that, but for counsel's

21  unprofessional errors, the result of the proceeding would have been different.  A reasonable

22  probability is a probability sufficient to undermine confidence in the outcome."  Strickland, 466

23  U.S. at 694.  Thus, in assessing the prejudice for the defendant's failure to investigate and present

24  available mitigation evidence, the reviewing court must "reweigh the evidence in aggravation

25  against the totality of available mitigating evidence."  Wiggins, 539 U.S. at 534.  Where there is a

26  "reasonable probability that at least one juror would have" voted for life after having heard the

27  available evidence defense counsel had failed to discover and present, a petitioner has

28  demonstrated prejudice.  Id. at 537; see Penal Code § 190.4(b) (noting California's unanimous

1  verdict requirement in capital sentencing).

2          2.   The California Supreme Court Was Unreasonable If It Concluded Petitioner Had Not
3               Made a Prima Facie Showing of Deficient Performance

4          In this proceeding and in state court, Petitioner has alleged several areas of mitigation

5  evidence that defense counsel were deficient for failing to investigate reasonably and present to

6  the jury, any or all of which, per Petitioner, reasonable counsel should have presented as

7  mitigating evidence in the penalty phase.  (ECF No. 26 at 140-67; LD 4a at 487-653.)  In Claim

8  XII, subclaim C, of his Petition for Writ of Habeas Corpus in state court, Petitioner alleged that

9  defense counsel unreasonably failed to present evidence known to counsel at the time, including

10  of Petitioner's mental health and cognitive impairments.  (LD 4a at 487-92.)  In Claim XII,

11  subclaim D, of the same pleading, Petitioner alleged that defense counsel "unreasonably failed to

12  investigate, prepare and present in mitigation evidence of Petitioner's family, personal history,

13  and background."  (LD 4a at 495-643.)  In Claim XII, subclaim E, of that pleading, Petitioner

14  alleged that defense counsel unreasonably failed to present evidence of his mental disabilities,

15  including those that rendered him incompetent during his trial, to effectuate waivers, or to form

16  the requisite intent at the time of the charged crimes.  (LD 4a at 644-51.)

17          In this Court, however, Petitioner has combined these three separate subclaims into a

18  single subclaim:  subclaim C of Claim XX of his Amended Petition for Writ of Habeas Corpus.

19  (ECF No. 26 at 140-67; see ECF No. 629 at 181.)  For the purposes of the analysis required under

20  section 2254(d), this Court must consider whether the state court's adjudication of this

21  subclaim—i.e., that contained in the federal habeas corpus petition—meets the gateway described

22  in subdivisions (d)(1) or (d)(2).  See 28 U.S.C. § 2254(d) ("An application for a writ of habeas

23  corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be

24  granted with respect to any claim that was adjudicated on the merits in State court proceedings

25  unless the adjudication of the claim" meets the standards described in (d)(1) or (d)(2)); see, e.g.,

26  Carter v. Bogan, 900 F.3d 754, 770 (6th Cir. 2018) (for the purposes of the 2254(d) analysis, the

27  federal court treats as a "claim" each distinct analytical basis for alleged constitutional violations,

28  regardless of whether the petitioner has identified it as a "claim" or "subclaim"); Wharton v.

74

1   Chappell, 765 F.3d 953, 963 & n.1 (9th Cir. 2014) (same, in assessing merits of habeas corpus

2   claims and subclaims); In re Robbins, 18 Cal.4th 770, 815 (1998) (same, in applying procedural

3   bars to claims or subclaims raised in a habeas corpus petition alleging federal constitutional

4   violations).  In many cases, this analysis is straightforward in the sense that the claims set forth in

5   the federal habeas corpus petition mirror those that had been raised in the state court habeas

6   corpus petition.  See, e.g., Richter, 562 U.S. at 97 ("After the California Supreme Court issued its

7   summary order denying relief, Richter filed a petition for habeas corpus in United States District

8   Court for the Eastern District of California. He reasserted the claims in his state petition.").  Here,

9   however, the analysis is more complicated in that the state court considered three distinct

10  subclaims in rendering its decision, so the analysis under 2254(d) begs the question of how

11  Petitioner shows that 2254(d)'s gateway has been met for subclaim C of Claim XX of the

12  Amended Petition for Writ of Habeas Corpus in this Court, i.e., whether it is necessary that

13  Petitioner show that the state court's denial of each of the three subclaims presented to it were

14  contrary to, or an unreasonable application of, clearly established federal law or an unreasonable

15  factual determination, or whether Petitioner meets his burden by merely showing that the denial

16  of any of the subclaims meets this standard.

17       The Supreme Court has not addressed this question directly.  In Richter, however, it

18  explained,

19       Where a state court decision is unaccompanied by an explanation,
         the habeas petitioner's burden still must be met by showing there
20       was no reasonable basis for the state court to deny relief. This is so
         whether or not the state court reveals which of the elements in a
21       multipart claim it found insufficient, for § 2254(d) applies when a
         "claim," not a component of one, has been adjudicated.
22

23

24  Richter, 562 U.S. at 98.  Here, in subclaim C of Claim XX, Petitioner has alleged that his trial

25  counsel performed ineffectively at the penalty phase by failing to investigate and present several

26  types of evidence.  Although in state court, he had divided these allegations into three separate

27  subclaims each addressing three different categories of evidence, here he has pled a single

28  constitutional violation containing different factual "component[s]."  See ibid.  As the Court

1    indicated in <u>Richter</u>, then, this Court must consider whether the state court's denial of the entire

2    current claim was reasonable under clearly established federal law and in light of the record

3    before it.  See <u>ibid</u>.  Thus, it follows that, if the state court's denial of any of the three subclaims

4    satisfies either section 2254(d)(1)'s or (d)(2)'s standard, and if that subclaim was itself substantial

5    enough to demonstrate a federal constitutional violation entitling Petitioner to relief, then the

6    claim should not be dismissed in the instant proceeding.  See <u>ibid</u>.; <u>see, e.g.</u>, <u>Carter</u>, 900 F.3d at

7    770-72.

8            That is the conclusion that results herein.  Petitioner has shown that the state court was

9    unreasonable if it concluded he had failed to make a prima facie showing of deficient

10   performance on the theory that counsel's investigation into his psychosocial history was

11   substandard under prevailing professional norms (Claim XIII, subclaim D, of his petition for writ

12   of habeas corpus in state court), and that this deficiency was prejudicial.  As described more fully

13   below, the state court may reasonably have concluded that the allegations he set forth in the other

14   two subclaims at issue here—Claim XIII, subclaims C and E, of the state habeas petition—failed

15   to make a prima facie showing of relief.  The allegations contained in those portions of his state

16   habeas petition, however, are not dispositive to his proving the core allegation of what is Claim

17   XX, subclaim C, in the operative petition in this Court:  that his trial counsel performed

18   deficiently and prejudicially in the investigation and presentation of available mitigation evidence

19   at the penalty phase.  In other words, Petitioner has shown that this Court cannot defer to the state

20   court's denial of this claim, because Petitioner did make a prima facie showing of his entitlement

21   to relief on, essentially, one of three theories presented in the alternative to the state court.

22   Accordingly, Petitioner has shown that AEDPA's gateway has been met as to Claim XX,

23   subclaim C, of his Amended Petition for Writ of Habeas Corpus in this Court, such that this Court

24   should not defer to the state court's summary denial of it.  See 28 U.S.C. § 2254(d); <u>Richter</u>, 562

25   U.S. at 98.

26           a.  Failure to Make Reasonable Investigation Into Petitioner's Psychosocial History

27           In subclaim D of Claim XIII of his Petition for Writ of Habeas Corpus in state court,

28   Petitioner alleged that defense counsel unreasonably failed to investigate adequately and to

present evidence of Petitioner's personal, familial, cultural, and psychosocial history, in contravention of contemporaneous professional norms.  (LD 4a at 493-646.)  Based on the record before that court, the state court could not reasonably have concluded that Petitioner had failed to make a prima facie showing of defense counsel's deficient performance on this subclaim.  See Richter, 562 U.S. at 99-102.

At the time of Petitioner's 1987 trial, defense counsel in a capital trial were required to conduct a "diligent investigation into his client's troubling background and unique personal circumstances" in preparing for the penalty phase.  Williams, 529 U.S. at 415; see also id. at 396 (to develop a mitigation case, defense counsel has an "obligation to conduct a thorough investigation of the defendant's background").  This included investigation into the defendant's "family and social history."  Wiggins, 539 U.S. at 524 (citing Am. Bar Ass'n, Standards for Criminal Justice Providing Defense Services, Standard 4-4.1 (2d ed. 1982 Supp.)); see generally Eddings v. Oklahoma, 455 U.S. 104, 115, 102 S. Ct. 869, 71 L. Ed. 2d 1 (1982) ("[T]here can be no doubt that evidence of a turbulent family history, of beatings by a harsh father, and of severe emotional disturbance is particularly relevant" to the capital sentencer); Apelt v. Ryan, 878 F.3d 800, 830 (9th Cir. 2017) ("it is difficult to imagine any rational basis for not investigating [the defendant's] mental health and childhood[,] [given that the defendant] was facing the death penalty for committing a horrendous, cold-blooded murder").  In California specifically, at the time of Petitioner's trial, defense counsel was on notice that such investigation should have encompassed the defendant's "past history and the unique circumstances affecting his formative development," including his "upbringing," childhood traumas, "and other formative influences."  People v. Deere, 41 Cal. 3d 353, 366-67 (1985) (quoting Gary Goodpaster, The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases, 58 N.Y.U. L. Rev. 299, 335-36 (1983)); see Goodpaster, The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases, 58 N.Y.U. L. Rev. at 323-24 (to prepare for the penalty phase, "[t]rial counsel has a duty to investigate the client's life history, and emotional and psychological make-up, as well as the substantive case and defenses.  There must be an inquiry into the client's childhood, upbringing, education, relationships, friendships, formative and traumatic experiences, personal psychology,

77

1    and present feelings."); <u>Samayoa v. Ayers</u>, 649 F.3d 919, 929 n.2 (9th Cir. 2011) (describing

2    mitigation investigation occurring in 1986 and 1987 in preparation for California capital trial,

3    which included multiple interviews with many "immediate and extended family members").  The

4    Supreme Court has never defined the precise scope of a reasonable social history investigation,

5    but has held a mitigation investigation unreasonable where counsel only interviewed the

6    defendant's father and mother, but failed to interview other "close family members" who had

7    been present for some or all of the defendant's "upbringing."  <u>Andrus v. Texas</u>, 140 S. Ct. 1875,

8    1882 (2020).

9         The record contained indicia that, at the time of Petitioner's trial, his counsel would have

10   been aware of these obligations.  Counsel who had represented Petitioner in some pretrial

11   proceedings declared that, in preparation for Petitioner's trial, they had intended to investigate

12   Petitioner's family and life experiences for the development of his defense.  (LD 4b Ex. 3 ¶¶ 10,

13   11; LD 4b Ex. 10 at 2-4.)  The defense presentation at the penalty phase also suggested counsel's

14   awareness of this approach generally, as counsel presented the testimonies of some witnesses who

15   described Petitioner's early life experiences and development of a substance abuse problem after

16   his exposure to drugs as a young child, as a means of contextualizing his crimes in a mitigating

17   way.  <u>See Osband</u>, 13 Cal.4th at 661 (describing some of this evidence); 14 RT 3323-473.

18        Here, the record before the state court was largely silent as to what mitigation

19   investigation any of Petitioner's defense counsel undertook at the time of trial.  In the state court

20   pleadings, there were few allegations concerning what mitigation investigation defense counsel

21   actually undertook.  (<u>See generally</u> LD 4a 493-98 (setting forth deficient performance

22   allegations).)  There were no declarations submitted by trial counsels Reese or O'Brien, nor from

23   any investigator who conducted any of the penalty phase investigation, identifying in any way

24   what the scope of their mitigation investigation had been.  (<u>See generally</u> LD 4b Ex. 9 [Decl. of

25   Wendell Burnett] ¶ 6 [recalling he was interviewed by a woman with a British accent whom he

26   believed had been a part of the defense team].)  Petitioner tendered a declaration from defense

27   counsel Loehr, who represented Petitioner for a portion of pretrial proceedings (<u>see</u> discussion of

28   Claim V, *ante*), but this declaration was largely silent on Mr. Loehr's approach to the penalty

78

1    phase investigation.  Mr. Loehr declared that he was aware of some possibly mitigating

2    information, and that he did not recall others, but he offered no indication as to what investigation

3    he did or did not conduct relative to any of these themes.  (See LD 4b Ex. 3 ¶¶ 10-17.)  Similarly,

4    although he recalled that he had difficulty establishing a rapport with Petitioner's mother and she

5    seemed reluctant to disclose information to him, there was no indication that this reticence

6    implied counsel's deficiencies.  (See LD 4b Ex. 3 ¶¶ 9, 10, 11, 12.)  Even if these statements

7    could be interpreted to suggest Mr. Loehr's investigation was deficient under contemporaneous

8    professional norms, the record was silent as to what extent, if at all, these failures affected the

9    investigation and trial presentation performed by Petitioner's subsequent counsel, Messrs.

10   O'Brien and Reese.

11          Under California law, the California Supreme Court would have evaluated Petitioner's

12   allegations in light of the entire record before it.  Pinholster, 563 U.S. at 188 n.12; Clark, 5

13   Cal.4th at 770; Duvall, 9 Cal.4th at 474.  The trial record suggests some of the investigation into

14   Petitioner's personal, familial, and psychosocial history that trial defense counsel O'Brien and

15   Reese conducted.  At the penalty phase, they presented the testimonies of Petitioner's elementary

16   school principal, one of his elementary school teachers, his childhood pastor, four of his

17   childhood friends, parents of two of his childhood friends, a family friend who knew Petitioner as

18   a child, one of his siblings, and his mother, suggesting that counsel had at least contacted and

19   conducted some measure of investigation with these persons before the penalty phase.  See 14 RT

20   3323-3499, 15 RT 3418-3561.

21          Nevertheless, the declarations submitted to the state court in support of Petitioner's

22   allegations of ineffective assistance of counsel indicate that defense counsel failed to interview

23   key members of Petitioner's extended family, many of whom described having had repeated

24   contact with Petitioner when he was a child and/or first-hand observations of Petitioner's parents'

25   impairments and abusive acts.  These included Petitioner's maternal half-sister LaDonna Brown

26   and half-brother Walter Johnson, Jr.; maternal aunt Velma Moten; maternal cousins Cle Etter

27   Johnson and Sharon Jones; and maternal relatives Ava Bass, Jackie Davis, and Norma

28   Washington. (LD 4b Ex. 9 [Decl. of LaDonna Brown] ¶ 63, Ex. 9 [Decl. of Walter Johnson, Jr.] ¶

1   47, Ex. 9 [Decl. of Sharon Jones] ¶ 7, Ex. 9 [Decl. of Cle Etter Johnson] ¶ 6, Ex. 9 [Velma

2   Moten] ¶ 36; LD 4f Ex. 26 [Decl. of Norma Washington] ¶ 5, Ex. 26 [Decl. of Ava Bass] ¶ 8, Ex.

3   26 [Decl. of Jackie Davis] ¶ 4.)

4       These omissions were unreasonable under contemporaneous professional norms.  Because

5   they were available members of Petitioner's family, defense counsel should have interviewed

6   these persons simply to understand the family in which Petitioner was raised, which provided the

7   principal context for his early, formative experiences.  See, e.g., Andrus, 140 S. Ct. at 1882;

8   Wiggins, 539 U.S. at 524; Williams, 529 U.S. at 396, 415; Samayoa, 649 F.3d at 929 n.2;

9   Goodpaster, The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases, 58

10  N.Y.U. L. Rev. at 323-24; Am. Bar Ass'n, Standards for Criminal Justice Providing Defense

11  Services, Standard 4-4.1 (2d ed. 1982 Supp.).  Counsel also should have known to interview these

12  particular family members because, by virtue of their proximity to Petitioner, they had personal

13  knowledge of his upbringing and childhood experiences, including abuse and neglect they

14  observed.  (See LD 4b Ex. 9 [Decl. of LaDonna Brown] ¶¶ 18, 19, 20, 29, 35, 43, 44, 45, 46, 47,

15  48, 49; LD 4b Ex. 9 [Decl. of Walter Johnson, Jr.] ¶¶ 15, 16, 17, 21, 29, 33, 34, 35, 36; LD 4b Ex.

16  9 [Decl. of Sharon Jones] ¶¶ 2, 3, 6; LD 4b Ex. 9 [Decl. of Cle Etter Johnson] ¶¶ 2, 3; LD 4b Ex.

17  9 [Velma Moten] ¶¶ 9-12; LD 4f Ex. 26 [Decl. of Norma Washington] ¶¶ 1, 3, 4; LD 4f Ex. 26

18  [Decl. of Ava Bass] ¶¶ 2, 3, 4, 6; LD 4f Ex. 26 [Decl. of Jackie Davis] ¶¶ 1, 2, 3.)  Many of these

19  family members also had sustained contact with Petitioner's mother before or during Petitioner's

20  childhood, and thus had information about her functioning, conduct, and abusive acts, which

21  would have been of particular import to reasonable defense counsel, given that counsel knew

22  Petitioner had been raised by his mother after his father left when Petitioner was a very young

23  child.  (See LD 4b Ex. 4 at 2-3 [Petitioner reported his father's absence to Dr. Mehtani during the

24  latter's November 1986 competence assessment]; LD 4b Ex. 9 [Decl. of LaDonna Brown] ¶¶ 10,

25  22, 23, 24, 25, 53, 54, 55, 56; LD 4b Ex. 9 [Decl. of Walter Johnson, Jr.] ¶¶ 7, 10, 29, 33, 36; LD

26  4b Ex. 9 [Decl. of Sharon Jones] ¶ 5; LD 4b Ex. 9 [Decl. of Cle Etter Johnson] ¶¶ 3, 4, 5; LD 4b

27  Ex. 9 [Decl. of Velma Moten] ¶¶ 13, 15-26.)

28       The declarations tendered to the state court also indicated that, of the mitigation

80

1    investigation that defense counsel did undertake, their approach was substandard and unlikely to

2    induce the disclosure of sensitive family information.  Petitioner's half-sister Beverly Sloan

3    declared that, around the time of Petitioner's trial, a member of the defense team telephoned her

4    and "rude[ly] . . . told [her] . . . to tell him how terrible [her] step-father, Earnest Osband, was,"

5    rather than inquiring, professionally, of her experiences with Petitioner and their common family

6    members, including Petitioner's father.  (LD 4b Ex. 9 [Decl. of Beverly Sloan] ¶ 95; see generally

7    id. ¶ 1, 6, 7, 10, 12, 14, 19, 20, 39, 44, 45, 47, 73-75, 81-88, 95 [in response to a different

8    investigator, Ms. Sloan detailed first-hand observations of Petitioner and experiences with their

9    mother and with Petitioner's father].)  Although Ms. Sloan could recall abuse at the hands of

10   Petitioner's father, Earnest Osband, Ms. Sloan found the defense team member's approach to be

11   so disrespectful and offensive, she was disinclined to answer his questions.  (LD 4b Ex. 9 [Decl.

12   of Beverly Sloan] ¶ 95; see id. at ¶¶ 6, 10, 100.)

13           To be sure, some of the information tendered to the state court did not support a finding of

14   deficient performance.  Petitioner tendered to the state court the declarations of several possible

15   mitigation witnesses in which the declarant had not indicated they had not been interviewed at the

16   time of trial; for these persons, the documentary materials submitted to the state court did not

17   substantiate the allegation that trial counsels' pretrial investigation had not encompassed them or

18   was otherwise unreasonable relative to them.  (See LD 4b Ex. 9 [Decls. of Ernest Osband, Cle

19   Esther Osband]; LD 4f Ex. 26 [Decl. of Dorestine Vicks].)  See generally Duncan v. Ornoski, 528

20   F.3d 1222, 1234 (9th Cir. 2008) (under Strickland, defense counsel is presumed competent, but

21   the petitioner may "rebut this presumption by showing that [counsel's] performance was

22   objectively unreasonable under prevailing professional norms and was not the product of sound

23   strategy"); Nunes v. Mueller, 350 F.3d 1045, 1054 (9th Cir. 2003) (to make a prima facie

24   showing of relief under Strickland, the habeas petitioner must "demonstrate that he had sufficient

25   evidence for a reasonable fact finder to conclude" that the elements of the claim have been met);

26   Duvall, 9 Cal.4th at 474 (under California law, a petition for writ of habeas corpus should

27   "include copies of reasonably available documentary evidence supporting the claim[s] [for relief],"

28   including pertinent portions of trial transcripts and affidavits or declarations," as "'[c]onclusory

1    allegations made without any explanation of the basis for the allegations do not warrant relief, let

2    alone an evidentiary hearing'"").  Petitioner also tendered to the state court declarations from some

3    witnesses who apparently provided more information to the post-conviction defense investigator

4    than to the defense team member to whom they spoke at the time of Petitioner's trial, but these

5    declarations provide no indication as to why the witness may have been more forthcoming with

6    the former than the latter.  (See LD 4b Ex. 9 [Decls. of Eric Gibson, Dorothy Osband, Vincent

7    Rogers]; LD 4f Ex. 26 [Decl. of Ruby Elliott].)  Without this information, the state court could

8    reasonably conclude that Petitioner had not made a prima facie showing that trial counsel's

9    approach with these particular witnesses had transgressed contemporaneous professional norms.

10   See, e.g., Babbitt v. Calderon, 151 F.3d 1170, 1174 (9th Cir. 1998), as amended (Aug. 27, 1998)

11   (counsel was not ineffective for failing to uncover a family history of mental illness where

12   defense investigators spoke with family members and friends who might have had such

13   information, but none of them reported any history of illness and there were no allegations that

14   the interviews were conducted in an unreasonable manner).  Similarly, although Petitioner alleges

15   counsel should have discovered and presented evidence that he had been sexually abused as a

16   child, there were no allegations tending to demonstrate that trial counsel's investigative failures

17   were the but-for cause of their ignorance of the abuse, given that post-conviction counsel

18   apparently only learned of it because Petitioner opted to disclose it many years after trial.  (LD 4b

19   Ex. 9 (Dorothy Osband Decl.) ¶ 82.)  In this circumstance, the state court may reasonably have

20   concluded that the failure of trial counsel to have learned of and presented such evidence could

21   not be traceable to any defects in their investigation methods, based on the pleadings and record

22   before it.  See Strickland, 466 U.S. at 694; Washington v. Shinn, 46 F.4th 915, 928-29 (9th Cir.

23   2022), cert. denied sub nom. Washington v. Thornell, 143 S. Ct. 1034 (2023); Babbitt, 151 F.3d

24   at 1174.[18]

25   _____

26   [18] In his briefing, Petitioner also posits the theory that defense counsel's investigation was
     deficient because it was not conducted in a timely manner.  (ECF No. 629 at 107 n.27, 193-94,

27   210-11.)  Even liberally construed, this allegation or theory does not appear to have been included
     in the operative allegations raised in Petitioner's Amended Petition for Writ of Habeas Corpus in

28   this Court (see ECF No. 26 at 140-67), and therefore does not offer a basis for relief. See

                                                      82

1    Even accounting for these caveats, however, the materials tendered to the state court

2    showed that trial defense counsel failed to conduct an investigation into Petitioner's personal

3    history that comported with basic professional norms governing the investigation of mitigation

4    information at the time of Petitioner's trial, by failing to interview available members of

5    Petitioner's extended family, including those whom counsel knew or should have known had

6    personal knowledge of Petitioner's upbringing and formative experiences.  Under clearly

7    established federal law, these allegations sufficed to make a prima facie showing of deficient

8    performance at the penalty phase.  See Andrus, 140 S. Ct. at 1882; Porter, 558 U.S. at 33, 41;

9    Wiggins, 539 U.S. at 524; Williams, 529 U.S. at 396, 415; Eddings, 455 U.S. at 115; Apelt, 878

10   F.3d at 830; Samayoa, 649 F.3d at 929 n.2; Robinson, 595 F.3d at 1108-09.

11        b.   Failure to Present Mitigation Evidence Known To Defense Counsel

12    As explained above, in state court Petitioner sufficiently met his burden of making a prima

13   facie showing of deficient performance on the allegations contained in subclaim C of Claim XX

14   of his Amended Petition for Writ of Habeas Corpus in this Court, as he had adequately pled

15   deficient performance in the allegations contained in subclaim D of Claim XIII of his petition for

16   writ of habeas corpus in state court.  For clarity, the undersigned addresses those allegations

17   raised in the other state-court subclaims subsumed into subclaim C of Claim XX of his Amended

18   Petition for Writ of Habeas Corpus (ECF No. 26), although, for the reasons explained *ante*,

19   Petitioner need not show that the state court's denial of relief on those additional subclaims meets

20   section 2254(d)'s standard, as that standard has been satisfied—at least, for the deficient

21   performance prong of Strickland—by those allegations set forth in subclaim D of Claim XIII of

22   his petition for writ of habeas corpus in state court.

23    In subclaim C of Claim XIII of his petition for writ of habeas corpus in state court,

24   _____

25   generally Blackledge v. Allison, 431 U.S. 63, 75 n. 7 (1977); Rules 2(c)(1) and (2), Rules
     Governing Section 2254 Cases in the United States District Courts (federal habeas corpus petition
26   must "specify all the grounds for relief available to the petitioner" and must "state the facts
     supporting each ground").  Even if the allegation were properly before this Court, the record
27   before the state court did not, as Petitioner argues, demonstrate in any way at what point defense
     counsel began their mitigation investigation, let alone that it was unreasonably dilatory.  (See LD
28   4b Ex 9 (Burnett Decl.) ¶ 6; ECF No. 629 at 193 (citing same).)

1   Petitioner alleged that his trial counsel performed deficiently by failing to present to the jury

2   "mitigating evidence known to [counsel] and/or in his possession."  (LD 4a at 487.)  Petitioner

3   alleged that this available evidence consisted of a handful of disparate facts:  evidence that

4   Petitioner's father had been diagnosed and treated for paranoid schizophrenia; that "mental health

5   professionals accept that such disorders have a heritable or genetic component"; that Dr. Mehtani

6   had diagnosed Petitioner with a psychotic disorder, "closest to simple schizophrenia"; that Dr.

7   Mehtani had believed Petitioner had been paranoid and suicidal prior to his arrest; that Petitioner

8   "exhibited numerous indications of mental disease, disorder or defect throughout childhood,

9   including but not limited to" sudden sleep, mood lability, and seizures; that Petitioner "had grown

10  up in a very low income, single parent household, in a community where racial/ethnic

11  segregation, prejudice, and violence remained prevalent throughout petitioner's development";

12  that Petitioner's father abandoned him as a child, causing Petitioner to have "desperately sought a

13  father figure for many years"; that Petitioner's mother was neglectful; that Petitioner had

14  experienced racial discrimination in school; that Petitioner saw and experienced a great deal of

15  violence, crime, and substance abuse as a child; that Petitioner had been physically abused by

16  several family members as a child; that, due to his neglect, Petitioner was manipulated by peers as

17  a child; that Petitioner had been molested by a trusted adult; that Petitioner suffered from loss of

18  contact from reality, irrational behavior, and low cognitive function, per Dr. Grover; and that

19  Petitioner was actually innocent of the crimes charged in counts one, three, and four.  (LD 4a at

20  488-89.)  Petitioner included these allegations in Claim XX, subclaim C, of his Amended Petition

21  for Writ of Habeas Corpus in this Court. (ECF No. 26 at 140-43.)  Based on the record before the

22  state court, the state court reasonably may have concluded that Petitioner failed to make a prima

23  facie showing of his counsel's deficient performance on the subclaim presented in that

24  proceeding.

25          The state court may reasonably have concluded that these allegations did not themselves

26  make a prima facie showing of defense counsel's deficient performance, under clearly established

27  federal law and in light of the record before it.  In none of his state court pleadings did Petitioner

28  show that "he had sufficient evidence for a reasonable fact finder to conclude," Nunes, 350 F.3d

1    at 1054-55, that he could prove his allegation that defense counsel knew or had in his possession

2    any of the factual information alleged—save the opinions of Dr. Mehtani and of Dr. Grover—that

3    formed the gravamen of this claim.  (See LD 4a at 485 [titling this claim as counsel having

4    "unreasonably failed to present mitigating evidence in his possession to the jury"].)  See also

5    Cannedy, 706 F.3d at 1159-60; Duvall, 9 Cal.4th at 474-75.  None of the factual materials

6    tendered in support of this subclaim in state court, nor any factual allegations averred, tended to

7    show in any way that Petitioner could meet his burden of production or persuasion on this key

8    component of his allegations, excepting Dr. Grover's and Dr. Mehtani's reports.  Instead, the

9    materials tendered in support of Petitioner's state habeas petition, as well as the allegations

10   comprising subclaim D of Claim XIII of that petition, indicated not that Petitioner's counsel had

11   known these specified facts, but that they could have learned them had they undertaken a

12   reasonable investigation.  Thus, the state court was not unreasonable if it concluded that the

13   record before it did not show, even as a prima facie matter, that defense counsel had actually

14   possessed certain mitigating information that they unreasonably withheld from the jury at the

15   penalty phase, excepting the psychiatric experts' opinions and reports.  (See LD 4a at 487-92; LD

16   4e at 311-16.)

17            The state court also could have concluded, based on the record before it, that Petitioner

18   had not shown that no reasonable defense counsel would have failed to call Dr. Mehtani as a

19   witness and elicit from him his opinion that Petitioner could be diagnosed with "a psychotic

20   mental disorder, closest to simple schizophrenia" and that Petitioner was "paranoid, and had been

21   immediately suicidal over the loss of a job not too long before his arrest." (LD 4a at 487.)  Under

22   clearly established federal law at the time, defense counsel is not deficient for failing to adduce

23   evidence that could be readily impeached.  See Strickland, 466 U.S. at 698-99 (trial counsel

24   exercises "reasonable professional judgment" in not presenting evidence that could be impeached

25   in very damaging way); see, e.g., Richter, 562 U.S. at 108 (same, where defense counsel had not

26   presented available expert testimony); Darden v. Wainwright, 477 U.S. 168, 186 (1986) (same,

27   where defense counsel had failed to present available mitigating evidence that could have been

28   rebutted and impeached); Hendricks, 70 F.3d at 1038; Bonin v. Calderon, 59 F.3d 815, 836 (9th

1   Cir. 1995).  The opinions of Dr. Mehtani on which Petitioner's allegations relied, although

2   uncited (see LD 4a at 487-92; LD 4e at 311-16), derived from Dr. Mehtani's November 26, 1986

3   report to the trial court concerning Petitioner's mental functioning at that time. (LD 4b Ex. 4 at 3-

4   5.)  Subsequently, however, and as Petitioner detailed in his discussion of Claim V of the instant

5   proceeding, Dr. Mehtani's impression of Petitioner changed and he later found Petitioner to

6   present with greater functioning than Dr. Mehtani had perceived at the time of generating his

7   November 1986 report.  (LD 2d Vol. II (Dec. 30, 1986 hearing) at 4-6.)  Additionally, Dr.

8   Mehtani had qualified his diagnostic impressions in his November 1986 report with the caveats

9   that those impressions were only tentative, only roughly fit the diagnostic criteria contained in the

10  DSM-III, and could only be confirmed with further psychiatric tests.  (LD 4b Ex. 4 at 4.)

11  Although Dr. Mehtani recorded that Petitioner had reported his own suicidality due to his job

12  loss, Dr. Mehtani did not diagnose Petitioner with any disorder reflecting suicidality or a related

13  disorder.  (See LD 4b Ex. 4 at 3-4.)  For all of these reasons, the state court could have concluded

14  that the evidence contained in Dr. Mehtani's November 1986 report was impeachable, such that it

15  could not be concluded that no reasonable defense counsel would have failed to present it.  See

16  Richter, 562 U.S. at 104; Strickland, 466 U.S. at 688-89.

17         A similar result obtains concerning Petitioner's allegations that defense counsel should

18  have elicited more favorable testimony from Dr. Grover on specific aspects of Petitioner's

19  psychiatric and cognitive functioning, derived from Dr. Grover's January 14, 1988, psychological

20  report of Petitioner.  Preliminarily, Petitioner failed to include in his state court pleadings any

21  citation to the factual materials purporting to show that he could prove the truth of these

22  allegations (see LD 4a at 485-92; LD 4e at 311-16), and the state court was not required to scour

23  Petitioner's pleadings and supportive materials to meet Petitioner's pleading burden on his behalf.

24  See Duvall, 9 Cal.4th at 474; see generally Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir. 1996).

25  Had the state court done so, however, they would have found ample reason to reject Petitioner's

26  allegations of deficient performance as to counsel's elicitation of Dr. Grover's testimony.  As

27  with the proposed testimony of Dr. Mehtani, had defense counsel elicited the testimony from Dr.

28  Grover that Petitioner identified in his habeas corpus proceedings, it would have been subject to

1    keen rebuttal from the prosecution.  In his habeas corpus petition, he alleged that defense counsel

2    should have elicited testimony from Dr. Grover that "Petitioner's score on the Benton Visual

3    Retention Test raised the question of an acquired impairment of cognitive functioning," (LD 4a at

4    489), but this allegation omits the full context of Dr. Grover's assessment of Petitioner's

5    intellectual and neuropsychological functioning, which concluded that Petitioner's "intellectual

6    potential is in the average range" and that other neuropsychological tests administered showed

7    Petitioner to have normal cognitive functioning.  (LD 4d Ex. M at 4.)  In light of this fact, a

8    reasonable defense counsel may have appropriately opted not to cherry-pick particular testing

9    results that, alone, appeared contradicted by Dr. Grover's other testing and his ultimate

10    conclusions.  Comparably, defense counsel may have very reasonably chosen not to elicit

11    testimony from Dr. Grover that Petitioner had a "tenuous" "contact with reality," "could become

12    totally irrational" during times of stress," and "was impaired in several areas at the time of the

13    offense," as he later proposed in habeas corpus proceedings (LD 4a at 489), in light of the full

14    context of Dr. Grover's clinical summary and conclusions, which were that these features, if

15    present at the time of the crimes, had resulted from Petitioner's drug use.  (LD 4d Ex. M at 5.)

16    Given that the prosecutor could have elicited this conclusion from Dr. Grover had defense

17    counsel elicited the testimony Petitioner now identifies—a possibility that is extremely realistic

18    given that the prosecutor otherwise examined Dr. Grover and other penalty phase witnesses about

19    their knowledge of Petitioner's drug use (see 14 RT 3402-08, 3442-44, 3505-09; 15 RT 3541-42)

20    and then argued, in closing, that it was in no way mitigating (see 15 RT 3641-44)—reasonable

21    trial counsel could have decided that the potential harm from this testimony outweighed any

22    benefit it might provide.  See, e.g., Mayfield, 270 F.3d at 931 n.17 (observing California juries'

23    reluctance to view the defendant's drug use as mitigating).

24        For these reasons, the state court's denial of subclaim C of Claim XIII of the petition for

25    writ of habeas corpus was not unreasonable, as the state court could have reasonably concluded

26    that these specific allegations did not make a prima facie showing of deficient performance.  See

27    Richter, 562 U.S. at 98, 102.

28    ////

1          c.   Failure to Investigate and Present Evidence of Petitioner's Mental Disabilities

2          In subclaim D of Claim XIII of Petitioner's petition for writ of habeas corpus, Petitioner

3   alleged that trial counsel performed deficiently by failing to investigate and present available

4   evidence of Petitioner's mental impairments, including but not limited to his having been

5   incompetent during the trial and when interrogated by the police.  (LD 4a at 644-51.)  He

6   included a very abbreviated form of these allegations in Claim XX, subclaim C, of the Amended

7   Petition for Writ of Habeas Corpus in this Court.  (ECF No. 26 at 166.)  Based on the entire

8   record before the state court at the time of its adjudication, it was reasonable for the state court to

9   have concluded that Petitioner had failed to make a prima facie showing of deficient performance

10  for the specific allegations contained in Claim XIII, subclaim E, of his habeas corpus petition in

11  that court.

12          In evaluating whether Petitioner had made a prima facie case of deficient performance, the

13  California Supreme Court was required to consider the allegations in light of the trial record and

14  could disregard any that were plainly contradicted by the factual record.  Landrigan, 550 U.S. at

15  474; Pinholster, 563 U.S. at 188 n.12; Perez, 459 F.3d at 951.  The trial record demonstrated that,

16  despite Petitioner's contrary allegations, defense counsel did investigate and present as mitigating

17  evidence of Petitioner's mental impairments at the penalty phase, through the testimony of Dr.

18  Edward Grover.  (14 RT 3474-3509; 15 RT 3418-3547.)  Although elsewhere in his state habeas

19  petition Petitioner argued that trial counsel's preparation of Dr. Grover was substandard, and

20  incorporated this allegation by reference into Claim XIII, subclaim E (LD 4a at 647-48; see id. at

21  384-91; LD 4e at 268-69), those allegations could have been reasonably discounted by the trial

22  court as a matter of law.  In his state habeas corpus petition, Petitioner repeatedly argued that the

23  Dr. Grover's approach to neuropsychological testing fell below the norms of his profession at the

24  time he tested Petitioner.  (LD 4a at 384-91.)  There is, however, no constitutional right to an

25  effective expert and failures of the expert cannot be imputed to trial counsel unless trial counsel

26  knew or had reason to know that the expert was performing substandardly.  Crittenden v. Ayers,

27  624 F.3d 943, 966 (9th Cir. 2010); Harris v. Vasquez, 959 F.2d 1497, 1517-18 (9th Cir. 1990);

28  see also People v. Samoya, 15 Cal.4th 795, 837-39 (1997).  (See also ECF No. 237 at 14-16.)

Petitioner made no allegations, nor offered available evidence to show, that there was some particular act or omission by trial counsel for which Dr. Grover's substandard testing could be attributed.  See, e.g., Hinton, 571 U.S. at 274-75.  (See LD 4a at 348-91.)  The closest Petitioner came to making this allegation was an argument that, by failing to have conducted a complete and accurate social history of Petitioner, defense counsel deprived Dr. Grover of necessary data to reach a reliable clinical conclusion.  (See LD 4a at 384, 386, 389-90.)  The state court, however, could have understood clearly established federal law as indicating that this argument was legally encompassed in Petitioner's allegations of Claim XIII, subclaim C, as a form of prejudice from counsel's failure to conduct a reasonable social history investigation, and thus that it did not demonstrate a distinct Sixth Amendment violation.  See Williams, 529 U.S. at 370-74 & n.4, 394-98 (analyzing a similar claim in this manner); see also Wiggins, 539 U.S. at 523-38 (same); id. at 538-39 (Scalia, J., dissenting) (same).  Finally, to the extent Petitioner alleged that trial counsel should have presented evidence of Petitioner's actual incompetence as mitigating, neither Petitioner's allegations nor materials submitted in support thereof in the state court demonstrated that he met this standard, for the reasons set forth in the undersigned's discussion of Claim V, *ante*.

For these reasons, the California Supreme Court was not unreasonable if it concluded that the allegations set forth in subclaim E of Claim XIII in the petition for writ of habeas corpus in that court did not, alone, make a prima facie showing of trial counsel's deficient performance under clearly established federal law.  See Richter, 562 U.S. at 98-102.

3.  The California Supreme Court Was Unreasonable If It Concluded Petitioner Had Not Made a Prima Facie Showing of Prejudice

Based on the record before it, the California Supreme Court could not have reasonably concluded that Petitioner had failed to make a prima facie showing of prejudice for defense counsel's failure to conduct a reasonable investigation into his personal, familial, and psychosocial history (Claim XIII, subclaim D of the state habeas corpus petition) under clearly established federal law.  See Richter, 562 U.S. at 98-102.  This Court has previously made the finding that the evidence tendered to the state court on this prong of Strickland reflected

89

1
2
3
4

> a mountain of the sort of mitigating evidence that courts have found relevant "because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional or mental problems, may be less culpable than defendants who have no such excuse." <u>Ainsworth</u>, 268 F.3d at 877 (citing <u>Penry</u>, 492 U.S. at 319); <u>Boyde</u>, 2005 WL 913434, at *13.

5   (ECF No. 169 at 31.)  This finding is law of the case in the instant proceeding and Respondent

6   has offered no argument as to why it should be disregarded.  <u>Alaimalo v. United States</u>, 645 F.3d

7   1042, 1049-50 (9th Cir. 2011).  (<u>See generally</u> ECF No. 659 at 1, 2, 3, 87 [elsewhere, Respondent

8   relying on the court's findings in the same order and urging the undersigned to rely on them in

9   resolving the instant motion].)

10         In any event, the magistrate judge's prior finding accurately reflected clearly established

11   federal law at the time of the state court adjudication, such that the California Supreme Court was

12   unreasonable if it reached a contrary view of Petitioner's prejudice allegations.  At trial, the

13   defense presented some evidence of Petitioner's upbringing and character, but this evidence was

14   simply that Petitioner had been a "nice kid," who had developed a drug problem due to childhood

15   exposure to a variety of illegal substances.  <u>Osband</u>, 13 Cal.4th at 660-61.  Despite this evidence,

16   per defense psychiatric expert Dr. Grover, he was likely to adapt and perform well in a

17   correctional setting.  <u>Id</u>. at 661.  In closing, defense counsel "urged the jury to show mercy to him

18   and compassion for his girlfriend, mother, and infant son."  <u>Ibid</u>.  The California Supreme Court

19   recognized that the defense penalty-phase presentation consisted of "undramatic testimony that

20   did not portray him as exceptionally virtuous," with the exception of testimony describing one

21   instance when, "at about age 17 defendant took it on himself to care for a sick individual."  <u>Id</u>. at

22   735.  The credibility of the defense witnesses who did testify may have been hindered by the fact

23   that "some of them had adult or criminal records" and, of these, some "testified in jail clothes."

24   <u>Ibid</u>.  The court recognized that, in sum, the defense did present some form of mitigating

25   evidence, which "may have been the best that he had available to him."  <u>Ibid</u>.

26         In his state habeas corpus proceedings, however, Petitioner demonstrated that a

27   "mountain" of extremely compelling mitigating evidence was also available and could have been

28   presented on his behalf and, under clearly established federal law, was of the type that may have

1   induced at least one juror to conclude Petitioner did not deserve death.  (See ECF No. 169 at 31.)

2   Petitioner presented voluminous materials tending to show that he had suffered serious abuse and

3   neglect as a child, including having been raised by mentally unstable caregivers and having

4   suffered from the absence of his father for many of his formative years.  (LD 4a at 495-645.)  He

5   presented materials that showed that these experiences occurred within the greater context of

6   abuse and deprivation in his extended family, poverty, instability, and racism in the communities

7   and institutions with which he interacted.  (Ibid.)  This personal history was itself mitigating, as

8   well as may have provided a compelling etiology for his own mental health impairments,

9   cognitive disfunction, and substance abuse.  (Ibid.)  It bears little resemblance to the "undramatic"

10  presentation the jury actually heard, which portrayed Petitioner as a nice, obedient child who had

11  enjoyed such recreational pursuits as go-kart racing, before drifting into a life of crime.  See

12  Osband, 13 Cal.4th at 735; see also id. at 660-61; 14 RT 3323-499; 15 RT 3418-561.

13          These factual allegations are materially indistinguishable from cases where the Supreme

14  Court has held the petitioner showed penalty phase prejudice from trial counsel's deficient

15  mitigation investigation.  In Rompilla, 545 U.S. at 392-93, for example, the Court held that the

16  petitioner had shown prejudice under Strickland where trial defense counsel had presented a

17  "benign conception of Rompilla's upbringing and mental capacity" and a "few naked pleas of

18  mercy."  Had they conducted a reasonable investigation into Mr. Rompilla's childhood, however,

19  counsel would have learned that he had experienced physical and verbal abuse and physical and

20  emotional neglect throughout his childhood, at the hands of his parents and other caregivers, all of

21  which was mitigating in and of itself, but also would have led defense experts to recognize Mr.

22  Rompilla's psychological and cognitive impairments that had likely resulted from these

23  experiences.  Id. at 390-93.  As a whole, this available mitigation evidence "adds up to a

24  mitigation case that bears no relation" to the presentation the jury had heard at trial, and,

25              although . . . it is possible that a jury could have heard it all and still
            have decided on the death penalty, . . . [i]t goes without saying that
26          the undiscovered "mitigating evidence, taken as a whole, 'might
            well have influenced the jury's appraisal' of [Rompilla's]
27          culpability," Wiggins v. Smith, 539 U.S., at 538, 123 S.Ct. 2527
            (quoting Williams v. Taylor, 529 U.S., at 398, 120 S.Ct. 1495), and
28          the likelihood of a different result if the evidence had gone in is

"sufficient to undermine confidence in the outcome" actually
reached at sentencing, Strickland, 466 U.S., at 694, 104 S.Ct. 2052.

Id. at 393; see also Porter, 558 U.S. at 41 (penalty phase prejudice shown where jury had heard "absolutely none" of the available evidence in mitigation, including the defendant's childhood abuse); Wiggins, 539 U.S. at 537 (penalty phase prejudice shown where "Wiggins' sentencing jury heard only one significant mitigating factor-that Wiggins had no prior convictions. Had the jury been able to place petitioner's excruciating life history on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance."); Williams, 529 U.S. at 398 (penalty phase prejudice shown where jury had heard nothing of the "graphic description of Williams' childhood, filled with abuse and privation, or the reality that he was 'borderline mentally retarded'").

Under clearly established federal law, the state court was required to "reweigh the evidence in aggravation against the totality of available mitigating evidence." Wiggins, 539 U.S. at 534. It would have been an unreasonable application of clearly established federal law for the state court to have concluded that there was no reasonable probability the jury would have returned a life verdict due to the strength of the aggravating evidence, irrespective of the strength and breadth of the mitigation evidence Petitioner proffered in habeas corpus. To be sure, the jury in Petitioner's case may have given great weight to the aggravating circumstances, which included the vicious, shocking crimes for which he was convicted at his capital trial and the evidence that he had committed other violent acts, including those of a sexual nature, in the past. In this way, however, Petitioner's case resembles that described in Williams, 529 U.S. at 398-400, where the Court considered penalty phase prejudice, where available mitigation evidence had included the defendant's post-crime remorse, evidence of his positive adaptation to prison, a "graphic description of [his] childhood, filled with abuse and privation," and his serious cognitive impairment. On the other side of the scale, the jury had also heard evidence that was very aggravating: the crime itself was brutal and senseless, with Mr. Williams having murdered the victim with a mattock after the victim had "refused to lend him 'a couple of dollars.'" Williams, 529 U.S. at 367-68. The jury also "heard evidence that, in the months following the murder of

92

1    [the victim], Williams savagely beat an elderly woman, stole two cars, set fire to a home, stabbed

2    a man during a robbery, set fire to the city jail, and confessed to having strong urges to choke

3    other inmates and to break a fellow prisoner's jaw." Id. at 418 (Rehnquist, C.J., concurring).

4    Despite this weighty aggravation evidence, the Court held that Mr. Williams had shown "'a

5    reasonable probability that the result of the sentencing proceeding would have been different' if

6    competent counsel had presented and explained the significance of all the available evidence" in

7    mitigation at the penalty phase, such that the state court's contrary conclusion reflected a decision

8    that was contrary to, or an unreasonable application of, clearly established federal law under 28

9    U.S.C. section 2254(d)(1). Id. at 398-99; see also Porter, 558 U.S. at 41-42 (holding prejudice

10   had been shown for counsel's failure to present compelling mitigation evidence, even where the

11   jury had also found several aggravating circumstances to have been present).

12          Under these precedents and in light of the record that was before the state court, the

13   California Supreme Court unreasonably applied clearly established federal law if it concluded

14   that Petitioner had failed to make a prima facie showing of prejudice at the penalty phase. See

15   Shinn, 141 S. Ct. at 524; Richter, 562 U.S. at 98-102, 105; Kipp, 971 F.3d at 948. Accordingly,

16   the state court's summary denial of relief on the allegations comprising Claim XX, subclaim C, of

17   the Amended Petition for Writ of Habeas Corpus (ECF No. 26) is not entitled to deference. See

18   28 U.S.C. § 2254(d).

19          Accordingly, IT IS HEREBY RECOMMENDED that

20   1.   The court finds Petitioner has satisfied the requirements of 28 U.S.C. section 2254(d) for

21        subclaim C of Claim XX of the Amended Petition for Writ of Habeas Corpus; and

22   2.   The court recommends that Claim I; Claim V; Claim IX; and subclaims A, B, D, E, F, and

23        G of Claim XX of the Amended Petition for Writ of Habeas Corpus be dismissed.

24          These findings and recommendations are submitted to the United States District Judge

25   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within thirty days after

26   being served with these findings and recommendations, any party may file written objections with

27   the court and serve a copy on all parties. Such a document should be captioned "Objections to

28   Magistrate Judge's Findings and Recommendations." If petitioner files objections, he shall also

1    address whether a certificate of appealability should issue and, if so, why and as to which issues.

2    A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the applicant has made a

3    substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(3). Any

4    response to the objections shall be filed and served within thirty days after service of the

5    objections. The parties are advised that failure to file objections within the specified time may

6    waive the right to appeal the District Court's order. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir.

7    1991).

8    Dated: September 7, 2023

9

10                                                    KENDALL J. NEWMAN
                                                      UNITED STATES MAGISTRATE JUDGE
11

12   [KH.Osba.0152]

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

94